Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 97 C 7556 | DATE | MARCH 5, 2001 |
| CASE TITLE | SHARON ANDERSON, et al. v. MARIO CORNEJO, etc., et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for APRIL 18, 2001 at 11:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiffs' motion to compel production in computer-readable form of names and addresses of persons subjected to negative personal searches [227] is granted in part and denied in part. Defendants shall provide the names, birth dates, and addresses within 14 days. No party is permitted to contact any of the nonparty passengers disclosed in any of the computer databases. By April 16, 2001, the parties shall submit their proposal for trying this case. All discovery is to be completed by April 30, 2001.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 6 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 0 6 2001 date docketed | |
| | Notified counsel by telephone. | | | 248 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 3/5/2001 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| CW | courtroom deputy's initials | Date/time received in central Clerk's Office | MQM mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHARON ANDERSON, et al.,            )
                                    )
                Plaintiffs,         )
                                    )
        v.                          )   No. 97 C 7556
                                    )
MARIO CORNEJO, individually and     )
in his official capacity,           )
et al.,                             )
                                    )
                Defendants.         )

DOCKETED
MAR 06 2001

**MEMORANDUM OPINION AND ORDER**

As presently constituted, this case has approximately 90 named plaintiffs, all of whom are African American women who were allegedly searched by employees of the United States Customs Service at Chicago's O'Hare International Airport following their arrival on international flights. Named as defendants are the United States, the Customs Service, and approximately 70 current or former employees of the Customs Service. Both supervisory and nonsupervisory employees are sued in their individual capacities.

Following prior rulings on motions to dismiss, for class certification, and for summary judgment, the following claims remain pending in the Seventh Amended Complaint. See Anderson v. Cornejo,___ F. Supp. 2d ___, 2000 WL 286902 (N.D. Ill. March 10,

248

2000) ("Anderson IV"), reconsideration granted in part, 2000 WL 1769636 (N.D. Ill. Oct. 12, 2000) ("Anderson V"); Anderson v. Cornejo, 1999 WL 258501 (N.D. Ill. April 21, 1999) ("Anderson II"). See also Anderson v. Cornejo, 1999 WL 35307 (N.D. Ill. Jan. 11, 1999) ("Anderson I"). Count I is an equal protection claim that Customs inspectors targeted African-American women for nonroutine personal searches. Count III is a Fourth Amendment claim that Customs inspectors lacked sufficient cause to seize, detain, and search plaintiffs. Count V is a Federal Tort Claims Act claim against the United States that the conduct of the individual defendants constitutes false imprisonment, assault, and battery. Count VI is a Fourth and Fifth Amendment claim that Customs inspectors denied due process by not obtaining judicial authorization for the searches and by holding plaintiffs "in communicado."[1] Count II is an equal protection claim that supervisory Customs employees failed to take proper action to prevent or stop the discriminatory selection of African-American women for nonroutine personal searches that is alleged in Count I. Count IV is a Fourth Amendment claim that supervisory Customs employees failed to take proper action to prevent or stop the illegal seizures, searches, and detentions alleged in Count III. Count VII is a Fourth and Fifth Amendment due process claim that supervisory Customs employees promulgated and executed a "policy and practice

---

[1] Count VI has been dismissed in part. See Anderson IV, 2000 WL 286902 at *12-13, 31.

allowing the Customs inspectors, on nothing more than alleged
'reasonable suspicion,' (a) to detain plaintiffs for an
indefinite and wholly discretionary time-period (b) to conduct
the non-routine personal searches described herein without
judicial authorization, (c) while holding the plaintiffs in
communicado."[2] Count IX is a claim that supervisory Customs
employees conspired together in violation of 42 U.S.C. § 1985(3)
to commit the violations alleged in Counts I, III, and VI,
including by establishing criteria for targeting persons to be
searched, fabricating search justifications, destroying
plaintiffs' Customs declaration cards, and ignoring complaints of
discrimination against African-American women. Count X is a
claim that supervisory Customs employees violated 42 U.S.C.
§ 1986 by failing to prevent the conspiratorial conduct alleged
in Count IX. Count VIII is a claim for injunctive relief on
behalf of a putative class of all persons in the country
subjected to nonroutine personal searches at international
airports. It is labeled as an Administrative Procedure Act
("APA") due process claim based on certain supervisory Customs
officials' promulgation of the policy and practice alleged in
Count VII.[3] The damages claims of each count are on behalf of

---

[2] Count VII has been dismissed in part. See Anderson V, 2000 WL 1769636 at *2, 4.

