# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | **WILLIAM T. HART** | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7556 | **DATE** | **MARCH 14, 2002** |
| **CASE TITLE** | **SHARON ANDERSON, et al. v. MARIO CORNEJO, etc., et al.** | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for **MAY 1, 2002 at 11:30 a.m.**

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motion [330-1] denied without prejudice. Motions [255, 314, 330-2] granted in part, denied in part. Motion [332-1] granted. Leave granted to file "initial surreply" and "supplemental surreply." Individual capacity claims against managerial defendants dismissed except (a) Counts I, III, and VI claims of Letkemann, Richards, and Walter against Hoteko; and (b) Count II damages claims against (i) Noonan; (ii) Trotter for strip searches after July 21, 1998; and (iii) Hoteko for searches from May 25, 1997 through September 15, 1997. Counts IX and X dismissed. Defendants Sam Banks, Weise, and Weeks dismissed from this action. Draft order as to supervisory defendants due 3/22/02. Revised joint trial plan due 4/19/02.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 1 5 2002 | **341** |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 3/14/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| cw | courtroom deputy's initials | | mqm | |
| | | Date/time received in central Clerk's Office | mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 1 5 2002

SHARON ANDERSON, et al., )
)
Plaintiffs, )
)
v. )    No. 97 C 7556
)
MARIO CORNEJO, individually and )
in his official capacity, )
et al., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

As presently constituted, this case has approximately 90
named plaintiffs, all of whom are African-American women with
United States citizenship who allegedly were searched by
employees of the United States Customs Service at Chicago's
O'Hare International Airport ("O'Hare") following their arrival
on international flights. The searches of the named plaintiffs
allegedly occurred between March 1996 and August 1999.[1] Named as
defendants are the United States, the United States Customs
Service ("Customs"), and approximately 70 current or former
employees of Customs. Management officials, lower-level

---

[1]After October 1998, only one more search of a named
plaintiff is alleged, the August 11, 1999 search of plaintiff
Duana Byrd. As to the remaining Managerial Defendants, only
Noonan was still in the same position as of August 1999.

supervisors, and nonsupervisory employees are sued in their individual capacities.[2]  Presently pending are certain defendants' motions for summary judgment and related procedural motions.

## I.  ISSUES RAISED

### A.  Allegations of the Complaint

Following prior rulings on motions to dismiss, for class certification, and for summary judgment, the following claims remain pending in the Seventh Amended Complaint.  See Anderson v. Cornejo, 199 F.R.D. 228 (N.D. Ill. 2000) ("Anderson IV"); Anderson v. Cornejo, 1999 WL 258501 (N.D. Ill. April 21, 1999) ("Anderson II").  See also Anderson v. Cornejo, 1999 WL 35307 (N.D. Ill. Jan. 11, 1999) ("Anderson I").[3]  Count I is an equal protection claim that Customs inspectors targeted

---

[2]The "Managerial Defendants" were permanent or acting Customs Commissioners, Assistant Commissioner of Field Operations, Chicago Port Director, Chicago Chief Inspector of Passenger Processing, and Chicago Passenger Service Representative.  The "Supervisory Defendants" primarily are supervisory Customs inspectors, the immediate supervisors of Customs inspectors.  The Seventh Amended Complaint labels defendant Noonan as a Supervisory Defendant.  On summary judgment, though, it is agreed that he fits in the Managerial category.

[3]As required by Anderson I, 1999 WL 35307 at *4, 7, for the Fifth Amended Complaint and thereafter, plaintiffs have provided a more definite statement listing the following information for each named plaintiff:  (a) the date of the alleged unlawful search, (b) the known defendants alleged to have been involved in the unlawful search, and (c) whether unknown defendants are also alleged to have been involved in the unlawful search.

African-American women for nonroutine personal searches.[4]
Count III is a Fourth Amendment claim that Customs inspectors
lacked sufficient cause or suspicion to seize, detain, and search
plaintiffs. Count V is a Federal Tort Claims Act claim against
the United States that the conduct of the individual defendants
constitutes false imprisonment, assault, and battery. Count VI
is a Fourth and Fifth Amendment claim that Customs inspectors[5]
denied due process by not obtaining judicial authorization for
the searches and by holding plaintiffs "in communicado."[6]

Count II is an equal protection claim that Managerial and
Supervisory Defendants failed to take proper action to prevent or
stop the discriminatory selection of African-American women for
nonroutine personal searches alleged in Count I. Count IV is a
Fourth Amendment claim that Managerial and Supervisory Defendants
failed to take proper action to prevent or stop the illegal
seizures, searches, and detentions alleged in Count III. Count
VII is a Fourth and Fifth Amendment due process claim that

---

[4]By "nonroutine personal searches," plaintiffs mean
patdown searches, strip searches, and visual and physical body
cavity searches generally conducted in an enclosed room, and also
off-premises medical examinations (including X-rays) and
monitored bowel movements. 7th Am. Compl. ¶ 113. This court has
also distinguished "standard" and "intrusive" patdown searches.
See Anderson IV, 199 F.R.D. at 258-59.

[5]Although Count I, Count III (with the exception of one
Supervisory Defendant), and Count VI refer to the actions of
Customs inspectors, plaintiffs' statements of more definite facts
also identify Supervisory Defendants as being liable for direct
involvement in many of the searches.

[6]Count VI has been dismissed in part. See Anderson IV,
199 F.R.D. at 246-47, 263.

Managerial and Supervisory Defendants promulgated and executed a "policy and practice allowing the Customs inspectors, on nothing more than alleged 'reasonable suspicion,' (a) to detain plaintiffs for an indefinite and wholly discretionary time-period; (b) to conduct the non-routine personal searches described herein without judicial authorization; (c) while holding the plaintiffs in communicado."[7]  7th Am. Compl. ¶ 175. Count IX is a claim that Managerial Defendants, Supervisory Defendants, and possibly Customs inspectors conspired together in violation of 42 U.S.C. § 1985(3) to commit the violations alleged in Counts I, III, and VI, including by establishing criteria for targeting persons to be searched, fabricating search justifications, destroying plaintiffs' Customs declaration cards, and ignoring complaints of discrimination against African-American women.  Count X is a claim that Managerial and Supervisory Defendants violated 42 U.S.C. § 1986 by failing to prevent the conspiratorial conduct alleged in Count IX.

Count VIII is a claim for injunctive relief on behalf of a putative class of all persons in the country subjected to nonroutine personal searches at international airports.  It is labeled as an Administrative Procedure Act ("APA") due process

---

[7]Count VII has been dismissed in part.  See Anderson IV, 199 F.R.D. at 264-65, 267.  In Count VII, it is claimed that reasonable suspicion did not exist, but that defendants purported to be applying that standard.  See id. at 264-65.

claim based on the various Customs Commissioners' promulgation of the policy and practice alleged in Count VII.[8]

The damages claims of each count are on behalf of the named plaintiffs only.[9]  Classes have been certified for injunctive relief only as to Counts II, IV, VII, VIII, IX, and X.[10]  Anderson IV, 199 F.R.D. at 237-45, 264-65, 267.

## B. The Motions for Summary Judgment

Managerial Defendants Sam Banks ("Banks"), George Weise,[11] Kevin Weeks, Sergei Hoteko, and Robert Trotter have moved for summary judgment on all the individual capacity claims brought against them in Counts II, IV, VII, IX, and X,[12] primarily on the ground that they were not personally involved in any of the alleged misconduct.[13]  Managerial Defendant Patrick

---

[8]Count VIII has been dismissed in part.  See Anderson IV, 199 F.R.D. at 264-65, 267.

[9]Claims of certain named plaintiffs have been dismissed in whole or in part.  See Anderson IV, 199 F.R.D. at 252-53, 259-62, 263, 265-66; Anderson II, 1999 WL 258501 at *5.

[10]The class for Count VIII is national in scope and is not limited to African-American women.  For all other counts, the class is limited to African-American women arriving at O'Hare.

[11]The Seventh Amended Complaint, and therefore the court docket as well, incorrectly spell his name "Wiese."

[12]The motions presently under consideration do not seek summary judgment as to Count VIII.  However, after these motions became fully briefed, defendants brought a separate summary judgment motion as to Count VIII.  That motion is still being briefed.

[13]Managerial Defendants Raymond Kelly, Margaret Fearon, and Robert Parsons also joined in the initial motion for summary judgment.  In their answer to the motion, plaintiffs conceded the claims against these defendants should be dismissed and

Noonan also moves for summary judgment, adopting the briefs of
the other Managerial Defendants.[14]  The parties have agreed that
any ruling as to Counts II, IV, and VII should also be applied to
the claims in those counts that are against Supervisory
Defendants Mario Cornejo, Larry DiGianntonio, William Desmond,
Gloria Banks, Ronald Zaczek, Gene Taylor, David Gooding, Dominic
Biagioni, Michael Johnson, and Mark Woods, except as to selected
searches in which one or more of these Supervisory Defendants
were directly involved.[15]  See Agreed Motion of Certain
Defendants to Join in the Pending Motion for Summary Judgment of
the Managerial Defendants [Docket Entry 313].  The parties have
also agreed that any ruling as to Count IX should apply as to the
Count IX § 1985 conspiracy claims against Customs inspectors Olga
Martinez, Maria Rocha, Michelle Belcastro, Jennifer Usleber,
Melissa Zytowski, Lynda Hall, Guadalupe Corona, Chen W. Yu, and
Samuel Ko.  See id.

### C. Issues Adequately Raised by the Motions

        On a motion for summary judgment, the entire record is
considered with all reasonable inferences drawn in favor of the
nonmovant and all factual disputes resolved in favor of the

_____

plaintiffs' motion to voluntarily dismiss these three defendants
was subsequently granted.  See Order dated Feb. 15, 2002 [Docket
Entry 335].

        [14]Noonan also filed a short brief and statement of facts.

        [15]The parties do not specifically identify the selected
searches.  Presumably, such claims would be contained in Counts I
III, and VI, which are against those defendants directly involved
in searches.

nonmovant.  <u>Schneiker v. Fortis Insurance Co.</u>, 200 F.3d 1055,

1057 (7th Cir. 2000); <u>Baron v. City of Highland Park</u>, 195 F.3d

333, 337-38 (7th Cir. 1999).  The burden of establishing a lack

of any genuine issue of material fact rests on the movant.

<u>Wollin v. Gondert</u>, 192 F.3d 616, 621-22 (7th Cir. 1999); <u>Essex v.

United Parcel Service, Inc.</u>, 111 F.3d 1304, 1308 (7th Cir. 1997).

The nonmovant, however, must make a showing sufficient to

establish any essential element for which she will bear the

burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 322 (1986); <u>Shank v. William R. Hague, Inc.</u>, 192 F.3d 675,

681 (7th Cir. 1999); <u>Wintz v. Northrop Corp.</u>, 110 F.3d 508, 512

(7th Cir. 1997).  The movant need not provide affidavits or

deposition testimony showing the nonexistence of such essential

elements.  <u>Celotex</u>, 477 U.S. at 324.  Also, it is not sufficient

to show evidence of purportedly disputed facts if those facts are

not plausible in light of the entire record.  <u>See</u> <u>NLFC, Inc. v.

Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert.

denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950

F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated

Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert.

denied</u>, 488 U.S. 852 (1988).  As the Seventh Circuit has

summarized:

> The moving party bears the initial burden of
> directing the district court to the determinative
> issues and the available evidence that pertains
> to each.  "[A] party seeking summary judgment
> always bears the initial responsibility of
> informing the district court of the basis for
> its motion, and identifying those portions

> of 'the pleadings, depositions, answers to
> interrogatories, and admissions on file, together
> with the affidavits, if any' which it believes
> demonstrate the absence of a genuine issue of
> material fact." Celotex Corp. v. Catrett, 477
> U.S. 317, 323 (1986); id. at 325 ("the burden on
> the moving party may be discharged by 'showing'--
> that is, pointing out to the district court--that
> there is an absence of evidence to support the
> nonmoving party's case"). Then, with respect to
> issues that the non-moving party will bear the
> burden of proving at trial, the non-moving party
> must come forward with affidavits, depositions,
> answers to interrogatories or admissions and
> designate specific facts which establish that
> there is a genuine issue for trial. Id. at
> 324. The non-moving party cannot rest on the
> pleadings alone, but must designate specific
> facts in affidavits, depositions, answers to
> interrogatories or admissions that establish that
> there is a genuine triable issue. Id. The
> non-moving party "must do more than simply show
> that there is some metaphysical doubt as to the
> material facts." Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 586 (1986).
> "The mere existence of a scintilla of evidence
> in support of the [non-moving party's] position
> will be insufficient; there must be evidence on
> which the jury could reasonably find for the
> [non-moving party]." Anderson v. Liberty Lobby,
> Inc., 477 U.S. 242, 252 (1986).

Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

A dispute exists regarding the precise issues raised by

defendants' summary judgment motions. Plaintiffs have moved to

strike defendants' reply brief and Local Rule 56.1(a) reply

[Docket Entry 326]. Plaintiffs have also moved to file a

surreply and supplemental surreply. The motion to strike will be

denied without prejudice. To the extent defendants' reply

contains impermissible argument or improper factual assertions or

evidence, the arguments will be rejected or treated as waived and

the assertions or evidence will not be treated as establishing undisputed facts. There is, however, no need to actually strike the brief or Local Rule 56.1(a) statement.[16] Plaintiffs will be granted leave to file the surreply and supplemental surreply and both surreplies have been fully considered in reaching today's ruling.[17]

In their opening brief, the Managerial Defendants contend they cannot be liable on Counts II and IV because, with one exception, they were not personally involved in the searches. As to the one exception, it is argued that defendant Hoteko's involvement in the search of plaintiff Arcadia Letkemann was limited to approving a search based on reasonable suspicion. As to Count VII, it is asserted that there is no evidence that the Managerial Defendants promulgated or approved a policy of permitting searches on less than reasonable suspicion. As to Counts IX and X, it is asserted that there is no evidence of an unlawful conspiracy or class-based animus and defendants argue that there can be no conspiracy because defendants were all members of the same organization, that is, there can be no

---

[16]Although they did not file a separate motion, defendants contend certain portions of plaintiffs' Local Rule 56.1(b)(3)(B) statement [Docket Entry 316] should be stricken because not supported by admissible evidence and because they contain arguments, not just factual assertions. Plaintiffs' statement will not be stricken. The only facts that will be considered are those adequately supported by admissible evidence.

[17]In footnote 2 of their motion to strike [Docket Entry 330], plaintiffs refer to the possibility of filing an additional surreply addressing the particular facts regarding each plaintiff's search. That aspect of the motion will be denied.

intracorporate conspiracy.  As to any individual capacity claim

for injunctive relief, defendants contend such claims are moot

because they are no longer employed in Customs positions in

Chicago.  Alternatively, defendants generally assert they would

be entitled to qualified immunity as to the damages claims

because any law under which they might be held liable was not

clearly established as of the pertinent time.  In sections 9 and

10, defendants also make the following assertions which are

quoted in their entirety.

### 9.   Each Plaintiff Must Show Injury To Obtain Damages.

Plaintiffs have not identified any illegal
policies promulgated by the managerial officials
and it is hard to imagine how plaintiffs can
possibly present evidence sufficient to create a
genuine factual dispute that the managerial
official[s] conspired to violate plaintiffs'
constitutional rights.  It should nevertheless be
noted that plaintiffs, in addition to showing
actionable misconduct by the managerial
officials, must as a prerequisite to obtaining
damages also prove that they were injured as [a]
proximate result of the alleged misconduct.  See
Indianapolis Minority Contractors Association,
Inc. v. Wiley, 187 F.3d 743, 754 (7th Cir. 1999)
(plaintiff must show an injury to his person or
property or a deprivation of some right or
privilege).  If the individual Customs inspectors
who searched a particular plaintiff were not
improperly motivated, then that plaintiff was not
injured due to any Constitutional violation by
the managerial officials, regardless [of] what
the managerial officials may have done.  Each
plaintiff who wishes to survive summary judgment
must present evidence from which a reasonable
jury could conclude that she in particular was
subjected to an illegal search as a result of the
acts of the managerial officials.

**10. Each Plaintiff's Case Against Each Defendant must Be Considered on its Own Facts.**

As written, the complaint does not distinguish among the plaintiffs as to their various potential claims against the managerial officials. The plaintiffs were searched at different times for different reasons by different Customs inspectors. Different managerial officials worked at different jobs at the times that the various plaintiffs were searched. Until plaintiffs specify the facts on which they base their claim, we cannot say more than we have in this memorandum; we merely note in advance that in response to this motion, each plaintiff has an independent burden to show a factual basis for her damages claim against each managerial official that she wants to keep in the case.

Def. Memo. in Support of Summ. Jmt. [Docket Entry 255] at 12-13.

In their Local Rule 56.1(a)(3) statement [Docket Entry 256], defendants recite the Customs positions they were in and the dates. Although reciting the titles of their job positions, neither the Local Rule 56.1(a)(3) statement nor the supporting affidavits describe the duties and responsibilities of the positions.[18] Each of the Managerial Defendants provides an affidavit generally denying direct involvement in any of the searches of a plaintiff, except the one search involving Hoteko. They also generally deny establishing, promulgating, or encouraging any policy to use race or gender in the selection of a person for a search, and instead state Customs inspectors are

---

[18]In their Local Rule 56.1(b)(3)(B) statement, plaintiffs provide some evidence regarding job duties and responsibilities.

trained not to consider race as a factor.[19]  They also generally
state that any allegations of discrimination brought to their
attention were routinely delegated to subordinates for
investigation and appropriate action.  Defendants also provide
evidence regarding the retention of baggage declarations and the
O'Hare Passenger Analysis Unit ("PAU").[20]  No factual assertions
or evidence are provided as to any specific search of a plaintiff
other than the search of Letkemann in which Hoteko was involved.

In neither their opening brief nor Local Rule 56.1(a)(3)
statement do defendants contend, even in a conclusory manner,
that Customs inspectors at O'Hare did not engage in a pattern or
practice of discriminatorily selecting African-American women for
searches and searching them on less than reasonable suspicion.
The closest defendants come to such an assertion is in sections 5
and 6 of their opening brief.  In § 5, it is asserted:  "In any
event, this court may reasonably grant summary judgment as to
Count VII, because there is no evidence that the managerial
officials promulgated or approved a policy of allowing searches
on less than reasonable suspicion."  The court understands this

_____

[19]Neither the affidavits nor Local Rule 56.1(a)(3)
statements deny that there was a custom or practice of conducting
nonroutine searches without adequate suspicion.

[20]Paragraphs 16 through 20 of defendants' Local Rule
56.1(a)(3) statement are on a separate page.  Plaintiffs' Local
Rule 56.1(b)(3)(A) statement [Docket Entry 316] does not respond
to these paragraphs.  The failure to respond apparently was an
oversight (or possibly the result of a missing page) and will not
be deemed an admission that the facts in those paragraphs are
uncontested.  See Loc. R. 56.1(b)(3)(B).

conclusory assertion (which is unsupported by any factual statement in defendants' Local Rule 56.1(a)(3) statement nor by any background evidence of the policies actually claimed to be in place) to be a contention that there were no formal policies to that effect, not a denial that a custom, pattern, or practice of such conduct existed. In § 6, it is asserted that "[s]ummary judgment is appropriate as to Count IX because there is no evidence of an unlawful conspiracy." The only reference to somewhat more particularized facts is the contention that the PAU had a proper purpose and that records of passenger entry were destroyed in a routine manner. There is no assertion, even a conclusory one, that there was no unlawful conspiracy because no underlying pattern of discrimination by Customs inspectors. There is also no contention, conclusory or otherwise, that Counts II and IV fail because there is no practice of, respectively, discriminatory selection of African-American women and nonroutine searches without adequate suspicion.

In response to defendants' summary judgment motions, plaintiffs provide detailed factual assertions and evidence to support their contention that the Managerial Defendants were aware of improper searches and the ineffectiveness of search procedures and were personally involved in supporting, encouraging, or turning a blind eye to such conduct. The focus of plaintiffs' response is on the Managerial Defendants' knowledge of policies and practices. Except as to the search of Letkemann, plaintiffs do not provide evidence as to the

particular searches of each plaintiff.  Although they responded
with some evidence as to policies and practices, plaintiffs argue
that the summary judgment motions could otherwise be denied in
their entirety because defendants failed to provide adequate
factual support for their motion.  See Pl. Response to Summ. Jmt.
[Docket Entry 321] at 30-31.  As to the arguments contained in
sections 9 and 10 of defendants' brief, plaintiffs also contend
that these arguments should not be considered because not
supported by sufficient legal argument.  See id. at 29 n.12.

        In their reply, defendants focus much of their argument
on the contention that plaintiffs have failed to provide evidence
that any of them was subjected to an unlawful search and
therefore, regardless of any policies or practices, no Managerial
or Supervisory Defendant can possibly be liable.  Even if an
improper policy or practice is shown, defendants contend that
plaintiffs have not shown that any of their searches were
pursuant to such policy or practice, that is, a causal
relationship has not been shown.  Defendants also point out that
plaintiffs did not dispute that each Managerial Defendant was in
his pertinent position during a specific time period, yet
plaintiffs fail to acknowledge that plaintiffs searched outside a
particular time period cannot have a claim against that
defendant.  Additionally, defendants contend in their reply that
no practice of equal protection or Fourth Amendment violations

has been shown.[21]  In their motion to strike and surreplies,
plaintiffs contend each of these arguments is waived because not
adequately raised in defendants' opening brief.  As to the timing
argument, however, plaintiffs provide a chart (Pl. Exh. 77)
showing which plaintiffs' searches predated each Managerial
Defendant's employment in a Managerial position and concede that
such plaintiffs would have no claim against that defendant or
defendants.

Even as to issues on which the nonmovant will bear the
burden of proof at trial, on summary judgment the moving party
has an "initial burden of production . . . to identify those
specific portions of the record that it believes demonstrate the
absence of a genuine issue of material fact."  Logan v.
Commercial Union Insurance Co., 96 F.3d 971, 978 (7th Cir. 1996).
The movant has "the initial responsibility of informing the
district court of the basis for its motion, and identifying those
portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence of
a genuine issue of material fact."  Id. (quoting Celotex, 477
U.S. at 323 (quoting Fed. R. Civ. P. 56(c))).  An "unsupported--
or 'naked'--motion for summary judgment does not require the
nonmovant to come forward with evidence to support each and every

---

[21]In their Local Rule 56.1(a) reply, defendants provide
some additional factual assertions and evidence.  They still do
not point to evidence regarding the searches of each plaintiff.

element of its claims. Russ [v. International Paper Co.],
943 F.2d [589], 591 [(5th Cir. 1991), cert. denied, 503 U.S. 987
(1992)]. Only after the movant has articulated with references
to the record and to the law specific reasons why it believes
there is no genuine issue of material fact must the nonmovant
present evidence sufficient to demonstrate an issue for trial."
Logan, 96 F.3d at 979. The movant still must place its argument
within a factual context and a court is not obliged to address
unfocused arguments. In re ContiCommodity Services, Inc.
Securities Litigation, 733 F. Supp. 1555, 1571 (N.D. Ill. 1990),
rev'd in part on other grounds sub nom. Brown v. United States,
976 F.2d 1104 (7th Cir. 1992), aff'd in part sub nom.,
ContiCommodity Services, Inc. v. Ragan, 63 F.3d 438 (5th Cir.
1995), cert. denied, 517 U.S. 1104 (1996). Also, the movant may
not raise one ground for summary judgment in its motion and raise
a different ground in its reply. Titran v. Ackman, 893 F.2d 145,
147 (7th Cir. 1990) ("When a party moves for summary judgment on
ground A, the opposing party need not address grounds B, C, and
so on; the number of potential grounds for (and arguments
against) summary judgment may be large, and litigation is costly
enough without requiring parties to respond to issues that have
not been raised on pain of forfeiting their position.").

While defendants' opening brief asserted that no
plaintiff can possibly have a cognizable claim against a
Managerial Defendant unless she was improperly searched by a
Customs inspector, defendants do not even conclusorily or

generally assert why the search of any plaintiff was lawful. Nor (with the one exception previously noted) does defendants' Local Rule 56.1(a)(3) statement contain any facts regarding the search of a particular plaintiff. Moreover, if defendants truly intended to raise this issue, there was no reason to limit the summary judgment motion to Managerial Defendants or even Supervisory Defendants. Instead, lack of an unlawful search would be a basis for denying the claims against all defendants (including Customs inspectors), yet there is absolutely no indication that the motion was intended to be brought on behalf of all defendants.[22] Defendants did not meet their initial burden of presenting an adequate argument or factual background regarding the lack of any unlawful searches. Plaintiffs were not required to respond with evidence supporting that each of them was subjected to an unlawful search.