[3] Count VIII has been dismissed in part. See Anderson V, 2000 WL 1769636 at *2, 4.

the named plaintiffs only.[4] Classes have been certified for injunctive relief only as to Counts II, IV, VII, VIII, IX, and X.[5] See Anderson IV, 2000 WL 286902 at *2-10, as modified by, Anderson V, 2000 WL 1769636.

Presently pending is plaintiffs' motion to compel defendants to disclose the names and addresses of passengers included in a computer database that has been provided during discovery.[6] This is at least the fourth motion concerning the computer databases. See Anderson v. Cornejo, 1999 WL 543196 *5 (N.D. Ill. July 22, 1999) ("Anderson III") (requiring the parties to meet to attempt to resolve problems regarding the readability of information in the databases); Docket Entries 196, 202, 209 (June 14, 2000 agreed order requiring, by July 28, 2000, disclosure in computer-readable format of four databases in "complete (i.e., unredacted)" form[7]); Anderson V, 2000 WL 1769636 at *3-4 (rejecting argument that plaintiffs were entitled to identifying information for female, African-American passengers

---

[4] Claims of certain named plaintiffs have been dismissed in whole or in part. See Anderson V, 2000 WL 1769636 at *2-3; Anderson IV, 2000 WL 286902 at *17-18, 25-28; Anderson II, 1999 WL 258501 at *5.

[5] The class for Count VIII is national in scope and is not limited to African-American women. For all other counts, the class only includes African-American women arriving at O'Hare.

[6] Passengers identified in the databases who are not named plaintiffs will be referred to as "nonparties."

[7] There is no present contention that this order constitutes resolution or waiver of defendants' present objections.

on the ground that attorneys were entitled to contact putative class members since passengers searched in the past were not necessarily members of a class limited to prospective relief and also noting that plaintiffs had not shown a particularized need for contacting the additional passengers).

In the July 1999 Anderson III ruling, it was also held that, as to search logs, negative search details, and other documents, defendants should provide the race, gender, and ethnic origin of each person, but were permitted to redact the person's name and other identifying information. Anderson III, 1999 WL 543196 at *3. It was further stated and held:

> . . . Plaintiffs argue the identifying information should be included so that they can selectively interview some of those who were searched. Defendants argue that the "searchees" should not be subjected to such an invasion of privacy.
> At this time, providing the redacted versions will suffice. If not already done, the redacted versions shall still be sufficient to identify if the same person was the subject of more than one search report. If, after examining the materials, plaintiffs desire to interview certain individuals, they may request identifying information as to those specific individuals. Cf. Czajkowski v. City of Chicago, 1992 WL 57945 *2-3 (N.D. Ill. March 20, 1992). At that point, if a dispute still exists as to disclosure of identifying information, an appropriate discovery motion may be presented to the court. At the present time, no opinion is expressed as to whether disclosure of any identifying information will be required or as to whether it would be appropriate to contact any identified search subjects.

Id.

Now, for the first time and with discovery coming to a close, plaintiffs present a more developed argument as to why they are entitled to identifying information. They still do not specifically identify any particular nonparty that they desire to contact.

Defendants have provided four computerized databases concerning Customs activity at O'Hare during the period January 1995 to April 2000. The four databases are described as follows:

(1) As to every passenger arriving at O'Hare on an international flight, the **"Passenger Arrival Database"** lists name, date of birth, date of arrival, flight number, and point of origin. This database was provided without redacting names or birth dates.