Defendants' opening brief also does not adequately raise issues as to the existence of a pattern or practice of discriminatory selection and searches on less than adequate suspicion. For purposes of ruling on the pending summary judgment motions, it will therefore be assumed that such practices existed as to searches at O'Hare. The summary judgment motions do adequately raise the issue of defendants' knowledge of, encouragement of, and involvement in such practices. Plaintiffs are required to provide evidence linking each

_____

[22]All defendants except Noonan are represented by the same attorneys.

defendant to such practices, which may necessitate some affirmative evidence of the existence of the practices.

As to an issue of causal relationship between any policy or practice shown and a plaintiff's actual search, no such contention is even conclusorily raised in the opening brief. Defendants cannot raise this argument for the first time in their reply. Plaintiffs were not compelled to provide evidence of a causal relationship between their individual searches and any policy or practice that was in existence.

The only cause issue raised in the opening brief concerns the dates the Managerial Defendants were employed in the pertinent positions and the date each plaintiff was searched. Defendants Local Rule 56.1(a)(3) statement recites the dates each Managerial Defendant served in the pertinent positions. No attempt is made to specifically correlate those dates with the dates particular plaintiffs were searched. Also, neither the opening brief nor defendants' reply makes any argument as to when during a particular Managerial Defendant's service time he may have first learned of the challenged practices or taken an action related to them. Although contending the timing issue is not adequately raised, plaintiffs concede that they are not entitled to recover from any defendant who entered a pertinent position subsequent to a particular plaintiff's search.[23]

---

[23]It is possible that a Managerial Defendant's conduct could still have had an effect for a period of time after he left the position. See, e.g., Shaw v. Stroud, 13 F.3d 791, 800 (4th Cir.), cert. denied, 513 U.S. 813, 814 (1994). Also, although

As to all the other arguments raised in defendants' opening brief, they are also generally raised in a cursory manner with only a limited factual background being provided in support thereof. Defendants do make legal arguments as to intracorporate conspiracy and personal involvement. Plaintiffs have been able to respond with a well developed argument (contained in an oversized, 35-page brief) and detailed factual support, including a 196-paragraph Local Rule 56.1(b)(3)(B) statement. Defendants' opening brief adequately raises the issues of (a) whether the Managerial Defendants were personally involved in the alleged unlawful conduct and responsible for any unlawful policy or practice; (b) whether the conspiracy claims fail as an intracorporate conspiracy; (c) whether any conspiracy is based on a racial animus on the part of the Managerial defendants; (d) certain issues as to Hoteko being liable for the search of Letkemann; (e) whether individual capacity injunctive relief is moot; and (f) whether, as to these arguments, defendants are entitled to qualified immunity because the law underlying such claims was not clearly established.[24]

---

specific causal issues are not being considered because not adequately raised, it can be held that a Managerial Defendant will not be liable for searches that occurred prior to the Managerial Defendant first engaging in conduct that facilitated, encouraged, or deliberately ignored unlawful searches.

[24]Just as defendants failed to adequately raise the issue of whether the particular search of each plaintiff was racially motivated and/or based on less than reasonable suspicion, qualified immunity cannot be based on any possible lack of clearly established law regarding a particular search.

## II. FACTS ON SUMMARY JUDGMENT

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiffs' favor, the facts assumed to be true for purposes of summary judgment are as follows.

### A. Managerial Defendants' Positions

Kelly was the Commissioner of Customs from August 1998 through January 2001. Banks was Acting Commissioner of Customs from September 1997 to August 1998. Weise was Commissioner of Customs from May 1993 until August 1997. Trotter was Assistant Commissioner of Field Operations from June 1997 to February 1999. He also acted in that position from October 2, 1996 until March 14, 1997. During all or most of Trotter's tenure, the Chicago Port Director reported to MidAmerica Customs Management Center Director Garnet Fee who in turn reported to Trotter. Trotter reported directly to the Commissioner of Customs.

Weeks was the acting or permanent Port Director of Chicago from February 1997 to July 1998, and since then has been Director of Field Operations for the West Great Lakes Customs Management Center based in Detroit, Michigan.[25] O'Hare is within Customs' Port of Chicago. As Port Director, Weeks had monthly meeting with Hoteko and O'Hare's supervisory Customs inspectors. Hoteko was Chief Inspector of Passenger Operations for the Port of Chicago from July 1995 until June 1999 and reported directly to the Chicago Port Director. In that position, Hoteko was

---

[25]There is nothing to indicate that O'Hare is part of the Great Lakes Customs Center.

responsible for all passenger processing operations for O'Hare international arrivals. Hoteko had weekly meetings with O'Hare Customs inspectors and also met with supervisory Customs inspectors. Noonan was the Passenger Service Representative in Hoteko's office from 1993 or 1994 through May 2000. Noonan's responsibilities included investigating passenger complaints regarding Customs inspectors. As part of his duties, Noonan spent as much time as possible directly observing O'Hare passenger processing.

### B. Statements of Commissioner Kelly

Plaintiffs contend that statements of Commissioner Kelly show wrongdoing on the part of Managerial Defendants. This contention is without merit for two reasons. Plaintiffs refer to these statements as "admissions binding on Customs." The present summary judgment motion, however, concerns the individual liability of Customs employees, not the liability of Customs itself. The statements of Kelly are not admissions as against the other parties; Kelly is not a representative, authorized spokesperson, or agent of the other defendants and plaintiffs have dropped their contention that he is a coconspirator. See Fed. R. Evid. 801(d)(2).

But even if Kelly's statements were admissions that may be used against defendants, plaintiffs generally do not provide admissible evidence showing that he made the statements attributed to him. Kelly apparently was available to be deposed, but plaintiffs chose not to depose him. On summary judgment,

quotes or paraphrased statements in a newspaper or magazine article are not acceptable evidence that a person actually made a statement contained in the article. Eisenstadt v. Centel Corp., 113 F.3d 738, 742-43 (7th Cir. 1997); Chicago Firefighters Local 2 v. City of Chicago, 249 F.3d 649, 654 (7th Cir. 2001); Jim Sowell Construction Co. v. City of Coppell, Tex., 61 F. Supp. 2d 542, 550 (N.D. Tex. 1999); Barnes Foundation v. Township of Lower Merion, 982 F. Supp. 970, 995-96 (E.D. Pa. 1997). The only purported statement of Kelly that is not from a newspaper or magazine article is his May 20, 1999 testimony before a congressional committee, presumably under oath, that Customs' use of personal searches is "a procedure that we have found in recent years to have suffered from poor oversight, insufficient training, and a lack of supervision."

### C. Statistical Evidence

Defendants object to plaintiffs' use of a March 2000 General Accounting Office report entitled "U.S. Customs Service: Better Targeting of Airline Passengers for Personal Searches Could Produce Better Results". Pl. Exh. 16 ("GAO Report"). Such governmental reports, however, are admissible evidence. Fed. R. Evid. 803(8). The GAO Report provides some support for plaintiffs' contentions, but it must be recognized that it is an analysis of nationwide practices and generally does not separately consider practices at O'Hare. Banks, Weise, and Trotter, though, were in national positions; their responsibilities were not limited to O'Hare.

The GAO Report analyzes the personal search reports for the approximately 102,000 passengers that were subjected to personal searches in fiscal year 1997 and 1998.[26]  The personal searches were categorized as patdowns (or frisks), strip searches, X-ray examinations, and body cavity searches.  95% of the personal searches were limited to patdown searches.

Among United States citizens selected for searches,[27] Whites were the racial group most likely to be strip searched (8.2%).  However, within each racial group except Whites,[28] women were more likely to be strip searched than men.  Broken down by race and gender, Black women were the most likely group to be strip searched (14.2%), a rate 73% higher than the next highest groups (White men and White women) and 281% higher than Black men.  It is also more than 6 times the rate of Hispanic men (2.2%) and more than twice the rate of Hispanic women (6.1%).  Black women were also the racial/gender group of United States

---

[26]The personal search reports often had incomplete data.  For example, 23% of the reports did not contain race data, 1% did not have gender data, and 21% did not have citizenship data.  However, GAO concluded that the data was sufficient to conduct multivariate analysis.  See GAO Report at 10 n.7.  See also id. at 39-40.  On defendants' summary judgment motion, it must be taken as true that the data was sufficient.

[27]The GAO Report does not provide any statistics comparing those selected for searches to the general population of arriving international air passengers.  The "race" categorization employed in the GAO Report actually mixes race and ethnicity, categorizing passengers as White, Black, Asian, Hispanic, and Native American.  There were too few Native Americans to conduct a separate analysis for that category.

[28]White women and White men were strip searched at the same rate, 8.21%.

citizens most likely to be X-rayed (6.4%), a rate more than 8 times that of White women (0.73%) and almost 12 times that of White men (0.53%), as well as 39% higher than Black men (4.6%).

Despite being the racial/gender group of United States citizens most likely to be strip searched, Black women were not the group most likely to be found to have contraband when strip searched. Of those Black women that were strip searched, contraband was found on 27.6% of them, which is a higher positive rate than for White men (25.1%) and White women (19.5%), but a substantially lower positive rate than for Black men (61.6%), Hispanic men (58.8%), and Hispanic women (45.7%). As to X-ray examinations, Black women were the least likely to be found to have contraband (28.2%). That is less than half the 58.7% positive rate for White men, White women, and Black men. For all searches, including both citizens and noncitizens, the positive rate was 3.1% for patdowns, 22.8% for strip searches, 30.6% for X-ray examinations, and 56.3% for body cavity searches.[29] GAO Report at 42.

As for searches at O'Hare, plaintiffs have gleaned data from the negative search reports that were provided in discovery. These reports are limited to passengers subjected to personal

_____

[29]For each category of search, the GAO Report does not provide separate data as to citizens and noncitizens. However, it provides that data for all searches. The positive rate for United States citizens is 5.8%, for noncitizens 3.49%, and for those with no available citizenship data 3.9%. GAO Report at 42. If this pattern applies within each category of search, the positive results for United States citizens would be higher than the percentage for all passengers recited in the text.

searches on whom no contraband was found.  For the period from January 1, 1995 to April 2000, African-American women were 9.9% of those subjected to all types of negative personal searches. However, they were subjected to 41.6% of the negative strip searches and 34.4% of the negative X-ray examinations.  By comparison, African-American men were 13.2% of all negative searches, 6.7% of negative strip searches and 48.9% of negative X-ray examinations.  The respective percentages were 35.6, 7.4, and 7.8 for White men and 14.5, 24.9, and 4.4 for White women. During the period from May 15 to September 15, 1997, the respective percentages for each group were:  16.2, 57.1, and 50.0 for African-American women; 12.6, 0, and 40.0 for African-American men; 27.0, 7.1, and 0 for White men; and 15.4, 28.8, and 0 for White women.  As to all strip searches (positive and negative) conducted at O'Hare in 1997 and for which there are records, 44% were of Black women.  The next highest group was White women at 23%.

    Statistics for both O'Hare and the nation as a whole show that, during the pertinent time period, African-American women that were selected for nonroutine searches were then selected for strip searches and X-ray examinations at a rate greatly disproportionate to their representation in this pool.[30]  Thus,

--------------------------------------------------

    [30]No evidence is presented of a discriminatory effect in the selection of African-American women for patdown searches. There is no data in any of the reports comparing the percentage of African-American women on inbound flights or inbound flights from source countries to the percentage of African-American women selected for secondary searches, all types of personal searches,

plaintiffs present adequate evidence of this discriminatory effect. Though the disparity is great and defendants do not proffer an alternative explanation for the disparity, additional evidence apparently would still be needed to show that this effect was motivated by a racial and gender animus on the part of front-line Customs inspectors. Chavez v. Illinois State Police, 251 F.3d 612, 647-48 (7th Cir. 2001); McCray v. City of Dothan, 169 F. Supp. 2d 1260, 1289-90 (M.D. Ala. 2001). Plaintiffs contend there is additional evidence from which the inference of discriminatory motives may be drawn. It need not be decided, however, whether any inference can be drawn as to the motivations of the Customs inspectors. As discussed in § I(C) supra, defendants' summary judgment motion does not put at issue the existence of a practice of discriminatorily selecting African-American women for nonroutine searches. As previously held, on summary judgment, it must be accepted that such a practice existed.