(2) As to every passenger arriving at O'Hare on an international flight who was targeted in advance for particular scrutiny by Customs, the **"Passenger Targeting Database"** lists name, date of birth, date targeted, and a narrative explanation of the reason for targeting. This database was provided without redacting names or birth dates.

(3) The **"Seizure/Arrest Database"** lists name, address, and date of birth of international travelers arrested or from whom drugs, currency, or property was seized. It indicates what was seized and where it was found (e.g., in luggage, in clothing,

or on the person). This database was provided without redacting names or birth dates.[8]

(4) As to every passenger arriving at O'Hare on an international flight who was searched by Customs, but not arrested nor any items seized, the **"Negative Search Database"** lists name, address,[9] date of birth, and the stated reason for the search. Names and addresses were not included in the data provided to plaintiffs, nor was any means provided for correlating persons in this database with other entries as to that person appearing either in this same database or the other databases. Also, this database apparently is the only one that consistently identifies the person's race, gender, and citizenship.

Counsel for defendants represent that they had also intended to redact identifying information from the first three databases, but that computer personnel failed to do so and, due to the deadline for turning over the materials, time was not available to modify the data to redact the identifying information. Defendants contend that all the records are protected from disclosure by the Privacy Act and that the records should not be disclosed because plaintiffs have not made a particularized enough showing as to the need to either

---

[8] It is unclear whether address information was redacted.

[9] If addresses were not directly in this database, they were available from a related database. Defendants do not dispute that the addresses are available.

(1) identify persons for purposes of correlating entries or (2) obtain addresses for purposes of contacting nonparties to obtain additional information. Defendants also contend that any additional information that might be obtained would be inadmissible other bad acts evidence.

Plaintiffs do not dispute that the Privacy Act limits disclosure of the information at issue. See 5 U.S.C. §§ 552a(a), 552a(b). However, disclosure "pursuant to the order of a court of competent jurisdiction" is still permitted. Id. § 552a(b)(11). This provision has been construed as consistent with the discovery rules contained in the Federal Rules of Civil Procedure; no additional showing is required beyond that ordinarily required under the Rules of Civil Procedure. See Pippinger v. Rubin, 129 F.3d 519, 532 (10th Cir. 1997); Bosaw v. National Treasury Employees' Union, 887 F. Supp. 1199, 1216 (S.D. Ind. 1995); Marozsan v. Veterans Administration, 1991 WL 441905 *2-3 (N.D. Ind. June 24, 1991). Moreover, defendants concede that they were not particularly troubled by the disclosure of nonparties' names in the first three databases because an agreement is in place that limits the parties' disclosure of confidential information. Defendants' only real argument as to confidentiality and privacy is that plaintiffs should not be able to contact the nonparties and thereby invade those persons' privacy. Before turning to that question, though, it will first be considered whether plaintiffs have adequately shown a need to identify persons in the Negative Search Database.

Separate from the question of whether plaintiffs should be permitted to contact any nonparties is the question of whether plaintiffs should be provided with information that will enable them to identify persons who are in both the Negative Search Database and another database and those who have more than one entry in the Negative Search Database. It was previously held that defendants were to provide information that would allow such correlations. <u>Anderson III</u>, 1999 WL 543196 at *3. As to multiple listings in the Negative Search Database itself, some identifying code could be used that would preclude the need to identify the person by name. However, any information to correlate with one of the other databases would necessarily disclose the person's name, since that information is in the other databases. In any event there is no problem with disclosing the names since the parties are already bound to keep that information confidential. <u>See</u> June 14, 2000 Agreed Order.

Plaintiffs need the identifying information so that they can conduct certain statistical analysis that cannot be done without correlating the data, including using the race and gender information in the Negative Search Database to identify the race and gender for many of the entries in the other databases. Statistical analyses that will be possible with the additional identifying information include (a) determining whether persons in the Negative Search Database were, on other occasions, found to have contraband, that is, correlating them with entries in the Seizure/Arrest Database; (b) correlating the Negative Search

Database with the Passenger Arrival Database to determine how frequently searched persons traveled, a factor Customs has identified as a criterion for conducting searches; and (c) correlating the Negative Search Database and Passenger Targeting Database to determine if this explains the different rates of negative searches for different races and genders. Also, it may be possible to analyze the overall data involving an individual defendant to determine if he or she searched African-American women at a different rate than others.