Plaintiffs also provide some statistical evidence regarding contraband found during searches at O'Hare. Plaintiffs, however, misdescribe the evidence. Plaintiffs cite to fiscal year 1997 and 1998 data for the number of secondary searches, not the number of personal searches. Secondary searches involve any questioning or luggage search beyond the

---

or patdown searches. The comparative data only goes to selection for strip searches and X-ray examinations, by comparing the percentage of African-American women selected for those procedures to their presence in the pool of personal searches.

initial examination upon a passenger's arrival at Customs.  The
document shows there were 31,428 secondary searches at O'Hare in
fiscal 1997, but only 3,344 personal searches.  Pl. Exh. 18.  In
fiscal 1998, there were 38,067 secondary searches.  Plaintiffs
focus on the number of times narcotics were found and contend it
is an extremely low "success rate."  In fiscal 1997, narcotics
were found in 61 of 31,428 secondary searches (.19%).  In fiscal
1998, narcotics were found in 20 of 38,067 secondary searches
(.05%).  The present case, however, involves the narrower class
of searches that have been referred to as personal searches or
nonroutine searches.  Plaintiffs also ignore that other
contraband or violations were found during the personal searches.
In fiscal 1997, 158 Category 1 violations were found and 145
Category 2 violations.  Pl. Exh. 18.[31]  That would be a secondary
search "success rate" of 0.96%.  The document does not set forth
how many of the violations were found during personal searches.
Assuming all the violations were found during personal searches,
the best possible fiscal 1997 "success rate" for personal
searches would be 9.06%.[32]  The secondary search evidence is also
broken down between randomly selected searches and those searches
of passengers specifically selected by enforcement personnel
("rover" searches).  In each year, approximately one-third of the

---

[31]The document does not define the distinction between
Category 1 and Category 2 violations.

[32]The GAO Report's national statistics showed a positive
search result in 4.25% of the personal searches conducted in
fiscal 1997-98.  Pl. Exh. 16 at 40.

secondary searches were randomly selected. In fiscal 1997, the "success rate" for rover searches was 14.21 times higher than for random searches and 13.21 times higher in fiscal 1998.

### D. Management Involvement in Discriminatory Search Practices

Plaintiffs contend that the Managerial Defendants' facilitation of and acquiescence in the practice of discriminatorily selecting African-American women for personal searches is shown by evidence of written policies sanctioning discriminatory search procedures, a lack of concern for the disproportionate effect on African-American women, the reckless disregard of passenger complaints and Congressional inquiries regarding racial targeting, and attempts to marginalize, silence, and cover up internal complaints of wrongdoing.

### 1. Written Policies

The official Customs training manual includes the following in the section entitled "Selectivity in Passenger Processing."

> Pay special attention to females. Young pretty females are used extensively for narcotics courier work. As with the male passenger, decide if the clothing is intended to stir a particular emotion or project a certain image? . . . Is the clothing designed to take your attention off the baggage and onto the bustline? . . .
> Look closely at the jewelry worn on the hands. Is there a wedding ring? If so, where is the spouse? Few married people vacation abroad by themselves without being up to something. Married women on sightseeing trips without their husbands constitute a high-risk passenger in more ways than one. . . .

Pl. Exh. 30 at 169.25, 169.27.

This quotation is from the Revised April 1999 version of the training manual. A supervisory Customs inspector who had been employed since 1979 recalled receiving instructions about being wary of women traveling alone, but did not recall receiving any special instructions about men traveling alone. He did not recall when he received these instructions. Plaintiffs contend the remaining Commissioner defendants (Banks and Weise) are responsible for the contents of the official training manual. However, there is no evidence that either of them were aware of the cited passages in the training manual.[33]

Contrary to plaintiffs' contention, they have not provided sufficient evidence from which it can be found or inferred that any of the Managerial Defendants promulgated, enforced, or sanctioned a written policy to profile passengers or select them for searches based on a passenger's race and/or gender.

## 2. Knowledge of Discriminatory Effects and Reaction Thereto

In July 1998, then-Senator Carol Mosely Braun was inquiring about searches at O'Hare. On July 21, 1998, MidAmerica Customs Management Center Director Fee emailed Trotter and one of Trotter's other subordinates (John McGowan) to inform them that Fee's meeting with Braun had been cancelled. Fee also provided

---

[33]Plaintiffs also point to training and evaluation documents that refer to profiling. The documents, however, are all from 1990 or earlier and none of the documents refer to profiling based on race or gender.

data for 1997 strip searches at O'Hare.[34]  Fee highlights the
source countries involving the most strip searches and the race
and gender of the strip-searched passengers that had narcotics.
He also notes that 47 of the 107 strip-searched passengers were
Black females, with 8 having narcotics.  25 of the 107 strip-
searched passengers were White females, with 6 having narcotics.
Narcotics were found on 27 of the 107 passengers who were
stripped search, a success rate of at least 25.2%.[35]  Fee does
not expressly state the percentage of Black females, nor does he
emphasize the Black female data over the other data, though the
reference to the Braun meeting could be read as bringing
attention to the issue of racial and gender profiling.  After
reciting the various data, Fee closes with:  "Any thoughts on
this?"  Trotter did not, in any way, follow up on this
information and query.  Neither did he contact McGowan about
the email nor did he refer the information to any other
subordinate.[36]  At his deposition in June 2001, Trotter did not

---

[34]The email does not specify strip searches, but
defendants do not dispute that it is referring to strip searches.
See Pl. Exh. 34; Def. Loc. R. 56.1(a) Reply ¶ 89.

[35]Fee's email mentions narcotics seizures.  He does not
indicate whether or not other contraband was found on any of the
passengers.

[36]Hoteko and Weeks may also have been aware of the data
on 1997 strip searches.  Fee testified that Hoteko and Weeks
helped him compile the data.  The testimony, though, is unclear
as to whether they provided him with all the individual search
reports from which Fee or a subordinate compiled the data or if
Hoteko, Weeks, and/or one of their subordinates compiled the data
and forwarded the numbers to Fee.  See Pl. Exh. 4, Fee Dep. at
73-75.

recall ever seeing the email, but admitted he received a lot of email and does not necessarily recall every one that he reads.

On May 24, 1997, five O'Hare passengers were found with narcotics. That is a high total for one day. Four of the passengers were African-American women arriving from Jamaica, two of whom had narcotics inserted in their vagina. One apparently had the narcotics under her clothes, or at least somewhere where the narcotics were discovered during a strip search. The fourth women apparently had the narcotics hidden internally, since the narcotics were discovered through an X-ray examination. It is reasonably inferred that Customs followed its usual practices of issuing an internal communique about the seizures and discussing the seizures at Hoteko's weekly meetings. The communique would have included the passengers' race and gender, as well as information about age, length of stay, method of payment of the ticket, and the passengers' stories as to the purposes of their trips. During an approximately four-month period after the May 24 seizures,[37] African-American women's proportionate share of personal searches, strip searches, and X-ray examinations at O'Hare increased. From January 1, 1995 through May 14, 1997, African-American women were subjected to 9.5% of all personal searches, 41.5% of strip searches, and 18.8% of X-ray examinations. From May 15 through September 15, 1997, they represented 16.2% of personal searches, 57.1% of strip searches,

_____

[37]The data provided is actually for the four-month period beginning May 15, 1997 and is limited to negative searches.

and 50.0% of X-ray examinations.  For the period from
September 16, 1997 through April 2000,[38] African-American women's
proportionate shares were again at lower levels:  8.7% of
all personal searches, 35.8% of strip searches, and 33.3% of
X-ray examinations.

It can reasonably be inferred that personal searches,
strip searches, and X-ray examinations of African-American women
increased as a result of communications regarding the May 24,
1997 seizures from four African-American women.  It can
reasonably be inferred that Hoteko was involved in discussions of
the May 24 seizures at one or more of his weekly meetings.  The
communique, however, would be a different matter.  The evidence
as to a communique being issued supports that it would originate
from the Custom inspectors involved in the seizures.  See Pl.
Exh. 4, Fee Dep. at 39.  While such a communique may have been
communicated to some of the Managerial Defendants, see id. at 41
(nondefendant manager Fee was one of the persons who would have
received such a communique), it would only show their knowledge
that information about the four seizures was distributed,
including the race and gender of the passengers.  It does not
show they were personally responsible for its distribution.

---

[38]Beginning in May 1999 reforms were instituted that were
aimed at decreasing discrimination in selections for personal
searches, including September and/or November 1999 revisions to
Customs' Personal Search Handbook.  Part of the September 1997
through April 2000 data is from the time period after the reforms
began.

### 3. Adverse Inferences From False Testimony

Citing <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147 (2000), and <u>Kasper v. St. Mary of Nazareth Hospital</u>, 135 F.3d 1170, 1173 (7th Cir. 1996), plaintiffs contend wrongful intent on the part of Hoteko and Trotter can be inferred from certain false denials at their depositions. The cited cases, however, concern inferring a discriminatory motive from a showing that a proffered ground for an adverse employment action was pretextual. In those cases, the false testimony or proffer directly concerns the issue of the defendant's motive. Moreover, those cases involved indirect proof under the <u>McDonnell Douglas</u> framework. In such cases, the plaintiff has already presented a <u>prima facie</u> case of discrimination from which a discriminatory motive can be inferred. Thus, proof that a proffered ground for an adverse employment action was pretextual leaves the <u>prima facie</u> inference of discrimination intact. <u>See</u> <u>Reeves</u>, 530 U.S. at 148; <u>Loyd v. Phillips Brothers, Inc.</u>, 25 F.3d 518, 522 (7th Cir. 1994); <u>McCoy v. WGN Continental Broadcasting Co.</u>, 957 F.2d 368, 372 (7th Cir. 1992); <u>King v. Wiseway Super Center, Inc.</u>, 954 F. Supp. 1289, 1292 (N.D. Ind. 1997).

Here, Trotter's purported false testimony is his failure to recall receiving the July 1998 Fee email or the strip search data contained therein. <u>See</u> Pl. Exh. 3, Trotter Dep. at 45-48. It is not a reasonable inference that Trotter lied about such knowledge instead of simply forgetting or never having read that email. Even if it is reasonable to infer intentional falsity, or

at least intentional evasiveness, this particular question is not so central to the issue of motive as to be sufficient by itself to infer a discriminatory motive on Trotter's part.  There would still have to be other substantial evidence of a discriminatory motive.

As to Hoteko, plaintiffs point to his testimony that, in 1997, he had no "access" to data as to the percentage of strip-searched passengers that were African-American women.    Pl. Exh. 2, Hoteko Dep. at 83-84.  This testimony should be understood as being that the data had not been compiled from individual reports until an effort was made in 1998 to tabulate it.   Moreover, the actual question was about African-American women being 46% [sic] of those strip searched in 1997.  That total could not have been known until after 1997 was completed.[39] But even if Hoteko's testimony was intentionally false, it is not so central to the issue of motive as to be sufficient by itself to infer a discriminatory motive on Hoteko's part.  There would still have to be other substantial evidence of a discriminatory motive.

### 4. Passenger Complaints of Discrimination

As to passenger complaints, each of the Managerial Defendants acknowledges in his summary judgment affidavit that he has received complaints of racial and gender discrimination,

_____

[39]The reference is to the data contained in Fee's email. That email does not specify whether Fee is referring to fiscal year 1997 (the government fiscal year ends on September 30) or calendar year 1997.

though none specifies a time period or number.  Plaintiffs
provide written complaints concerning searches following arrival
at O'Hare on 12 different flights.[40]  See Pl. Exh. 49.[41]  The
written complaints were received by Customs officials[42] between
December 1996 and February 1999 and concern searches that
occurred between March 1996 and October 1998.  As to three of the
incidents, the complainant was an African-American male, though
one of those three also complained about his African-American
wife being searched.  All of the remaining complaints were

---

[40]Defendants admit that "numerous" named plaintiffs also
verbally complained that their searches were because of their
race.  See Def. Loc. R. 56.1(a) Reply ¶ 125.  However,
plaintiffs' cited support (which omitted citations to specific
pages) only shows that one plaintiff complained to a supervisory
Customs inspector immediately after the search, though she did
not specifically testify that she complained of racial
discrimination (Phillips Dep. at 68-71); one plaintiff complained
she wanted to talk to a supervisor, but was not provided the
opportunity (Chalk Dep. at 83-84); and one plaintiff attempted to
telephone in a complaint, but did not get through (Byrd-Brown
Dep. at 59).  It is also admitted that, prior to 1999, Customs
did not keep records of verbal complaints.