Defendants contend such statistical analyses would be irrelevant and therefore it is unnecessary to provide this information to plaintiffs. Even if it were assumed that privacy and/or burdensomeness concerns justified limiting discovery to evidence that would actually be admissible (instead of the usual "reasonably calculated to lead to the discovery of admissible evidence," Fed. R. Civ. P. 26(b)(2)), plaintiffs are entitled to the discovery. Defendants contend that the additional analysis would only provide evidence of systemwide practices of Customs and their possible disparate impact on African-American women. They contend such statistics would not be pertinent to intentional discrimination claims against individual Customs inspectors. They also contend it would not even be pertinent to the systemwide injunctive relief claims because those claims focus on future conduct and also because practices have changed since this lawsuit was initiated. Defendants, however, ignore that there are also damages claims against supervisory personnel

responsible for broader policies, not just claims against nonsupervisory inspectors. Also, contrary to defendants' contentions, inferences of intentional discrimination can be inferred from statistical disparities. See EEOC v. O & G Spring & Wire Forms Speciality Co., 38 F.3d 872, 876 (7th Cir. 1994), cert. denied, 513 U.S. 1198 (1995). Also, the due process and Fourth Amendment claims do not require proof of a racial animus, but the statistical evidence may be relevant as evidence that the criteria used for searches was not effective in finding contraband. See Edmond v. Goldsmith, 183 F.3d 659, 661-62 (7th Cir. 1999), aff'd sub nom., City of Indianapolis v. Edmond, 121 S. Ct. 447 (2000). Further, even as to an individual Customs inspector, there may be sufficient data to show a significant variance in that inspector's treatment of African-American women. Additionally, contrary to defendants' contention, evidence of past practices may be relevant to current and future practices. See Sierakowski v. Ryan, 223 F.3d 440, 445 (7th Cir. 2000); United States v. Raymond, 228 F.3d 804, 813 (7th Cir. 2000); Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)). See also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 120 S. Ct. 693, 708-09 (2000). Finally, contrary to defendants' contention, evidence of a defendant's treatment of other similarly situated persons is admissible to prove intentional discrimination. See Fed. R. Evid. 404(b); Kunzman v. Enron Corp., 941 F. Supp. 853,

863-64 (N.D. Iowa 1996). Cf. Jannotta v. Subway Sandwich Shops, Inc., 125 F.3d 503, 517 (7th Cir. 1997).

Plaintiffs have made a sufficient showing to require defendants to provide identifying information that would enable plaintiffs to correlate data that relates to the same person. Defendants will be required to provide the names and birth dates of the subjects of the Negative Search Database. Addresses do not appear to be necessary for doing such a correlation. However, plaintiffs also contend that addresses would be useful for statistical analysis in that, given the degree of segregation in the Chicago area, some assumptions about race can be made based on address information. Since defendants do not contend providing the addresses would be a significant additional burden, to the extent they have additional addresses for any of the databases, defendants will be required to provide addresses as well. Whether plaintiffs may use the addresses to contact any of the persons is a distinct question. It is assumed that plaintiffs will maintain the confidentiality of the addresses and that they will not contact any nonparty disclosed in the databases without first obtaining leave from the court.

Plaintiffs still have not identified any particular person that they desire to contact. Perhaps this is because they need the identifying information necessary for correlation before they can determine whom they would contact. Plaintiffs indicate that they would first attempt to survey the nonparties before

determining specific persons from whom they would seek more detailed information.