[41]The Exhibit contains multiple copies and multiple
letters regarding each incident.  As to one incoming flight, two
African-American male friends wrote separate letters complaining
of both of them being searched.  This will be counted as a single
incident for a total of 12 incidents or complaints.  Contrary to
defendants' contention, all the letters expressly or implicitly
complain of racial discrimination and, even if the writer did not
always identify his or her race, incident reports or other
information disclosed the complaining passenger's race.
Plaintiffs are admonished that, if they again submit this type of
exhibit, they must organize it better (for example, grouping
together each complainant's documents and ordering them
chronologically), provide a summary of the exhibit's contents,
and number the pages of the exhibit.

[42]Many of the complaints were forwarded by others, such
as Congresspersons or, in one case, the Immigration and
Naturalization Service.

initiated by African-American women or their representatives.
Five of the complainants are named plaintiffs in this case.  A
number of the letters were not limited to the person's own
search, but also complained that additional African-Americans on
the particular flight had been disproportionately selected for
searches.  The correspondence indicates that at least eight of
the complaints were brought to Noonan's attention, at least four
to Weeks' attention, at least two to Weise's attention, and at
least one to Hoteko's attention.  As to one of the complaints,
none of the remaining defendants is indicated as having received
a copy.[43]

As to all of the incidents, Customs' official response
was that neither race nor gender were factors in conducting the
search.  Evidence, however, supports that investigations of the
complaints were usually limited to examining Customs' records and
talking to the inspectors involved, who often did not recall the
incident.  Noonan states that he never found a justified

---

[43]Plaintiffs contend that Banks also received notice of
at least one of the written complaints.  If the court has missed
such notice or miscounted the number received by others, it is
due to plaintiffs' failure to organize Exh. 49 and provide
specific citations.  There is also evidence that Noonan had
responsibility for the investigation of most passenger complaints
and that Hoteko and the Port Director would approve the response
to the passenger.  If the complaint was originally submitted to
the national office, the response would also pass through
Trotter.  However, three of the complaints were received after
Weeks left Chicago and one before he was Port Director.  Two of
the complaints were received before Trotter's tenure and one was
received afterwards.  Two of the complaints were received before
Banks was Acting Commissioner and three afterwards.  Only three
of the complaints were received before Weise retired.

passenger complaint of racial discrimination, nor even a justified complaint of an unfair strip or personal search. Only one of the 12 complaints was forwarded to Internal Affairs for an investigation. Although Noonan did not find discrimination, on the pending motions for summary judgment, the five incidents involving the named plaintiffs must be assumed to have involved discriminatory selection of African-American women. While the evidence supports that Noonan conducted a less than adequate inspection, there is no basis for inferring that any of the other Managerial Defendants were aware of or condoned Noonan's deficient investigatory practices.[44]

Twelve written complaints of discrimination over a period of approximately two and one-half years must be viewed in light of the number of passengers passing through Customs at O'Hare. During the pertinent time period, more than 30,000 O'Hare passengers per year were being subjected to secondary searches and more than 3,000 O'Hare passengers per year were being subjected to personal searches. Also, a total of more than 3,000,000 passengers passed through O'Hare Customs each year.

---

[44]Plaintiffs contend that Hoteko and Weeks failed to follow up on Fee's decision to require weekly reports of passenger complaints. That request, however, came in late April 1999, after all but one of the searches involved in the present case. Moreover, Fee further testified that he soon determined that was an unrealistic expectation and instead relied on periodic meetings with those from whom he had requested the weekly reports.

## 5. Congressional Inquiries

In May 1998, Senator Braun sent a letter to Acting
Commissioner Banks noting "concern[] about recent reports that
airline passengers are arbitrarily being detained by Customs
officials because they fit into certain 'profiles.'"  She further
noted that she was concerned about invasions of the "privacy of
innocent Americans, and particularly minority Americans."  She
requested information as to the number of airline passenger
searches; "the race, national origin, and gender of those
searched;" and the number and type of violations discovered in
such searches.  The letter did not specifically mention O'Hare
and the information requested was national in scope.  By June or
July 1998, however, O'Hare data was being requested and Weeks was
involved in the process by at least June.  The data was not
provided before Weeks and Banks left their positions in July and
August of that year, and their replacements did not provide the
information to Braun before she left office in January 1999.  For
1997 and 1998, however, there was no existing database with
racial and gender statistics.  Compilation of the data had to be
performed manually.

## 6. Employee Complaints and Internal Investigations

Before 1999, a Customs inspector's report that minorities
were being disproportionately targeted should have been reported
up the chain of command to the Port Director.  If there was a
complaint about a specific inspector engaging in such conduct and
it was believed credible, it probably should have been referred

to Internal Affairs, but there was no specific policy to that effect. As of sometime in 1999, it became mandatory to refer to Internal Affairs both general and specific complaints of discriminatory targeting.

Apparently in August or September 1998, African-American Customs inspector Ray Smith informed his immediate supervisor and her superior, Supervisory Defendants Gloria Banks and Mario Cornejo, that he believed passengers of color were being disproportionately targeted and that certain Customs inspectors were engaging in discriminatory selection. The complaint was passed on to Hoteko, who also met with Smith. In response, Cornejo suggested that Smith see a psychologist[45] and also indicated that minorities should be searched more often because they were more likely to possess contraband. When Smith met with Hoteko, Hoteko expressed concern and said he would have an EEO Counselor look into the allegations. A meeting was then held with the EEO Counselor, Smith, Gloria Banks, Cornejo, Hoteko, and the specifically accused Customs inspectors. At the meeting, the Customs inspectors and supervisors were reminded not to target minorities. No referral was made to Internal Affairs. Hoteko testified that he left to the EEO counselor any decision to further pursue the allegations. The EEO counselor apparently

---

[45]There is evidence that Cornejo suggested the psychologist because of allegations Smith was harassing female Customs inspectors. On defendants' summary judgment motions, however, it must be taken as true that Smith did not engage in harassment and that Cornejo had an insufficient basis for suggesting consultation with a psychologist.

determined that the accusations against the specific Customs inspectors were unfounded.  See Pl. Exh. 2, Hoteko Dep. Exh. 19 at 2.  Hoteko also testified that, as a result of the discussions at the meeting, Hoteko understood that Smith agreed his accusations were unfounded.

Plaintiffs also provide evidence regarding two other situations that they contend should have been referred to Internal Affairs for investigation of discriminatory selections for secondary searches.  The evidence, however, does not support that the situations involved discriminatory selection by Customs inspectors or a failure on the part of supervisory Customs inspectors to adequately inquire or refer for investigation.

### 7. Destruction of Evidence

Plaintiffs also seek an adverse inference from the destruction of PAU daily lists.  Based on various factors, the PAU selects passengers for questioning prior to their arrival.  The questioning may or may not result in a decision to conduct a personal search.  The persons selected are referred to as "PAU lookouts" and a written list of PAU lookouts is produced each day.  At the end of each day, the copies of the daily list are destroyed.  Apparently beginning in May 1999, one copy of the daily list was retained in the PAU office.  Prior to that practice, no copies were retained.  Defendants provided the daily lists for May 1999 through December 1999 and informed plaintiffs that subsequent lists were also available.  Plaintiffs point to no evidence that they first requested the lists prior to May

1999, nor do they point to any evidence that the daily
destruction of prior lists was intended to evade discovery. It
apparently was a practice that predated this lawsuit. There is
no basis for drawing an adverse inference.

### E. Goals and Incentives

Plaintiffs provide evidence of performance goals and a
cash award system that they contend are an incentive for
conducting searches on less than the required suspicion.
Statutes require that Customs establish annual performance plans
that generally must include "objective, quantifiable, and
measurable" goals. 31 U.S.C. § 1115. See also 5 U.S.C. § 306.
Accordingly, Customs sets yearly performance targets for the
overall poundage of narcotics interdiction. It also sets goals
regarding the success rate of rover searches compared to random
searches, goals that O'Hare Customs exceeded in fiscal years 1997
and 1998. GAO Report at 27-28.

In a newsletter to the ranks, Hoteko recited the national
goals as to the amounts for various narcotics seizures and stated
"NARCOTIC ENFORCEMENT is still OUR number ONE goal. It MEANS we
use TARGETS and MEASURES to ensure that we are headed to OUR
goal." This was probably a quote or paraphrase from a
headquarters communication. Hoteko has stated that seizure
activity at O'Hare helps Customs achieve the national goals. In
the newsletter, he has also stated that seizure activity at
O'Hare creates good press, puts Chicago on the map, and keeps
Customs employees at O'Hare in contention for the Commissioner's

Unit Citation Award, which is a coveted award. When O'Hare received the award for fiscal 1997, Hoteko described it as the "highlight of the year." In the newsletter, Hoteko proudly quoted the national drug czar's description of Customs as "the most PROFESSIONAL and AGGRESSIVE law enforcement agency in the government today!!" In the newsletter, Hoteko also highlighted and reported proudly that the fiscal 1997 success rate for rover secondary searches was 14.21 times higher than for random searches. It was Hoteko's belief that the more narcotics that were seized, the more resources that would be allocated to Customs and O'Hare. Trotter, though, has expressed the view that he believed failing to meet seizure targets would not affect funding.

From October 1992 through May 1999, Michael Perron worked on national programs at headquarters, and was involved in the process for setting some of the national goals. When Kelly became Commissioner, Perron noticed a new emphasis on search efficacy, that is, producing more seizures from less personal searches. Under Weise and Banks, however, the emphasis was primarily on the amount of drugs seized. "We were concerned more with the raw outcome, which would have been the number of seizures, the amount of narcotics seized, and we did not really get into the aspect of how much work was going on to do that, how many people were being searched." Pl. Exh. 23, Perron Dep. at 88.

The Customs inspector evaluation form in effect from 1996 through 1999 did not specifically refer to the inspector's aggregate amount of seizures. Search efficacy also was not included on the form.[46]

Customs has two award systems. The SHARE awards come from an annual pool of money that is shared by a large number of employees in accordance with a formula for assigning each employee a percentage. Other awards (sometimes called on-the-spot awards), which may be in the form of cash, time off, or a citation, are for particular acts or activities. It is undisputed that on-the-spot awards have sometimes been made for particular drug seizures. It is unclear whether drug seizures can be a basis for increasing an employee's percentage of a SHARE award. There, however, is no evidence as to how frequently or regularly a drug seizure results in an award. Plaintiffs provide evidence of four or five awards based on drug seizures, but only one occurred in the pertinent time period and one occurred as far back as the 1980's. The evidence does not support an inference that a Customs inspector would have an expectation of receiving an award every time he or she seized drugs, nor even every time there was a seizure of a large amount of drugs. There is no basis in the evidence for inferring that the cash award system in place provided an undue, or even significant, incentive to engage

_____

[46]Plaintiffs provide evidence of evaluation forms used in 1995 and earlier that included information on aggregate seizures, but not search efficacy.

in unlawful searches in the hope of finding drugs that would result in an award.

Plaintiffs also make much of a district court opinion that contains _dictum_ criticizing Customs' cash award system. See Buritica v. United States, 8 F. Supp. 2d 1188, 1193-95 (C.D. Cal. 1998).[47] There, the court indicated that Customs had a program under which the amount of drugs seized was a factor to be considered in granting a "Superior Achievement Award." _Id._ at 1193. The court did not reach a conclusion as to whether the defendants in that case were actually motivated by the incentive program, but did state that "such a program creates perverse law enforcement incentives that have an unduly dangerous propensity to encourage unreasonable searches and detentions." _Id._ The court did not conclude that the incentive program actually violated the Constitution, but indicated that it might. The court did not resolve the issue because it instead held that Buritica lacked standing to seek declaratory relief. _Id._ at 1195-97. Plaintiffs contend that the failure to end the cash award program following the Buritica case indicates a disregard for constitutional rights. The cited criticism, however, is _dictum_. Moreover, there is no evidence in the present case of a cash award system that has produced an undue influence on seizures. No inference can be drawn from the failure to change policies following the Buritica case.

---

[47]There is no contention that there is any collateral estoppel effect from this case.