Plaintiffs contend they need to contact nonparties who are not African-American women ("comparables") to obtain further or more detailed evidence the comparables were treated more favorably. Plaintiffs give two examples of information they would solicit that does not already appear in the databases they have. One example is that there is evidence that some named plaintiffs were listed as having been subjected to standard patdowns even though the particular plaintiffs testified their searches were more intrusive. Plaintiffs want to question comparables to learn if their searches were more intrusive than listed in the databases. Such evidence, however, would be favorable to defendants, not plaintiffs. Since defendants have not sought such discovery, plaintiffs do not need to pursue this avenue to be able to rebut any evidence of defendants. The other example given is being able to ask White women whether they were asked to remove tampons during searches, as some of the named plaintiffs were asked. Again, this would be seeking evidence favorable to defendants. Defendants contend they followed a general policy of not making such requests and apparently no evidence has been produced that such a request was ever made of a White woman. Since defendants oppose the further discovery, they would be precluded from contending otherwise. Plaintiffs have not pointed to sufficient reasons supporting a need to survey, interview, or depose comparables.

Plaintiffs also contend that they need to contact nonparty African-American women. Plaintiffs contend that such persons could corroborate testimony of plaintiffs without being subject to impeachment on the ground that they have a financial stake in the outcome of the case. However, plaintiffs already have 90 different named plaintiffs to provide testimony. Testimony from additional nonparty African-American women would be cumulative. It is doubted that such witnesses' possible lack of a stake in the outcome would have a significant effect on the factfinder. Moreover, as plaintiffs concede, nonparties who were subjected to similar treatment, may decide to bring their own lawsuits once contacted, thus taking away most, if not all, of any possible special benefit of their testimony. Additionally, selectively picking out additional witnesses who support plaintiffs' case would not necessarily be very probative. Instead, defendants might receive an equal or greater benefit from discovering nonparties who do not corroborate plaintiffs' allegations. The limited possible benefit that plaintiffs might obtain from this avenue of inquiry does not justify intruding upon nonparties, many of whom likely would not appreciate being contacted or knowing that attorneys have examined records of their searches. Plaintiffs have not pointed to a sufficient reason for contacting the nonparties. See Czajkowski, 1992 WL 57945 at *2.

Plaintiffs also contend that they would like to contact some nonparties who were searched at the same time as some named

plaintiffs to find out if those nonparties can corroborate the particular plaintiffs' versions of events. Such testimony would necessarily be limited to what happened before being searched in nonpublic rooms. Plaintiffs refer to one named plaintiff whom defendants contend was unusually agitated, uncooperative, and engaged in histrionics while in a public area. Although they have had a sufficient opportunity to do so, plaintiffs still fail to point to specific persons they would question. To the extent any such persons were in the Seizure/Arrest Database, plaintiffs could identify the potential witnesses by name. To the extent they are in the Negative Search Database, plaintiffs could have identified the records of the potential witnesses, though not the names. Plaintiffs again fail to make a sufficient showing. Moreover, it is highly doubtful that such potential witnesses presently have a memory of how some of the plaintiffs were treated.

Plaintiffs have had a number of opportunities to adequately show their need to interview, depose, or otherwise contact nonparties that are subjects of the databases. They have again failed to do so. At some point, discovery has to come to a close in this case.

Defendants shall provide the name, birth date, and address information within 14 days. All discovery, including expert discovery, shall be completed by April 30, 2001. A status hearing is set for April 18, 2001 at 11:00 a.m. Prior to that date, the parties shall meet to discuss procedures for trying

this case. By April 16, 2001, the parties shall submit a joint memorandum or separate memoranda setting forth their proposals for trying this case.

IT IS THEREFORE ORDERED that plaintiffs' motion to compel production in computer-readable form of names and addresses of persons subjected to negative personal searches [227] is granted in part and denied in part. Defendants shall provide the names, birth dates, and addresses within 14 days. No party is permitted to contact any of the nonparty passengers disclosed in any of the computer databases. By April 16, 2001, the parties shall submit their proposal for trying this case. All discovery is to be completed by April 30, 2001. Status hearing set for April 18, 2001 at 11:00 a.m.

ENTER:

*William T. Hart*
UNITED STATES DISTRICT JUDGE

DATED: MARCH 5, 2001