Plaintiffs also point to a discussion of the <u>Buritica</u> case contained in a Trotter memorandum. In addition to reaching the issue of standing as to injunctive and declaratory relief, the <u>Buritica</u> case denies a motion for new trial or remittitur as to $225,000 in damages awarded against two Customs inspectors and denies a motion for judgment as a matter of law regarding punitive damages awarded against a supervisory Customs inspector. <u>See</u> <u>id.</u> at 1191-92. Neither of those rulings, however, address the issue of the applicable legal standard for the search that was found to be unlawful.[48] The opinion does not describe the nature of the unlawful search, other than to imply that it concerned suspected internal smuggling of drugs. <u>See</u> <u>id.</u> at 1191. Plaintiffs complain that Trotter's memorandum does not mention the cash award system "rebuke" and fails to criticize the unlawful conduct, instead conveying the message that Customs will stand behind its employees even when they act in an unconstitutional manner.

First, plaintiffs ignore that Trotter's memorandum is dated October 29, 1998 and therefore could have had no effect on any of the searches of named plaintiffs except possibly the August 1999 search, which was almost a year later and six months after Trotter left his Assistant Commissioner position. In any

---

[48]The court refers to a prior "lengthy order" ruling on summary judgment. <u>Buritica</u>, 8 F. Supp. 2d at 1190. The summary judgment ruling is not published and does not appear on Westlaw. According to Trotter's memorandum, the case involved monitored bowel movements and settled after trial. Pl. Exh. 29 at 2.

event, no negative inference may reasonably be drawn from a failure to comment on _dictum_ in a case. Trotter does note that no Customs employee was personally liable under the settlement and that Customs backed them up during the litigation process. He describes the _Buritica_ defendants' decision to conduct the search as being in accordance with established procedures and not found to be unlawful, only the length of the detention being found unlawful. He suggests that a different judge and jury may have decided differently as to the length of detention and refers to unspecified Supreme Court precedent upholding a 16-hour detention.[49] Nevertheless, Trotter correctly states that the reasonableness of the detention will depend on the particular facts of the case. Also, the beginning of the memorandum emphasizes that employees are to follow the 1997 Personal Search Handbook[50] and that Customs will "fully support its employees who perform their duties in accordance with written policy and procedures," not that Customs will fully support employees no matter what they do. Additionally, the memorandum discusses the _Anderson_ case and emphasizes that the "use of improper discriminatory targeting criteria is absolutely prohibited."

---

[49]This is likely a reference to _United States v. Montoya de Hernandez_, 473 U.S. 531 (1985). _See also_ _Anderson IV_, 199 F.R.D. at 248-50.

[50]In response to the summary judgment motion, there is no contention by plaintiffs that the then-existing Personal Search Handbook contained unlawful standards. They do not refer to it as evidence of unlawful written policies.

Trotter's memorandum is not evidence of encouragement of unlawful behavior. And even if it were so construed, it was sent after all but one of the searches in this case.

## F. Reforms

On May 20, 1999, Commissioner Kelly issued a news release announcing certain reforms that were described as being intended to ensure passengers would be "treated fairly and with dignity" and as "safeguards against potential abuse or bias in the Customs search process." The news release also states that Customs does not tolerate "racial targeting" or the "mistreatment of innocent passengers" and that the reforms were intended to ensure that practices were consistent with policies. The new measures included: (a) conducting a personal search had to be approved by a supervisor; (b) off-site X-ray examinations had to be approved by the Port Director; (c) if a personal search exceeded two hours, Customs inspectors would make a telephone call to a person of the passenger's choice; (d) having Customs lawyers available 24 hours a day to advise Customs inspectors as to the propriety of search procedures; (e) new data analysis of passenger searches and to monitor trends; and (f) establishment of an internal task force to review the criteria used to select passengers for personal searches. The news release also mentions prior changes involving new Customs inspector training in cultural interaction, interpersonal communications, and confrontation management and an ongoing panel of independent federal officials who were reviewing Customs search practices.

The GAO Report confirms that most of these changes were implemented,[51] see GAO Report at 6-8, 16-17, 20, 23-25, 27-29, and Kelly also provided similar information in testimony before a House committee. See Pl. Exh. 8. Plaintiffs also contend that the reforms resulted in a decreased number of invasive searches, while increasing the contraband seizure rates. The submitted support, however, is an inadmissible magazine article and therefore is not credited. See Pl. Exh. 14.[52] The GAO Report states that national positive search results for personal searches increased from 3.5% in fiscal 1998 to 5.73% in fiscal 1999. GAO Report at 31.

## III. MERITS

### A. Supervisory Liability

In a Bivens claim such as Counts II, IV, and VII, defendants cannot be held liable based on respondeat superior. Del Raine v. Williford, 32 F.3d 1024, 1047 (7th Cir. 1994). The rule is essentially the same as that for constitutional claims under 42 U.S.C. § 1983. Id. To be liable for a constitutional violation, a supervisory defendant need not have directly

---

[51]The GAO Report does not report whether attorneys were provided to advise Customs inspectors.

[52]The Newsweek article from the October 1, 2001 issue at 61, actually refers to a decrease in "searches" not a decrease in invasive searches. "Last year, under the new system, Customs conducted 70 percent fewer searches than it did in the late 1990s but increased its yield of illegal drugs and other contraband 25 percent."

participated in the deprivation of rights, but he or she must have been personally involved in the deprivation.  Id.; Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001); Chavez, 251 F.3d at 651.  "A defendant 'will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.'"  Sanville, 266 F.3d at 740 (quoting Chavez, 251 F.3d at 652).  "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. . . .  The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.  They must in other words act either knowingly or with deliberate, reckless indifference."  Chavez, 251 F.3d at 651 (quoting Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988)).  Thus, where there is a formal policy that is unconstitutional, an official will be liable for "formulating and directing" the policy.  Del Raine, 32 F.3d at 1052 (Manion, J., concurring); Neilis v. Ward, 2000 WL 1372870 *3 (N.D. Ill. Sept. 21, 2000); Bolden v. Peters, 1994 WL 695524 *4 (N.D. Ill. Dec. 9, 1994).  Where there is a custom, practice, or pattern of unconstitutional conduct by subordinates that is not pursuant to a formal policy, the supervisor must facilitate, approve, condone, or deliberately ignore the practice in order to be liable.  Clinkscales v. Sheahan, 1998 WL 292402 *2 (N.D. Ill. May 19, 1998).

## 1. Count II

In Count II, it is claimed that the Managerial Defendants are responsible for Customs inspectors' practice of discriminatorily selecting African-American women for nonroutine searches. For purposes of the summary judgment motions, it is taken as true that such a practice existed among Customs inspectors during the pertinent time period, see § I(C) supra, and plaintiffs also provide statistical evidence supporting that such a practice existed, see § II(C) supra. Plaintiffs do not provide adequate evidence of any written or formal policies requiring or encouraging such practices and for which any of the remaining Managerial Defendants are responsible. See § II(D)(1) supra. Therefore, plaintiffs must rely on evidence that the Managerial Defendants had knowledge of the practice and facilitated, condoned, or approved it, or deliberately turned a blind eye to it.

Although plaintiffs provide statistical evidence that African-American women were disproportionately selected for strip searches and X-ray examinations, most of the cited reports did not exist until after the searches of the named plaintiffs and therefore could not be the basis for Managerial Defendants having knowledge of discriminatory practices. Moreover, none of the data shows that African-American women were disproportionately selected for patdown searches, only that they were disproportionately selected for strip searches and X-ray examinations. The GAO report is from March 2000. The data from

the negative search database was compiled for use in this litigation and apparently was first provided to defendants as part of plaintiffs' October 2001 response to the summary judgment motions.

The only evidence of data being provided to defendants during the pertinent time period relates to Fee's July 21, 1998 email to Trotter which contained data as to 1997 strip searches at O'Hare. As of that date, it can be inferred that Trotter had knowledge that, in 1997, 44% of the 107 strip searches at O'Hare were performed on African-American women. There is no evidence that Trotter would have a basis for believing such data was not indicative of discriminatory practices. Nevertheless, Trotter took no action either to further investigate the data or seek to curtail the practice; nor did he take the precaution of issuing a communication to Customs inspectors reinforcing a policy against discriminatory selection of passengers for searches. Instead, Trotter turned a blind eye to the information.[53] Therefore,

_____

[53]Defendants contend this data does not show a discriminatory effect because there is no population benchmark for comparison. As discussed supra, the existence of discriminatory selection practices is not at issue, but the Managerial Defendants' knowledge of such practices is at issue. The question presently being considered is whether Trotter had knowledge to which he thereafter turned a blind eye. It can be inferred that a person would know that African-American women do not make up anywhere near 44% of the general population. The 44% figure would raise suspicions. While there could possibly be a nondiscriminatory explanation, there is no indication that Trotter was already aware of such an explanation and he took no action to investigate further. Thus, it can reasonably be inferred that he deliberately turned a blind eye to the information that was provided to him. A reasonable trier of fact could also find otherwise. On defendants' summary judgment

Trotter could be found liable for strip searches that occurred after July 21, 1998.[54] Since causation is not at issue, it will not be considered whether such plaintiffs could muster evidence to prove Trotter's deliberate indifference to the July 21, 1998 email was a cause of their discriminatory selection for a search. It will not be considered whether he could have done anything to have prevented those searches, how quickly he could have acted, nor how long the lingering effect of his conduct may have been. The Count II claims against Trotter by named plaintiffs who were strip searched after July 21, 1998 will not be dismissed.

There is also equivocal evidence that Hoteko and/or Weeks provided the data to Fee and therefore, in July 1998, were also aware of the 1997 strip search data. See § II(D)(2) supra. But even if it is reasonable to draw such an inference as to both Weeks and Hoteko, Weeks left the Chicago Port that month and therefore could not be expected to have followed up on the data. Moreover, there is no argument by plaintiffs that either Weeks or Hoteko failed to act after learning of this information. See Pl.

---

motions, however, the reasonable inference favoring plaintiffs must be drawn.

[54]According to Pl. Exh. 77, six named plaintiffs were searched after July 21, 1998, though it might actually be only five. (On Exhibit 77, Patricia Coleman is listed as July 1998, but the complaint specifies July 30, 1998. 7th Am. Compl. ¶ 62. As to Iris Liddell, however, Exhibit 77 states August 1998, but plaintiffs' more definite statement recites August 27, 1996 as the date she was searched.) It is unknown whether any of these five or six plaintiffs were subjected to strip searches, but the complaint generally alleges that they were and that fact is not at issue in the present motions. See 7th Am. Compl. ¶ 118. See also Anderson I, 1999 WL 35307 at *4.

Response to Summ. Jmt. [Docket Entry 321] at 16. Therefore, the 1997 strip search data will not be held to be a basis for finding Weeks and Hoteko liable for subsequent searches of named plaintiffs.

The question also arises as to whether the Managerial Defendants may be considered to have turned a blind eye by waiting until 1999 to begin implementing a system to automate the collection of racial and gender data. First, there is no evidence as to who would be able to implement such a decision. Presumably it would have to be implemented from headquarters and therefore is an improbable basis for finding the Chicago Managerial Employees liable. In any event, before a defendant can be found liable for ignoring information by failing to create a means to collect it, he or she must have had a reason to be interested in collecting it. Unless there is other sufficient indication of discrimination, defendants cannot be considered to have deliberately turned a blind eye by avoiding the collection of data that might further or better indicate discrimination was occurring. The other evidence is insufficient to draw such a conclusion.

Although, each year at O'Hare, more than 3,000,000 passengers passed through Customs, more than 30,000 secondary searches were performed, and more than 3,000 personal searches were performed, during a two-and-one-half year period there were a total of 12 written complaints of discrimination against African-Americans. With the possible exceptions of Hoteko and

Noonan, none of the defendants were aware of all 12 complaints.
But even considering all 12 complaints, most were directed to
racial discrimination and did not raise the specific issue in
this case:  racial and gender discrimination against African-
American women.  This is not an insignificant point because the
evidence in this case does not support that there was
discrimination against African-Americans generally, only that
there was discrimination against African-American women.  Even if
the complaints had placed a defendant on notice to inquire about
racial discrimination it would not necessarily have been
confirmed if the inquiry did not consider the mix between racial
and gender discrimination.  Moreover, the person assigned to
investigate the complaints did not find that any of the
complaints had merit and there is no evidence to support that any
of the other Managerial Defendants who learned of the complaints
were aware that the investigations finding no wrongdoing were
superficial or deficient.  Clearly, the passenger complaints are
an insufficient basis for concluding that any Managerial
Defendants other than possibly Noonan were aware of the
discrimination that was occurring.  Cf. Zentmyer v. Kendall
County, Ill., 220 F.3d 805, 812 (7th Cir. 2000).

Noonan is in a different position.  He was directly
responsible for investigating the complaints of discrimination
and there is sufficient evidence to reasonably infer that he
performed less than adequate investigations of the complaints.
See § II(D)(4) supra.  On his summary judgment motion, it must be

assumed to be true that Noonan repeatedly failed to perform adequate investigations of the complaints of discrimination. This is not a situation where Noonan failed to investigate one particular complaint or employee.[55] Cf. Gates v. Unified School Dist. No. 449 of Leavenworth County, Kan., 996 F.2d 1035, 1043 (10th Cir. 1993); Hosty v. Governors State University, 2001 WL 1465621 *4 (N.D. Ill. Nov. 15, 2001); Wilson v. DeTella, 1999 WL 1000502 *5 (N.D. Ill. Nov. 1, 1999). Instead, the facts before the court are that he repeatedly performed superficial and inadequate investigations. While a reasonable trier of fact might find otherwise or that Noonan's conduct was only negligent, it can also be reasonably inferred that Noonan intentionally turned a blind eye to the possibility that Customs inspectors were engaging in discriminatory selection practices. Moreover, the deficient investigations condoned and failed to discourage the discriminatory conduct that was occurring. Further, if Noonan had acted properly, the discriminatory conduct of specific Customs inspectors may have been curtailed and it is even possible that findings of discriminatory conduct would have sooner led to implementation of institutional reforms. There is

---

[55]Also, a claim cannot succeed that Noonan's failure to adequately investigate a complaint about a particular search makes him liable as to that particular search. Kernats v. O'Sullivan, 35 F.3d 1171, 1182-83 (7th Cir. 1994); Boyd v. Snyder, 2002 WL 58802 *2 (N.D. Ill. Jan. 14, 2002). Instead, it must be shown that his deficient investigation or prior misconduct thereafter facilitated subsequent searches of a named plaintiff because the offending Customs inspectors were not disciplined or otherwise restrained.

sufficient evidence to find that Noonan acted with deliberate indifference and therefore can be liable for discriminatory searches of the named plaintiffs. See Diaz v. Martinez, 112 F.3d 1, 4 (1st Cir. 1997); Estate of Davis by Ostenfeld v. Delo, 115 F.3d 1388, 1395 (8th Cir. 1997); Konrad v. Genualdi, 1996 WL 556985 *2 (N.D. Ill. Sept. 26, 1996); Czajkowski v. City of Chicago, Ill., 810 F. Supp. 1428, 1440-41 (N.D. Ill. 1992); Fisher v. Below, 1989 WL 134762 *7-8 (N.D. Ill. Oct. 31, 1989). Since Noonan was responsible for investigating passenger complaints throughout the time period of named plaintiffs' searches, none of the Count II damages claims against Noonan will be dismissed. Any issues as to a causal relationship between his conduct and the searches of particular plaintiffs is not raised by the pending motions. See § I(C) supra.

At the time Senator Braun requested data related to possible racial and gender profiling, the data was not readily available. The record does not support that Weeks and Banks should have been able to fully respond to Braun's request before they left office nor is there a basis for finding that they intentionally delayed any response to avoid the discovery of discriminatory conduct they suspected might exist. See § II(D)(5) supra. Although there was no response to Braun's request before she left office, the GAO, Treasury Department, and Customs itself all completed investigations in 1999 or 2000 and reforms began to be implemented in 1999. See § II(F) supra.

As is discussed in § II(D)(6) _supra_, there is no sufficient evidence that any Managerial Defendant failed to adequately follow up on employee complaints of discriminatory selection of passengers.  There is also no adverse inference to be drawn from the destruction of the PAU lists.  _See_ § II(D)(7) _supra_.

As is discussed in § II(D)(2), following the May 24, 1997 seizure of narcotics from four African-American women, for approximately the next four months, there was a substantial increase in searches of African-American women.  Though the evidence is somewhat weak, it is still reasonable to infer that Hoteko's discussion of these seizures contributed to the increased number of searches of African-American women.  Therefore, it can be found that Hoteko encouraged race-conscious conduct that led to discriminatory search conduct during this time period.  Again, the existence of a causal relationship between Hoteko's conduct and each particular search is not at issue.  _See_ § I(C) _supra_.  As to plaintiffs who were searched from May 25, 1997 through September 15, 1997,[56] their Count II damages claims against Hoteko will not be dismissed.

As to the Managerial Defendants, the Count II damages claims will be dismissed except (a) all claims against Noonan; (b) those claims against Trotter based on strip searches occurring after July 21, 1998; and (c) those claims against

---

[56]Approximately half the named plaintiffs were searched during this time period.

Hoteko based on searches occurring from May 25, 1997 through September 15, 1997. None of these claims involves a unique application of the established law as to supervisory liability. Prior to the pertinent dates, it was well established that supervisory officials could be liable based on deliberate indifference in failing to discipline subordinates or investigate allegations of misconduct by subordinates, based on knowing of unconstitutional conduct and acting with deliberate indifference toward its continuation, and for instigating race and gender conscious actions in the selection of passengers for searches. None of the remaining aspects of Count II are subject to dismissal on qualified immunity grounds.

All the Count II claims against Banks, Weise, and Weeks will be dismissed.

The Count II claims against the Supervisory Defendants are discussed in § III(A)(4) _infra_.

### 2. Count IV

In Count IV, it is claimed that the Managerial Defendants are responsible for Customs inspectors' practice of searching passengers without adequate cause or suspicion. For purposes of the summary judgment motions, it is taken as true that such a practice existed among Customs inspectors during the pertinent time period. _See_ § I(C) _supra_. However, unlike the claimed discriminatory practice underlying Count II, plaintiffs present no evidence showing that the Count IV practice existed.

Therefore, there is no evidence from which it can be found the Managerial Defendants were aware of the practice.

Plaintiffs point to Commissioner Kelly's purported admissions as to the misconduct of Managerial Defendants. That evidence, however, generally is not admissible. See § II(B) supra. Kelly's congressional testimony that Customs' use of personal searches is "a procedure that we have found in recent years to have suffered from poor oversight, insufficient training, and a lack of supervision" lacks specificity. Nowhere in his testimony does Kelly identify particular management officials who are responsible for these shortcomings and his descriptions of the shortcomings themselves lack specificity. See Pl. Exh. 8. Also, he does not admit that discriminatory practices existed, referring only to "allegations" of racial bias. Id. at 1. As to Fourth Amendment violations, there is no statement in his testimony indicating that searches were performed without adequate suspicion or cause, only references to a lack of good communications with passengers who are in a stressful situation. See id. at 1, 4. There are no admissible statements of Kelly that implicate the Managerial Defendants.

Plaintiffs also contend the Managerial Defendants facilitated or encouraged Fourth Amendment violations through the use of goals and cash awards. Plaintiffs further contend that defendants encouraged personal searches despite the low

percentage of positive results.[57]  Plaintiffs contend that

beneficial results and efficacy are factors to consider in the

balance of whether a search practice is justified.  See Mary

Beth G. v. City of Chicago, 723 F.2d 1263, 1272-73 (7th Cir.

1983).

As is discussed in § II(E) supra, the evidence does not

support that the cash awards had the effect of encouraging

unlawful searches.

There is evidence that Managerial Defendants set goals

for narcotics seizures and encouraged the use of personal

searches in helping to achieve these goals.  Although not

expressly acknowledged by plaintiffs, there were also goals for

search efficacy, measured by comparing the success rate for

random and rover searches, and evidence that meeting that goal

was encouraged as well.  See § II(E) supra.  Plaintiffs'

contentions as to the extremely low positive results of personal

searches is not supported by the record.  See § II(C) supra.

Plaintiffs misstated the data by limiting the definition of

positive results to narcotic seizures (thereby omitting

successful seizures of other contraband) and by overstating the

number of personal searches by counting all secondary searches

instead of just personal searches.  Evidence is not provided to

---

[57]Plaintiffs also contend that narcotics seized from
airline passengers represent a minuscule portion of narcotics
seizures, with cargo seizures being where most narcotics are
found.  The evidence provided by plaintiffs does not adequately
support this assertion.  See Def. Loc. R. 56.1(a) Reply ¶ 30.

establish the success rate for all O'Hare personal searches.
Perhaps it was as high as 9.06%, perhaps it was near the national
average of 4.25%, or perhaps it was some other percentage less
than 9.06%.  Plaintiffs did not meet their burden of providing
evidence to determine the actual personal search success rate at
O'Hare.

In any event, the personal search success rate is not the
appropriate inquiry.  As to all the damages claims of named
plaintiffs, except as to the one search conducted in August 1999,
the law to be applied is that no suspicion was required for a
standard patdown search.  See Anderson IV, 199 F.R.D. at 256-57
(qualified immunity ruling).  There must be an intrusive patdown
search, strip search, or other intrusive search before reasonable
suspicion or some other level of suspicion or cause was required.
See id. at 258-59.  Most personal searches are patdowns or an
even less intrusive form of searching.  The data does not
distinguish between standard and intrusive searches.  Since no
level of suspicion was required for standard patdown searches,
encouragement of such searches could not have been the
encouragement of searches on less than the required level of
suspicion.  Therefore, as far as encouraging searches on less
than the necessary suspicion, efficacy could only possibly be
relevant for those searches requiring some level of suspicion or
cause.  For O'Hare, the only available data for such searches is

that 25.2% of the strip searches in 1997 produced narcotics.[58]
The national data for fiscal years 1997 and 1998 is that
contraband was found in approximately 23% of strip searches, 31%
of X-ray examinations, and 56% of body cavity searches.[59]
Plaintiffs do not contend that success rates at that level do not
justify performing intrusive searches.

Plaintiffs provide no sufficient evidence establishing
that the Managerial Defendants knew there was a practice of
searching without adequate suspicion or cause. They also provide
no sufficient evidence that any Managerial Defendant engaged in
conduct that encouraged or facilitated such a practice. The
Count IV individual capacity claims will be dismissed as to all
the Managerial Defendants.

### 3. Count VII

It is unclear how Count VII is distinguished from
Count IV, other than possibly alleging additional facts as to
injuries plaintiffs suffered in being searched without adequate
suspicion. Initially, in ruling on defendants' motion to
dismiss, it was held that, if being searched based on adequate
suspicion, plaintiffs could not bring a damages claim based on
any of the conduct complained of in Count VII, that is, being

---

[58]The success rate may actually have been higher since
this figure may not include seizures of contraband other than
narcotics.

[59]This includes all passengers. As is noted in § II(C)
supra, the success rates may be higher for searches of United
States citizens.

held for a substantial period of time of less than 24 hours, not being given <u>Miranda</u> warnings, conducting intrusive searches, not being able to contact others, and not obtaining judicial authorization for any of that. <u>See</u> <u>Anderson IV</u>, 199 F.R.D. at 248-50. On reconsideration, plaintiffs clarified that, in Count VII, they were alleging adequate suspicion did not exist. Therefore, Count VII was reinstated except as to standard patdown searches prior to July 6, 1999 and except as to any claim as to the failure to give <u>Miranda</u> warnings. <u>Id.</u> at 264-65. In response to summary judgment, however, plaintiffs contend the above-described conduct is unlawful regardless of whether adequate suspicion existed. <u>See</u> Pl. Response to Summ. Jmt. [Docket Entry 321] at 29 n.12. That contention is contrary to the initial holding in <u>Anderson IV</u>, 199 F.R.D. at 248-50. Plaintiffs cannot succeed on their Count VII claims unless they were searched without adequate suspicion. As is discussed in § III(A)(2) <u>supra</u>, plaintiffs have not shown that any Managerial Defendant is responsible for the practice of searching passengers without adequate suspicion. Therefore, plaintiffs cannot succeed on their Count VII claims. As to all the Managerial Defendants, the Count VII individual capacity claims will be dismissed.

### 4. Supervisory Defendants

The parties have agreed that the rulings as to Counts II, IV, and VII may also be applied as to the Supervisory Defendants named in those counts. The parties, however, did not amplify the

nature of their agreement.   Without objection, defendants
describe the agreement as:

> The parties have discussed the matter and
> agree that this court's decision on the pending
> motion for summary judgment filed by the
> managerial defendants will govern the claims
> against the supervisory inspectors as to those
> searches in which they had no personal
> involvement and that there would be no purpose
> served as to separate briefing of the matter as
> to these defendants.

Agreed Motion of Certain Def. [Docket Entry 313] ¶ 3.

The parties will be required to submit a draft order
applying the effect of this opinion to the Count II,
IV, and VII claims against the Supervisory Defendants.

### B. Conspiracy Claims

Essential to the § 1985(3) and § 1986 claims contained in
Counts IX and X is proof of a conspiracy based on racial animus.
Payton v. Rush-Presbyterian-St. Luke's Medical Center, 184 F.3d
623, 632 (7th Cir. 1999).   Plaintiffs do not dispute that the
general rule is that a conspiracy cannot be amongst members of
the same corporation or government entity.   Plaintiffs, however,
rely on two exceptions to the intracorporate conspiracy rule:
(1) conspirators acting in their own personal interests and (2) a
broad pattern of discriminatory conduct that permeates the ranks
of an organization.   See Wright v. Illinois Department of
Children & Family Services, 40 F.3d 1492, 1508 (7th Cir. 1994);
Hartman v. Board of Trustees of Community College District No.
508, 4 F.3d 465, 470-71 (7th Cir. 1993); Volk v. Coler, 845 F.2d

1422, 1435 (7th Cir. 1988); <u>Payton</u>, 184 F.3d at 633 n.9; <u>Berry v. Illinois Department of Human Services</u>, 2001 WL 111035 *9-10 (N.D. Ill. Feb. 2, 2001); <u>McCraven v. City of Chicago</u>, 109 F. Supp. 2d 935, 946 (N.D. Ill. 2000); <u>Zoch v. City of Chicago</u>, 1997 WL 89231 *56 (N.D. Ill. Feb. 4, 1997).

Having a personal stake in what happens is not, by itself, enough to apply an intracorporate conspiracy exception. Instead, the employee must be motivated solely by his or her own personal interest. <u>Hartman</u>, 4 F.3d at 470; <u>Payton</u>, 184 F.3d at 633 n.9; <u>Berry</u>, 2001 WL 111035 at *9. Here, the claimed misconduct involves searching passengers for illegal contraband in order to prevent such goods from entering the United States. That is part of the mission of Customs. The personal interest exception does not apply to plaintiffs' claims.

Plaintiffs contend the following evidence shows that discrimination permeated all the ranks of Customs: (a) Managerial Defendants promulgated and disseminated training materials instructing Custom inspectors to place a special focus on women travelers; (b) job performance and job responsibility premised on knowledge of profiling; (c) widespread disregard of numerous complaints of discrimination and Congressional inquiries; (d) blanket disregard of the disproportionate selection of African-American women for intrusive searches; (e) covering up complaints of subordinates; (f) covering up by failure to refer investigations to Internal Affairs; and (g) covering up through destruction of PAU documents.

As has been previously discussed, plaintiffs have not presented sufficient evidence supporting these contentions. See § III(A)(1) _supra_. As to the specific contentions: (a) There is one passage in a training manual and no Managerial Defendant was shown to be responsible for promulgating or disseminating it. See § II(D)(1) _supra_. (b) There is no evidence that, during the pertinent time period, Customs inspectors were required to have knowledge of racial profiling or evaluated on such knowledge. See _id._ (c) In a two and one-half year period, there were 12 complaints of racial discrimination (not all limited to women), which cannot be considered widespread in light of the number of passengers searched. Only one Managerial Defendant was aware that these complaints were not adequately investigated. See §§ II(D)(4), (5) _supra_. (d) There is no evidence that, during the pertinent time period, the Managerial Defendants were aware of the disproportionate selection of African-American women for searches, except for Trotter's (and possibly two others') knowledge of the 1997 strip search statistics for O'Hare. See II(D)(2) _supra_. (e)-(f) There is no evidence of a failure to adequately follow up on an employee complaint of discrimination in the selection of passengers for searches. See § II(D)(6) _supra_. (g) There is no evidence of documents being destroyed in an attempt to cover up misconduct. See § II(D)(7) _supra_. Plaintiffs have not presented a sufficient basis for finding that discrimination permeated the ranks. Therefore, the

intracorporate conspiracy doctrine precludes any possible conspiracy claim.

Counts IX and X will be dismissed as to all the Managerial Defendants. Since the parties have agreed to apply this ruling to the Supervisory Defendants as well, it will be dismissed as to those defendants also. It is unclear if nonsupervisory Customs inspectors are also claimed to be involved in the conspiracy. To the extent they are, the intracorporate conspiracy doctrine would also bar a claim against them. Additionally, because no conspiracy has been shown to exist, there is no possible basis for injunctive relief. Counts IX and X will be dismissed in their entirety.

### C. Injunctive Relief

None of the Managerial Defendants is currently employed in a position with responsibility for O'Hare. Therefore, even as to the still pending aspects of Count II, any individual capacity claim for injunctive relief as against the Managerial Defendants is moot. As to any Supervisory Defendant who is no longer employed at O'Hare, the Count II individual capacity injunctive relief claims are also moot. As to Supervisory Defendants still employed at O'Hare, the individual capacity injunctive relief claims remain pending as long as the particular count remains pending against that defendant.

As to Counts II, IV, and VII, official capacity claims for injunctive relief still remain pending.

### D. Letkemann Claim Against Hoteko

On October 31, 1996, named plaintiff Letkemann was subjected to an intrusive search at O'Hare. She was required to remove all her outer garments and her bra, but was allowed to keep her panty hose on. She was then patted down, including between her legs and the Customs inspector visually inspected her anus and vagina. The incident log for this search lists defendant Hoteko as the supervisor who approved the search.[60] The "search type" is identified as being a "patdown." Hoteko testified at his deposition that he has no independent recollection of the search, even after having his memory refreshed by seeing the incident log.

In his summary judgment affidavit, Hoteko expressly acknowledges and does not dispute that he was the approving supervisor. He also states:

> 4. Customs records indicate that I approved a pat down search of Ms. Letkemann based upon information that was provided to me by a subordinate Inspector. The inspector related that the passenger was unemployed but had nonetheless traveled frequently; that the travel was to a "high risk" country for narcotics activity (i.e., Jamaica); and that the passenger gave some misinformation to the inspector. Based on that information, I determined that the requisite "little or no suspicion" standard was met and authorized a pat down search.

Def. Exh. 7, Hoteko Aff. ¶ 4. Hoteko's deposition testimony is clear that he has no independent recollection of this information

---

[60]The incident log is Exh. 20 to Hoteko's deposition, which is included in Pl. Exh. 2.

and instead relies upon the incident log for the statement in his affidavit.

In prior rulings in this case, it has been held that, as of October 31, 1996, there can be no damages liability for a standard patdown search because it was not then clearly established that any level of suspicion was required for such a search. Anderson IV, 199 F.R.D. at 256-57. As of that time, it was clearly established that intrusive patdown searches required at least reasonable suspicion. Id. at 258-59. Hoteko contends he cannot be liable for damages for Letkemann's search because he provided approval for a standard patdown search, not a strip search, and no suspicion was required for such a search.

The incident log is insufficient to establish that Hoteko only approved a standard patdown search. The incident log simply states: "search type: P," with a list of the codes identifying "P" as "patdown." No testimony is provided to show that search type on the incident log identifies the type of search approved, not the type of search actually conducted. Moreover, the incident log codes do not distinguish between standard and intrusive patdowns. Therefore, even if the code refers to approving a patdown, it could mean approving an intrusive patdown which required reasonable suspicion. Resolving genuine disputes in Letkemann's favor, it must be assumed for purposes of Hoteko's summary judgment motion that Hoteko approved an intrusive patdown and strip search. Such an inference can reasonably be drawn from the evidence that Hoteko approved the search and the type of

search that was actually performed.  Letkemann's Counts I, III, and VI claims against Hoteko will not be dismissed.

Hoteko could still avoid liability for this intrusive search if there was sufficient information to constitute reasonable suspicion.  Although Hoteko's affidavit refers to the purported grounds for conducting the search, the presence of adequate suspicion is not an argument raised in defendants' briefs.  See Def. Memo. in Support of Summ. Jmt. [Docket Entry 255] at 8 ("Accordingly, this court need not even consider the reasons proffered for approval of the pat down search.").  See also Def. Reply [Docket Entry 325] at 18-19.  Therefore, this issue need not be addressed.  But even if it had been raised, Hoteko would not be entitled to summary judgment.  Hoteko's affidavit statements as to the grounds supporting the search would have to be rejected because he testified in his deposition that he had no independent recollection of those grounds.  However, plaintiffs then provided the incident log which would be admissible as a government record to show the grounds for the search contained therein.  In any event, the burden would be on Letkemann to prove a lack of reasonable suspicion.  See Woods v. City of Chicago, 234 F.3d 979, 986-87 (7th Cir. 2000), cert. denied, 122 S. Ct. 354 (2001).  Plaintiff satisfies this burden because she provides her own deposition testimony as to the events preceding the search.  See Pl. Exh. 1, Letkemann Dep. at 48-57.  Plaintiff arrived on a flight from Switzerland, not Jamaica.  There is no evidence that Switzerland is considered a

source country for narcotics. Her testimony does support that, as of October 1996, she had been unemployed for a short period of time and that she traveled somewhat frequently because her boyfriend lived in Switzerland, but she does not testify to providing inconsistent information to the Customs inspectors. Crediting her testimony, the record supports that reasonable suspicion was not present. Thus, even if Hoteko did raise the issue of whether there was adequate suspicion to conduct an intrusive search, he would not be entitled to summary judgment as against Letkemann.

Plaintiffs also contend that Hoteko is incorrect in contending that he was not directly involved in any of the other searches of a named plaintiff. They point to the statement in his affidavit that he had the authority to approve X-ray examinations. Def. Exh. 7, Hoteko Aff. ¶ 5. Plaintiffs contend this statement shows Hoteko was directly involved in the searches of the two named plaintiffs who were subjected to X-ray examinations. It will be considered that these two plaintiffs, Gwendolyn Richards and Jacqueline Walter, still have pending Counts I, III, and VI claims against Hoteko.

### IV. CONCLUSION

Defendants' motions for summary judgment will be granted in part and denied in part. All the individual capacity claims against the Managerial Defendants will be dismissed except those Count II claims that are specified, certain claims for injunctive

relief, and the Counts I, III, and VI claims against Hoteko that
are specified. Counts IX and X are dismissed as against all
defendants. The parties are to submit a draft order as to the
Count II, IV, and VII claims against Supervisory Defendants.

Still being briefed is defendants' summary judgment
motion as to the Count VIII claim for injunctive relief based on
national practices. That claim would involve many factual
issues that are distinct from all the other remaining claims.
Therefore, appropriate procedures for trying the other claims in
this case can be addressed prior to resolving the Count VIII
motion. Within two weeks, the parties shall meet to discuss
possible trial procedures. By April 19, 2002, the parties shall
file a revised joint trial plan proposal, or separate proposals
if they cannot reach agreement. The proposal will be discussed
at a May 1, 2002 status hearing.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motion to strike [330-1] is denied
without prejudice.

(2) Plaintiffs' motion for leave to file additional
pleadings [330-2] is granted in part and denied in part.
Plaintiffs are granted leave to file their "initial surreply,"
which is Exhibit A to motion [330].

(3) Plaintiffs' motion for leave to file supplemental
surreply instanter [332-1] is granted.

(4) Managerial and Supervisory Defendants' motions for
summary judgment [255, 314] are granted in part and denied in

part.  All individual capacity claims against managerial defendants are dismissed except:  (a) Count I, Count III, and Count VI claims of plaintiffs Arcadia Letkemann, Gwendolyn Richards, and Jacqueline Walter against defendant Hoteko; and (b) Count II damages claims against (i) defendant Patrick Noonan; (ii) defendant Robert Trotter based on strip searches occurring after July 21, 1998; and (iii) defendant Sergei Hoteko based on searches occurring from May 25, 1997 through September 15, 1997. Counts IX and X are dismissed in their entirety.  All claims against defendants Sam Banks, George Weise, and Kevin Weeks are dismissed and those defendants are dismissed from this action.

(5) By March 22, 2002, the parties shall submit a draft order clarifying which claims against supervisory defendants are dismissed and which remain pending.

(6) By April 19, 2002, the remaining parties shall submit a proposed revised joint trial plan for all remaining claims except Count VIII, or separate proposed plans if the parties cannot agree.

(7) Status hearing set for May 1, 2002 at 11:30 a.m.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED:  MARCH  _14_ , 2002