## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**DOCKETED**

**NOV 1 4 2002**

| | |
|---|---|
| SHARON ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 97 C 7556 |
| v. | ) |
| | ) The Honorable William T. Hart |
| | ) |
| MARIO CORNEJO, et al., | ) |
| Defendants. | ) |

### PLAINTIFFS' AMENDED RESPONSE TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF SIX PLAINTIFFS

**FILED**

**NOV 0 5 2002**

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

405

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF FACTS RELATING TO THE SEARCHES OF PLAINTIFFS AND
THE FOURTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The evidence to be Considered Must be Construed in the Light Most Favorable to
Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Plaintiffs' Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.    Yvette Price & Adunni Allen . . . . . . . . . . . . . . . . . . . . . . 4

        2.    Katherine Milner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.    Jacqueline Jones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        4.    Ruby Mendenhall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        5.    Michelle Absolam . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        6.    Facts in Common to all Plaintiffs . . . . . . . . . . . . . . . . . . . 11

III.   THE STANDARD OF REASONABLE SUSPICION WAS NOT
MET BY CUSTOMS IN THEIR SEARCHES OF PLAINTIFFS . . . . . . . . . . . . . . 12

    A.    Defendants are not Entitled to Qualified Immunity . . . . . . . . . . . . . . . . . . . . 17

    B.    Defendants are not Entitled to Qualified Immunity Based
upon Allegedly Feeling a Pad in the Groin of a Plaintiff . . . . . . . . . . . . . . . . 20

    C.    The Defendants should not be Entitled to Qualified Immunity
for Pat Down Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
ON PLAINTIFFS' EQUAL PROTECTION VIOLATIONS . . . . . . . . . . . . . . . . . 24

    A.    The Law Governing Plaintiffs' Equal Protection Claims . . . . . . . . . . . . . . . . . 24

    B.    Plaintiffs Have Produced Evidence of Discriminatory Effect
By Showing that Similarly Situated Travelers Were Not Stopped,
Detained or Searched by Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.    This Court May Draw a Negative Inference that Other Evidence, that Defendants Destroyed or Prevented Plaintiffs from Obtaining, Would Have Supported Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.    Defendants Are Estopped From Denying that Similarly Situated Individuals Were Not Subjected to Intrusive Searches . . . . . . . . . . . . . . . . . . . 32

E.    Plaintiffs Have Produced Statistical Evidence of Discriminatory Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      1.    Statistical Evidence Shows that African American Women Were Subjected to Intrusive Personal Searches . . . . . . . . . . . . . . . . . . . 34

F.    Plaintiffs Have Produced Sufficient Evidence of Discriminatory Purpose to Preclude Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

      1.    Statistics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

      2.    No reasonable justification to search plaintiffs . . . . . . . . . . . . . . . . . . . 44

      3.    Hispanic inspectors accused of targeting people of color . . . . . . . . . . . 44

      4.    Dissent stifled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      5.    Improper Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      6.    Inspectors trained to target women . . . . . . . . . . . . . . . . . . . . . . . 45

      7.    Targeting process and PAU document destruction . . . . . . . . . . . . . . . 46

      8.    Passenger complaints of racial targeting . . . . . . . . . . . . . . . . . . . . . 46

      9.    Cash Award system . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

G.    The GAO Report and Customs' Reforms . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

H.    Defendants Hoteko, Trotter and Noonan . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

V.       SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON PLAINTIFFS' DUE PROCESS CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

VI.      FEDERAL TORT CLAIM ACT CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHARON ANDERSON, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 97 C 7556 |
| v. | ) |
| | ) The Honorable William T. Hart |
| | ) |
| MARIO CORNEJO, et al., | ) |
| Defendants. | ) |

**PLAINTIFFS' AMENDED RESPONSE TO THE DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF SIX PLAINTIFFS**

**I.      INTRODUCTION**

In their motion, defendants seek summary judgment on the Fourth Amendment, Equal

Protection, Federal Tort Claim Act, and Due Process claims of plaintiffs Michelle Absolam,

Adunni Allen, Jacqueline Jones, Katherine Milner, Ruby Mendenhall, and Yvette Price.

Defendants move on behalf of the individual Customs inspectors involved in the searches of each

plaintiff, as well as on behalf of management level defendants (Robert Trotter, Sergei Hoteko,

and Patrick Noonan) for the Equal Protection claims brought against them, and on behalf of the

United States for plaintiffs' FTCA claims.

In their motion, defendants invite this Court to accept their view of the facts and to read

the applicable law through their myopic eyes.  However, the evidence, especially when construed

in the light favorable to plaintiffs as is necessary on summary judgment, raises numerous

disputed factual issues which require the denial of defendants' motion as to all of plaintiffs'

claims.  Moreover, the applicable law when properly construed supports (and does not doom)

plaintiffs' claims.   In this response, plaintiffs will show (in Sections II and III) that defendants

are not entitled to qualified immunity on their Fourth Amendment claims; (in Section IV) that

plaintiffs have presented sufficient evidence to allow a jury to find for them on each element of

their Equal Protection claims; (in Section V) that plaintiffs' due process claims survive; and (in

Section VI) that the plaintiffs' FTCA claims are viable under the plain meaning of that Act.

## II. STATEMENT OF FACTS RELATING TO THE SEARCHES OF PLAINTIFFS AND THE FOURTH AMENDMENT

### A. The Evidence to Be Considered Must Be Construed in the Light Most Favorable to Plaintiffs

The individual defendants have repeatedly indicated in deposition testimony that they do not remember the individual searches of the six plaintiffs.[1] E.g., Fact 223, Pltf. Resp. to Defs. 56.1 Statement ("Pltf. 56.1 Resp") at 126. Defendants have also repeatedly testified that they rely on the reasons contained in the search incident logs (IOILs) to justify their searches. Pltf. Fact 220. Indeed, this is consistent with Customs' policy that an "inspector is supposed to write down in the IOIL all of the reasons for a search." P. Ex. 30 - DeGiannantonio Dep. at 107; see also Pltf. Fact 220. The proper focus for summary judgment, therefore, is whether the IOILs, and the reasons asserted therein, are sufficient to justify the type of search each plaintiff was forced to endure.

Defendants further assert that they "accept the plaintiffs' accounts and assume that the Customs records are in error" for purposes of their motion. Def. Mem. at 2. This assertion and seeming concession is wholly disingenuous. Defendants agree to "accept plaintiffs' accounts" only so that they can bootstrap plaintiffs' testimony into alleged additional reasons justifying the searches. However, where a plaintiff's account of what occurred differed in a material way from the reasons for the search as stated in the IOIL, defendants have either ignored or misrepresented this account.[2] Defendants cannot have it both ways on what testimony from plaintiffs they choose to utilize -- or ignore -- for purpose of their summary judgment motion.

For four of the plaintiffs, defendants attempt to rely on a fact not stated in the IOIL to justify a strip search, namely, that the inspector felt or alleged to have felt something in plaintiff's groin area. Using this newly articulated reason, defendants claim that the 7th Circuit's opinion in Saffell v. Crews 183 F.3d 655 (7th Cir. 1999), grants qualified immunity for these strip searches. Notwithstanding this new alleged justification for search, for 3 of the 4 plaintiffs,

---

1. There are a few exceptions to this; however, none of these are relevant to the plaintiffs at issue.
2. For example, Adunni Allen stated that she was wearing a tight body suit, not loose fitting clothes. Pltf 56.1 Resp. 151-52. Ruby Mendenhall stated that no dog alerted to her, contrary to what is reported in the IOIL. Pltf. 56.1 Resp. 93.

2

the inspectors in fact felt nothing, and an inspector's claim that she did feel a bulge is simply pretext. Indeed, the evidence shows that inspectors often use this rationale to unjustifiably extend a search.[3] E.g., Pltf. Fact 226.

In this same context, defendants contend through Sergei Hoteko,[4] that inspectors were expected to conduct strip searches upon feeling a pad during a pat down. Def. Mem. at 21. The evidence shows, however, that there is no policy mandating a strip search, even if inspectors believe they feel something during a pat down. Pltf. Fact 226, 265. Inspectors have testified to this, and the Customs handbook contradicts Hoteko's claim. Defs' Ex. 41. This is particularly true where, as here, there were no other material, undisputed factors warranting a personal search. See Section III below.

Further, the law is clear that *post hoc* rationalizations for an action taken do not count. See Section III.A. below. Defendants are thus left with their own written records of why they conducted each search. These written records (IOILs) themselves defeat defendants' claims of "reasonable suspicion" to search.

Detailed below are reasons for each search as reported in the respective IOILs, along with plaintiffs' testimony regarding what occurred. Plaintiffs make a factual showing that the IOILs do not contain undisputed "reasons" to differentiate each plaintiff from virtually every other passenger on their flights. Plaintiffs also document below the validity, or lack thereof, for the individual "factors" inspectors typically use to justify their searches. For example, defendant Olga Martinez repeatedly claims that she feels a sanitary pad, or "something" in the groin of a woman during a pat down, as pretext to undertake a strip search, when there in fact is no foreign object there to feel. Pltf. Fact 226. Defendants also repeatedly use "one fact fits all" reasons to search, such as "source country." See e.g., Defs' Exs. 9, 13 and 24. However, Customs employees have testified that nearly every country in the world is a "source" or "transit" country

---

3. In fact, this is exactly what occurred in the Saffell v. Crews case, upon which defendants rely. However, the Court there mistakenly accepted Customs' testimony -- which has been proven false here -- about the policy on tampon removal. See Section III.A., below.

4. The defendants repeatedly cited to Hoteko's declaration. However, the declaration does not contain any of the information called for by the many citations. Accordingly, this Court should ignore this "evidence."

for narcotics, thereby making this "factor" meaningless. Pltf. Fact 221, 222. Finally, there are simply no facts in connection with any plaintiff, particularized to that plaintiff, indicating that she was secreting drugs in an area to be uncovered by a strip search.[5]

## B. The Plaintiffs' Searches

### 1. Yvette Price & Adunni Allen

These two women's searches are analyzed together for good reason: they were traveling together when searched; they were searched by the same defendants; the reasons for search were nearly identical; and both searching inspectors (Martinez and Rocha) claimed that each felt something in the respective plaintiffs' groin, but no foreign object was in fact there. Pltf. 56.1 Resp. 152, 175. Further, these two African American women were the only people from their flight subjected to any sort of personal search whatsoever. Pltf. Fact 49. Comparing these two searches sheds light on the defendants' clear lack of credibility. Despite the fact that nearly all material facts are the same, Customs records, which were filled out by defendants, report that Price was strip searched while Allen was merely patted down. Def. Fact 130, 177. In fact, like Price, whose IOIL was nearly identical to Allen's, the latter was also strip searched.

For Adunni Allen, Martinez conducted the hands-on search, Rocha participated as a witness, and Desmond was the approving supervisor. Defendant Corona authored the PAU lookout report recommending a "100%" exam and pd [pat down]. Defs' Ex. 10.[6] The reasons for the pat down, as listed on the IOIL, was: high risk travel; short trip; appeared to be nervous; bulky; and the passenger was a PAU lookout. Defs' Ex. 9. The IOIL indicates that Allen was only patted down; a reasonable inference from this report, confirmed by Martinez, is that there did not exist sufficient factors to justify a strip search of her. Defs' Ex. 9; Pltf. Fact 256.

The evidence regarding Allen clearly disputes the "reasons" stated on the IOIL for her

---

5. Some of these "drug secreting" factors, as recognized by this Court include: inspectors observing a bloated or distended stomach, lomotil tablets in the luggage, ground charcoal in the luggage, steroid gel in the luggage, a girdle under baggy clothes, few items of clothing, inconsistent identification papers, inconsistent answers on questions, and/or a fraudulently obtained passport. See Ekpo v. U.S., 1992 WL 117121 at 4-6 (N.D. Ill. 1996) (Hart, J.); see also, Adedeji v. U.S., 782 F.Supp 688 1694-99 (D.Mass. 1997). None of plaintiffs had any of the above "drug secreting" factors.

6. Plaintiffs refer to exhibits accompanying defendants' moving papers as "Defs' Ex. __" and to defendants' 56.1 statement of facts as "Def. Fact __." Plaintiffs refer to their statement of Additional Facts Making Summary Judgment Inappropriate as "Pltf. Fact __," and the accompanying exhibits as "P. Ex. __."

search. Allen testified that she was wearing a tight body suit, not bulky clothing. Pltf. 56.1

Resp. 149-50. Nor was she nervous. Pltf. 56.1 Resp. 152. Customs inspectors have consistently

claimed that being a "PAU lookout" as was Allen, is meaningless for purposes of establishing

"reasonable suspicion."[7] "High risk travel" is merely another way of saying that Allen was

traveling from an alleged drug source country. This, again, is a meaningless factor in light of

case law, see infra, and Custom employee testimony on what "source country" means. Pltf. Fact

221, 222. Allen also testified that Martinez indicated that she thought she felt a pad or something

in Allen's groin. See Pltf. 56.1 Resp. 150-51. However, Allen was not wearing a sanitary pad

and had no foreign object in her groin area. Id., 152. The IOIL for Allen's search indicates that

only a pat-down was done. Defs' Ex. 9. Given what occurred with Price, see below, the

reasonable inference here is that Allen's IOIL is deliberately false; although she was strip

searched, it was not reported as such because Rocha and Martinez knew there were not sufficient

true facts giving rise to reasonable suspicion.[8]

For Yvette Price's search, Martinez, Rocha and Desmond were the witness, searcher, and

approving supervisor, respectively. Defendant Corona authored the PAU lookout report, again,

recommending a "100%" exam and pd [pat down]." Defs' Ex. 14. The reasons listed for Price

are nearly identical to those for Allen: "pax returning from a 3 day trip from Jamaica. Pax was a

PAU lookout, she appeared very nervous and wore loose fitting clothing." Defs' Ex. 13. The

report also notes: "When asked how her trip was she almost wanted to cry and said that all she

wanted to do was to see her kids. Drivers lic. was issued the day of departing to Cancun." Defs'

Ex. 13.

Again, the evidence regarding Price clearly disputes the "reasons" stated on the IOIL for

her search. Price was also not wearing loose fitting clothing that would be somehow unusual

given her travel: she was wearing overall shorts over a bathing suit. Her bathing suit was

---

7. Contradicting the IOIL, Customs employees have repeatedly asserted that a "PAU lookout" only gets a
passenger into secondary for questioning; the decision to personally search a passenger is made independent of the
PAU report. See, e.g., Pltf. Fact 258.

8. Significantly, defendants even have the date of the search wrong on the Allen's IOIL. Defendants have
admitted that Allen was traveling with Price on June 23, 1997, not on June 26 as reported on Allen's IOIL, and both
were searched on June 23.

exposed on top. She was not nervous. She did not "almost [want] to cry", and she did not state that she "wanted to see her kids." Indeed, Price only has one child. Finally, she did not obtain a drivers license the date she departed for "Cancun." Price had traveled to Jamaica, not Cancun, as reported on the IOIL. Pltf. Fact 240-245. As with Allen, and based on defendants' own testimony, Price's "PAU lookout" is meaningless in the "reasonable suspicion" equation. Pltf. Fact 258. Finally, like Martinez during Allen's search, Rocha used words to the effect that she felt a pad or something in Price's groin. Pltf. 56.1 Resp. 175. However, Price was not wearing a sanitary pad, and there was no foreign object in Price's groin to be felt. Indeed, since Price was wearing shorts over her bathing suit, it would be improbable to mistakenly "feel" a foreign object. Finally, both Allen and Price walked past a Customs dog that did not alert to them. The *only* undisputed fact for Allen giving rise to her strip search (which Customs records dispute) is that she returned from Jamaica (as had everybody on her plane).

The *only* undisputed facts for Price giving rise to her strip search was that she was returning from a 3 day vacation to Jamaica, and that she had recently renewed her drivers license because the old one had expired and she needed identification to travel to Jamaica.

### 2.     Katherine Milner

Milner's incident log indicates that she was subjected to "only" a pat-down. Defs' Ex. 16. She has testified that she was strip searched. Def. Fact 126. Given this discrepancy, the reasonable inference is that defendants did not possess reasonable suspicion sufficient to justify a strip search; if they had, they would have admitted to such.

The defendants involved with Milner's search were Alma Reyther (searching officer) and Supervisor Inspector Gloria Banks. The witness, Sheehy, is not a defendant. The reasons listed in Milner's IOIL are: "Alpha travel, traveling with friend, but friend stayed behind, stayed at the Quality In [sic], student at Loyola, and a caregiver." Defs' Ex. 17.

When Milner deplaned at O'Hare, she walked past a male Customs agent with a dog that did not alert to Milner. Pltf. 56.1 Resp. 112. Milner was wearing a white *see through* shirt which made it clear that she was not concealing anything in this area. Pltf. 56.1 Resp. 120. Both defendants Reyther and Banks have admitted that being a student and/or a caregiver or both does

not warrant a personal search. Further, although Milner's friend remained in Jamaica, Milner had not even traveled to Jamaica with this friend, but rather met her there. Pltf. Fact 56.1 Resp. 130. The Quality Inn where Milner stayed was not identified as a place where drug smugglers stay. Finally, Milner responded cooperatively to all of the questions asked of her.

Defendant Reyther has testified that she has no recollection of Milner's search, and that the IOIL did not refresh her recollection of the search. Nor did Reyther recall any conversation whatsoever with Milner. Id. Milner, who was menstruating, was wearing a panty liner. According to Milner, she was instructed by Reyther to lower her pants in order for Reyther to see the soiled liner. Def. Fact 127. This is not reported in the IOIL. Defs' Ex. 16. Milner was also required to remove a tampon she was using, which request is allegedly against Customs policy[9] (see Sections III.C. and IV.D., discussing the Saffell decision and this Court's discovery order; but see Pltf. 56.1 Resp. 127). Milner testified that she bought her tickets at Alpha One travel because it is close to her house, and a friend of her's (Patricia Liddell, another plaintiff not subject to this motion), works there. Nothing suspicious was discovered in her luggage. Pltf. 56.1 Resp. 129. There was not a single objective fact particularized to Milner indicating she was secreting contraband.

The *only* undisputed facts stated in the IOIL giving rise to Milner's strip search (which itself is contradicted by the IOIL) are those that defendants have admitted do not give rise to reasonable suspension, namely, that the ticket was purchased at Alpha One, that she was a student and a caregiver who met a friend in Jamaica, and that she stayed at a Quality Inn. There is not a single particularized fact contained in these "reasons." Finally, these "reasons" completely ignore Milner's cooperation in answering questions.

### 3. Jacqueline Jones

The defendants involved with Jones' search were Victoria Diez, the searching officer, and

---

9. Defendants make the astonishing claim that "the request to remove a tampon was, in the whole picture, a relatively minimal additional intrusion." Def. Mem. at 23 n. 2. The 7th Circuit has noted that *less* intrusive searches are incredibly humiliating. Mary Beth G. v. Chicago, 723 F.2d 1263, 1274 (7th Cir. 1984)("the visual cavity searches conducted by the City are one of the more humiliating invasions of privacy imaginable, and we find those searches to be substantially more intrusive than the thorough hand searches").

Gloria Banks, the "witness" and approving supervisor. The reasons listed for search in Jones' IOIL (Defs' Ex. 22) are:

> Passenger stated that she was a lawyer and an actress/ticket was paid for by MVP company for work at a trade show in Germany/However, passenger could not provide many details of the company until she produced a brochure during the luggage exam/newer issued passport (end of July) and even new issued state ID (August)/First trip outside of U.S./Very loose-fitting over jacket/partial strip to verify pad/passenger had to be stopped in the searchroom from removing clothing/. . .

None of these "reasons" are sufficient to constitute legal cause for a strip search. Jones is a lawyer and an actress. Pltf. Fact 10. Her ticket was paid for by MVP company, as was the ticket of at least one of her traveling companions (a white male). Pltf. 56.1 Resp. 73. Jones provided the details regarding MVP and the purpose of her trip both before and after she found supporting documents. Pltf. 56.1 Resp. 74. Defendants' concede, as reported in the IOIL, that Jones, upon "produc[ing] a brochure", supplied details before she was personally searched. Defs' Ex. 22. In response to questions, Jones told Diez that MVP paid for the trip, and that she was there on business with a group of people with whom she was traveling. Pltf. 56.1 Resp. 37; see also Pltf. Fact 14-18. Moreover, once Jones reviewed her traveling documents, she was able to give further details about payment for the trip. Pltf. 56.1 Resp. 74.

Jones was not wearing any "very" loose-fitting clothes. She was wearing a "comfortable" jacket that was plain. Pltf. 56.1 Resp. 30. Jones was traveling with three non-black persons who could have confirmed the totality of her statements. Pltf. Fact 17. Neither Banks or Diez attempted to confirm Jones' statements, though. Pltf. 56.1 Resp. 49. The fact that Jones' passport was two months' old was not suspicious, particularly given that this was her first trip internationally, as she told the defendants. Pltf. Fact 13. Indeed, one of her traveling companions, a white male, also had a newly-issue passport; however, he was not stopped by Customs. Pltf. Fact 19-20.

Jones, who was menstruating, was wearing a make-shift sanitary pad. Pltf. 56.1 Resp. 100. Diez admits, however, that inspectors retain discretion to decide whether to conduct a strip search, even if they feel what they believe to be a foreign object on a passenger's body. Pltf. 56.1 Resp. 46; Pltf. Fact 265. This discretion is particularly important given the highly intrusive

nature of the search and that 15-20% of women, at any given time, are menstruating.[10]

In sum, there was not a single fact that indicated that Jones was smuggling contraband; nor is there a single undisputed fact sufficient to legally justify a strip search. This is particularly true given that Jones' answers could be verified with her documents and her traveling companions. In fact, Diez and Banks could have easily corroborated Jones' responses had they bothered. Moreover, based upon the factors contained in Jones' IOIL, Customs Supervisor Patrick Noonan could see no reason to do a strip search. Pltf. Fact 237.

### 4.    **Ruby Mendenhall**

Michelle Belcastro was the canine officer, primary and searching officer for Ruby Mendenhall's search. Melissa Zitowsky was the "witness," and Gloria Banks was the supervising inspector. The reasons for search, as stated in Mendenhall's IOIL, are: "passivek-9 [sic] alert, high risk travel." Defs' Ex. 24.

The IOIL reports, and Mendenhall agrees, that she was stripped searched. Supervising Inspector Banks concedes, however, that the stated reasons for search -- the dog alert and "high risk travel" -- is not enough for a strip search.[11] Pltf. Fact 40. In addition, Mendenhall disputes that she was the subject of a dog alert. According to Mendenhall, the dog merely walked past her, and did not sit near her or do anything that would, as defendants concede, constitute a passive canine alert. Pltf. 56.1 Resp. 93. Finally, as discussed above, "high risk travel," meaning "source country" is a meaningless factor. Pltf. Fact 221-222.

At the time of her search, Mendenhall had a Masters' Degree in Public Policy from the University of Chicago, and was working on her Ph.D. at Northwestern University. She was traveling with her friend, and fellow plaintiff, Jackie Miller (who was also searched). The trip was a birthday present from her husband. Pltf. Fact 34.

At some point during Mendenhall's search, she was asked if she was on her period, which she was. However, the inspector did not feel anything in Mendenhall's groin area prior to asking

---

10. Women of child-bearing age typically menstruate every month for an average of 5 days. Plaintiffs respectfully request that this Court take judicial notice of this undeniable biological fact. See P. Ex. 12.
11. Significantly, these *same* reasons for search were listed as justifying merely a pat down of the only non-black woman personally searched from Mendenhall's flight. Pltf. Fact 53.

this question. Pltf. 56.1 Resp.100. In any event, the incident log does not indicate feeling a foreign object as a reason for the search, Defs' Ex. 16, and defendants themselves do not remember the search. The only undisputed fact as a basis for Mendenhall's strip search was that she was returning from Jamaica.

### 5. Michelle Absolam

The persons involved in Absolam's search were Guadalupe Corona, the searcher, Mary McCarthy the authorizing supervisor, Douglas Nathaniel, the primary officer, and Carol Czech who made Absolam a "lookout." Absolam agrees that she was subjected to a pat-down. The stated reasons for her search were: "drug paraphernalia found in Pax's luggage, and income not commensurate with travel." Defs' Ex. 2.

Absolam's testimony disputes the stated "reasons" for her pat-down search. Absolam is a Jamaican citizen who has lived in the Chicago area for many years. (She graduated from high school in Rogers Park.) She has never been arrested for any drug related offense, she has a college education, and she has worked as a Certified Nurse's Aid for at least 10 years. Pltf. Fact 4. She is also not familiar with, aware of or affiliated with any Jamaican gangs, including the "Gold Star Jamaican Posse" identified on the lookout. Also contrary to the lookout, she has never attempted to smuggle any contraband into the United States. Id.

In 1997, Absolam worked full time and earned between $8.22 and $8.30 per hour at her job. Pltf. Fact 4. Prior to moving in with her mother, her mother assisted her from time to time with the rent. It had been Absolam's practice, since 1992, to travel to Jamaica once per year, usually around Christmas to see relatives. Pltf. 56.1 Resp. 42. She in fact returned to Chicago, and was searched on January 4, 1998.

In plaintiff's luggage, the inspector found a single rolling paper that had a telephone number written on it by her sister. Pltf. Fact 5; Pltf. 56.1 Resp. 48. She had nothing that could be even remotely characterized as "drug paraphernalia." Further, Absolam does not recall being asked anything about her income on this particular trip. Pltf. Fact 4. Thus, there was no way defendants would know her income or whether the trip was consistent with her income. In any event, plaintiff had an air only ticket because she frequently stayed with relatives while in

10

Jamaica. Pltf. Fact 4. Her income is not inconsistent with this trip.

Thus, there are literally no undisputed facts causing the search of Absolam; having a single rolling paper with telephone numbers can be hardly characterized as "drug paraphernalia," and her income is commensurate with a plane ticket to Jamaica.

### 6. Facts in Common to all Plaintiffs

Plaintiffs briefly summarize facts common to many of the plaintiffs, including all those at issue here, demonstrating that reasonable suspicion to conduct strip searches did not exist. First, Martinez, who, among all defendants, is the most prolific searcher and witness of plaintiffs (and was involved in Allen's and Price's search), operated under the wrong search standard. She testified during her deposition that she (wrongly) believed that she needed "some" or "mere" suspicion to undertake a luggage search (for which no suspicion is needed); she also testified that she needed only "some" or "mere" suspicion to undertake a strip search. Pltf. Fact 227-28. She thus used the wrong legal standard to inform herself of when to do a strip search.

Second, "source country" is a useless standard because there is no apparent objective measure to determine what this includes, and because many Customs inspectors label almost every country in the world (except perhaps Canada) as a "source" country. Pltf. Fact 221-22, 266. Nevertheless, this "reason" was used repeatedly to justify personal searches, including strip searches. Third, "bulky" or "loose fitting clothing" was a wholly subjective standard; inspectors could not agree on what it means, and were inconsistent even within each defendants' own judgment. Pltf. Fact 224.

Additionally, for every plaintiff at issue here, defendants have omitted to note that at no stage prior to the strip search of a particular plaintiff did they uncover a single fact giving rise to a heightened degree of suspicion. See Brent v. Ashley, 66 F.Supp. 2d 1287, 1301 (S.D. Fla. 1999); aff'd 247 F.3d 1294 (11th Cir. 2001) ("as a search progresses from a stop, to a pat-down search, to a strip search, an agent must reevaluate whether reasonable suspicion to justify the next level of intrusion exists in light of the information gained during the encounter.") As revealed by the omissions in the IOILs, defendants thus ignored that nothing suspicious was found in the luggage of a single plaintiff. No plaintiff was thought to have given inconsistent answers to

questions. No plaintiff was discovered to have a fraudulent passport or license. No plaintiff was discovered to have had a criminal record that was suspicious. No plaintiff was the subject of an informant's tip. All of the plaintiffs were cooperative. Finally, in every case, plaintiffs were able to explain who they were and what they were about: for example, Jones was an actress and lawyer. Mendenhall was a Ph.D. candidate. Price had worked for WorldCom for many years. All these facts, which were omitted in the IOILs and the defendants' statement of facts, should have served to eliminate suspicion.[12] See, Brent, 66 F.Supp.2d at 1301.; Expo, 1992 WL 117121 at *5-6; Adedeji, 782 F. Supp. at 699.

## III. THE STANDARD OF REASONABLE SUSPICION WAS NOT MET BY CUSTOMS IN THEIR SEARCHES OF PLAINTIFFS

In the context of strip searches or greater intrusions by Customs inspectors, there is no dispute that the inspectors must have "reasonable suspicion" that the person has secreted contraband in the area of the body to be searched. Further, it is not so impossible to articulate what "reasonable suspicion" means, as the defendant would have this Court believe. Def. Mem. at 14.

In the context of searches by Customs' inspectors, "officials at the border must have a 'particularized and objective basis for suspecting the particular person of . . . smuggling [in the area to be searched]." U.S. v. Montoya de Hernandez, 473 U.S. 531, 541-542 (1985). This quantum of suspicion means that there must be "some minimal level of objective justification" that consists of "more than inchoate or unparticularized suspicion or 'hunch,'" but less than the level of suspicion required for probable cause. U.S. v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989) (internal citations and quotations omitted). "In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). As a result, there cannot be purely subjective hunches or statements of suspicion

---

12. The foregoing discussion omits that the statistical disparities which exist regarding plaintiffs, all of whom are African American black women. See Section IV.E.

unsupported by a reasonable basis for making the assertions used to supply "reasonable suspicion." The Supreme Court observed that the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence". Id., 392 U.S. at 22 fn. 18.

This demand for "objective" justification supported by specificity of information is important to this case. Plaintiffs here have had the unprecedented opportunity to examine all the factors that Customs inspectors use to attempt to justify a strip search. When the inspectors' attempted justifications for searches are examined fully, and with the benefit of reviewing dozens if not hundreds of searches, plaintiffs can and have shown that the typical reasons for a search are anything but "objective," and they are not supported by truthful information. Further, most, if not all the reasons reported by defendants in their IOILs to support a strip search fail as reasons when scrutinized.

One of the "reasons" that fail when scrutinized is "nervousness." This is a "reason" that defendants routinely relied upon to support reasonable suspicion for some of the plaintiffs at issue. See, e.g., Defs' Exs. 9, 13 (IOILs for Allen, Price). Not only do these plaintiffs deny having been nervous (thus raising a disputed material fact), many courts have recognized the difficulties with using this factor as one to support "reasonable suspicion." See U.S. v. Tapia, 912 F.2d 1367, 1371 (11th Cir.1990) (holding that no reasonable suspicion existed to support detention when suspect appeared visibly nervous during confrontation with officers and had few pieces of luggage); accord U.S. v. White, 890 F.2d 1413, 1417 (8th Cir.1989) (finding insufficient evidence to support reasonable suspicion for stop where defendant bought airline ticket with cash, arrived on flight known to be used by narcotics traffickers, and acted nervous and suspicious in the airport); U.S. v. Grant, 920 F.2d 376, 386 (6th Cir. 1990) ("[n]ervousness is entirely consistent with innocent behavior, especially at an airport where a traveler may be anticipating a long-awaited rendezvous with friends or family") (citing U.S. v. Andrews, 600 F.2d 563, 566 (6th Cir.1979)); see also U.S. v. Barron-Cabrera, 119 F.3d 1454, 1461 (10th Cir.1997) ("[W]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior

13

after being confronted by law enforcement officials ....") (quoting <u>U.S. v. Peters</u>, 10 F.3d 1517, 1521 (10th Cir.1993)); <u>U.S. v. Wood</u>, 106 F.3d 942, 948 (10th Cir.1997) ("nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on ... nervousness ... as a basis for reasonable suspicion ... 'must be treated with caution.'") (quoting <u>U.S. v. Fernandez</u>, 18 F.3d 874, 879 (10th Cir.1994)); <u>U.S. v. Black</u>, 675 F.2d 129, 136-37 (7th Cir.1982) (holding that, although the totality of circumstances supported reasonable suspicion, it was not enough merely that the passenger had arrived from Fort Lauderdale, was the first off the plane, deplaned speedily and in a disoriented state, and appeared nervous); <u>see</u> <u>also</u> <u>Brent v. Ashley</u>, 247 F.3d 1294, 1302 (11th Cir. 2001).

Similarly, the factor of "source country" is factually not objective. It is not based upon any objective standards, and is not a factor particularized to a specific passenger. Customs supervisors and inspectors have routinely testified that virtually every country in the world can be deemed a "source" or "transit" country for narcotics, thus allegedly justifying suspicion for everyone on every international flight. Pltf. Fact 221-22, 266. In <u>Reid v. Georgia</u>, 448 U.S. 438 (1980) (per curiam), the Supreme Court recognized that "source" country was not a useful factor when it rejected its use to support "reasonable suspicion" to detain a traveler in an airport in Atlanta. The Supreme Court concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances," including source country, because this would describe a large number of "presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." <u>Id.</u>, at 441. Similarly, in <u>U.S. v. Grant</u>, 920 F.2d at 386, the Court recognized the problems with using "source country" as a factor to provide "reasonable suspicion" because, as here, its use is subject to abuse. Indeed, the <u>Grant</u> Court specifically held that arrival from a source location does not provide reasonable suspicion because "[o]ur experience with DEA agent testimony in other cases makes us wonder whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center." <u>Id.</u>, at 386.

14

The concept of a "short trip" is similarly ambiguous, and not used in a particularized sense to cause suspicion of any particular plaintiff. Although Courts have held that various days of travel may be deemed a suspiciously "short trip", thus worthy of being placed in the "reasonable suspicion" equation, all of the decisions were based solely upon a law enforcement personnel's testimony. See U.S. v. Himmelwright, 406 F.Supp. 889, 892-893 (D.C.Fla. 1975) (short trip to Columbia was 7 days, plus the passenger was unusually calm.); U. S. v. Carter, 590 F.2d 138, 139 (C.A.Fla. 1979)(short trip to Columbia was 10 days); U.S. v. Sokolow, 490 U.S. 1, 9 (1989)(disputably deemed a trip "short" because "while a trip from Honolulu to Miami, standing alone, is not a cause for any sort of suspicion, here there was more: surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July"); cf. U.S. v. Elliot, 807 F.Supp. 1373, 1374-75 (N.D.Ill. 1992)("short trip" was properly used as factor because amount of luggage being carried not consistent with short trip). In no instance here did a defendant reasonably use the fact of a "short trip", as was used in Elliot, supra, namely, to identify a passenger whose "short trip" was either not explainable (as, for example, a vacation), or inconsistent with other attributes of the passenger.

Further, courts, including this Court, in Ekpo, supra, have all held that inspectors must look to all factors, including exculpatory ones, to determine reasonable suspicion. See, e.g., Adedji, 782 F.Supp. at 699; Brent, 66 F.Supp.2d at 1294. Where reasonable, innocent explanations are given for conduct that could be suspicious, these explanations should eliminate any "reasonable" suspicion. See, e.g., Brent, supra (where check of luggage revealed nothing, plaintiff verified employment and residence information, plaintiff was cooperative, and computer system revealed nothing suspicious, no reasonable suspicion existed, despite fact that passenger, among other things, was nervous, came from a source country, had purchased her ticket at suspect travel agency, and showed disapproval of law enforcement's activities); see also U.S. v. Afanador, 567 F.2d 1325, 1330-31 (5th Cir. 1978) (fact that suspect fit certain profile information was not reasonable suspicion to do strip search where nothing was found in luggage and no suspicious information was elicited from suspect). In not a single case here, did defendants address the exculpatory factors eliminating suspicion. For plaintiffs, nothing of a

15

suspicious nature was found in their luggage, nor were any of the plaintiffs "argumentative" or evasive or inconsistent in their responses. Plaintiffs had careers, ranging from that of a lawyer to a caregiver to a Ph.D. candidate to a telephone operator (See, e.g., Pltf. Fact 10, 34, 42, 240), undermining the contention that reasonable suspicion existed for any plaintiff. An examination of all these factors here show there was substantially less to support "reasonable suspicion" than in similar cases also holding that legal cause to search did not exist. See, e.g., Brent, 247 F.3d at 1301-03; Ekpo, 1992 WL 117121 at *5-6; Adedji, 782 F.Supp at 699. (In all 3 cases, the district courts and appellate court in Brent determined that legal cause to do a strip search did not exist, notwithstanding fairly extensive facts set forth by Customs, because of the exculpatory factors for which Customs should have accounted.)

Further, the Supreme Court has provided an ascertainable benchmark of what factors in an airport context would *not* provide reasonable suspicion to undertake a strip search. In Reid v. Georgia, 448 U.S. 438 (1980), a DEA agent stopped a traveler in the Atlanta Airport because his characteristics and actions fit the "drug courier profile": (1) the defendant arrived from Fort Lauderdale, a city the agent knew to be a principal source of cocaine; (2) he arrived early in the morning, when law enforcement activity is diminished; (3) he and his companion appeared to be concealing the fact that the two were traveling together; and (4) he and his companion had no luggage except for their shoulder bags. Id., at 440-41. The Supreme Court concluded that "the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." Id., at 441. The only fact that related to the individuals' conduct, the Court found, was that the defendant preceded his companion and occasionally looked backward at him. The Court found that the other circumstances, including arrival from a source location, describe such a large number of "presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." For the plaintiffs at issue in this motion, Reid's analysis fits their circumstances. There is virtually no set of facts that relate to a single *individual* plaintiff's conduct, that equal reasonable suspicion, as opposed to generalized facts that likely applied to all the passengers on the airplane (for example, source country, short

16

trip and type of clothing worn).[13]

## A.    Defendants are not Entitled to Qualified Immunity

The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation. Hope v. Pelzer, 122 S.Ct. 2508, 2513 (2002). If there is a constitutional violation, officers "may nevertheless be shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id., at 2515, quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Contrary to defendants' suggestion, the determination as to whether the law in a particular area has been clearly established, does "not require a prior case that is precisely on all fours on the facts and law involved with the case at issue (McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992)); or a "controlling precedent" (Cleveland - Perdue v. Brutsche, 881 F.2d 427, 437 (7th Cir. 1989); K.H. Through Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990)); or a prior case "which differs only trivially" with the case at issue. Id. Instead, as the Supreme Court has stated, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action has [not] previously been held unlawful.'" U.S. v. Lanier, 520 U.S. 259, 270 (1997); see also Hope, 122 S.Ct. at 2516 ("Our opinion in Lanier thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in Lanier, we expressly rejected a requirement that previous cases be "fundamentally similar.")

In ascertaining clearly established law, courts are to look to case law as well as agency regulations that govern employees' conduct. Id. ("The respondents violated clearly established law. Our conclusion that 'a reasonable person would have known,'... of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of

---

13. The defendants also appear, without having clearly made the argument, to contend that a witness might not be liable even though the searcher is liable. However, since both clearly participated in and/or observed the search, both would be liable. In fact, the failure to protect a plaintiff, by a witness, from a wrongful search, subjects that person to liability. Montalvo v. Park Ridge Police Department, 170 F.Supp.2d 800, 802 (N.D. Il. 2001) (failure to protect grounds for section 1983 liability).

its practices before the incidents in this case took place."); see also Saffell, 183 F.3d 655, 659 (7th Cir. 1999) (qualified immunity granted because defendant was "following the policies of Customs...").

Relying on Saffell, defendants have made the wholly unsupported contention that an inspector could reasonably believe that merely feeling a bulky object in the groin of a passenger "is a sufficient basis to constitute reasonable suspicion for a partial strip search. . ." Def. Mem. at 21. This is wrong. First, Saffell did not so hold, but indicated that "other factors" must also be present. Id., 183 F.3d at 659 (sufficient basis for strip search included "canine alert and the revelations of the patdown search, *as well as other factors,* to fully justify the partial strip search" (emphasis added)). Second, nowhere in the Customs' Personal Search Handbook (1997) is it stated that merely feeling an object in the groin equals reasonable suspicion for a strip search. See Defs' Ex. 41.[14] Third, the case law has consistently held that "reasonable suspicion" is based upon the *totality of the circumstances,* not some single factor in isolation. Terry v. Ohio, 392 U.S. 1, 21-22 (1968). Fourth, case law has long held that exculpatory information learned by Customs inspectors during the course of an investigation will negate a suspicious factor. See, e.g., Adedeji, 782 F.Supp. at 699 ("When suspicious factors prove to be consistent with innocent behavior within the context of the entire circumstances, they lose their predictive value and should not be given substantial weight as a basis for reasonable suspicion.") Indeed, if defendants' version of the law were accepted, then with impunity, a woman can be taken into a Customs search room for a pat down based on no suspicion, and then be strip searched (or required to remove a tampon) if she happens to be menstruating (which is biologically and statistically likely for 15-20% of all child bearing aged women). This result would be tantamount to throwing out the requirement of reasonable suspicion because in reality none is required under defendants' vision of the law.[15]

Regardless of defendants' vision of the law, they are not entitled to qualified immunity because there are disputed facts that are decisive to the immunity question. Defendants'

---

14. This is significant because the Handbook does explain, in detail, what constitutes "reasonable suspicion."
15. This would also be discriminatory against women, generally, on its face.

contentions ignore the many disputed material facts that operate to deny them qualified immunity. It is hornbook law that if there are disputed issues of fact, as is abundant here, a court may not grant qualified immunity. Green v. Carlson, 826 F.2d 647, 652 (7th Cir.1987) ("if there are issues of disputed fact upon which the question of immunity turns, ... the case must proceed to trial."); Apostol v. Landau, 957 F.2d 339, 342 (7th Cir.1992) ("If there are issues of disputed fact upon which the question of immunity turns, ... the district court's grant of summary judgment in favor of the defendants was not proper.").

Defendants' revisionist view of the facts are in dispute. Each plaintiff has disputed material portions of the reasons stated in the IOIL for their search. For example, Allen and Price deny they were nervous or wore bulky clothes; Jones provided appropriate details of her trip, and Mendenhall disputes that she was subjected to a dog alert. Thus, also on this ground alone, qualified immunity must be denied.

Finally, even in the context of qualified immunity, *post hoc* attempted justifications for an inspector's actions by employing a different spin on the facts is not sufficient to obtain immunity. The 7th Circuit has expressly looked with disfavor on such tactics:

> Nevertheless, while an objective standard is to be employed in assessing the legal basis for an arrest, we will not "indulge in *ex post facto* extrapolations of all crimes that might have been charged on a given set of facts at the moment of the arrest, nor [] will [we] look favorably upon arguments of the government doing the same. Such an exercise might permit an arrest that was a sham or fraud at the outset, really unrelated to the crime for which probable cause to arrest was actually present[,] to be retroactively validated." Essentially we have in mind a rationale that would recommend itself to a reasonable police officer acting in good faith. A rationale which is extravagant or novel, or which is based on "stale" facts that could have formed the basis for an earlier arrest, may be rejected as unreasonable. We will not look favorably on any arrest based on an "arrest now, explain later" policy. (Citations omitted).

Richardson v. Bonds, 860 F.2d 1427, 1431 (7th Cir.1988). Thus, to grant immunity, defendants would have this Court ignore defendants' IOILs and the original "reasons" stated for a search; defendants would have this Court also ignore the facts that are disputed by plaintiffs; and defendants would have this Court grant an immunity based upon a single fact that has nothing to do with reasonable suspicion, but rather, a statistical and biological certainty. That is, the mere fact that 15-20% of child bearing age women are on their menstrual cycle and have a pad in their

groin. This result would be preposterous. Accordingly, this Court should deny defendants' request for qualified immunity.

### B.    Defendants are not Entitled to Qualified Immunity Based upon Allegedly Feeling a Pad in the Groin of a Plaintiff

For only 1 of the 6 plaintiffs at issue did defendants report in the IOIL that a reason for that search was feeling a pad in the groin area during a pat down. Defs' Ex. 22 (Jones IOIL). Nevertheless, defendants have contended that the Saffell decision provides qualified immunity for all defendants at issue here. Recent case law, and the evidence, demonstrate that defendants' credibility is so lacking, and the material facts so disputed, that qualified immunity is unavailing.

Saffell v. Crews, 1998 WL 832653 (N.D.Ill. 1998), a decision much relied upon by defendants here, was based upon false factual premises that Customs inspectors, two of whom are defendants at issue here, managed to convince the Court were true. The 7th Circuit in turn adopted the District Court's factual findings upon which that case turned. Before the Customs Service was forced to change its policies and training, individual inspectors relied upon the broad latitude that their own agency, and Courts, gave them in molding the factual circumstances of *any* traveler into "reasonable suspicion" to justify a search without much scrutiny of these facts. Indeed, another District Court has recognized this:

> This case suggests strongly that courts should be cautious in deferring to subjective determinations by even trained inspectors. The defendant in this case, Customs Inspector Seymour Schor, persuaded a jury in another case with testimony that he suspected a traveler was transporting drugs because he was "fairly deadpan," expressionless, without visible signs of agitation and did not protest being singled out for questioning. United States v. Rivera, 926 F.2d 1564, 1568 (11th Cir.1991). By affidavit submitted in this case he concluded, erroneously, that Brent was a drug carrier because her reaction was exactly opposite that of the defendant in the Rivera case. If such testimony could constitute "articulable suspicion" an inspector could justify a search of anyone.

Brent, 66 F.Supp.2d at 1293 n.2. In its opinion affirming the district court, the 11th Circuit expressly endorsed this caution. Brent, 247 F.3d at 1302 fn. 8.

In Saffell, the plaintiff, an African American woman, complained of a strip search that bore substantial similarity to many of the strip searches that the plaintiffs were made to undergo

here. During Saffell's pat down, inspector Crews claimed that she had a bulge in her crotch leading Crews, along with other factors, to conduct a strip search. Crews claimed that Saffell was wearing a sanitary napkin thus causing the bulge, thus leading to the strip search. See, Saffell, at n.3.

Saffell disputed that she was wearing a sanitary napkin; rather, she testified that she was utilizing a tampon which would not cause a bulge. Saffell further testified that she was asked to strip without any bulge having been felt. Finally, Saffell testified that Crews requested her to remove her tampon as part of the search. Crews denied that this occurred. The District Court credited Crews' testimony:

> Ms. Saffell contends that she was wearing a tampon, and Crews ordered her to remove it, which she did after first refusing to do so. We reject this testimony. A tampon in Saffell's body would have revealed no telltale bulge or bump, which was what triggered the strip search in the first place. *Further, Crews' actions, as testified to by Saffell, would have seriously violated Customs' policies.* We do not believe Agent Crews, a Customs agent with over twenty years experience, would do so for no reason, and no reason is revealed by the testimony.

Saffell, 1998 WL 832653 at 1 n.3 (emphasis added). Both Crews and Inspector Diez (who was dismissed as a defendant before trial) testified that Customs policy was not to have a passenger remove her tampon. This was false. Among other evidence showing this to be false is the testimony of Supervising Inspector Gloria Banks, who was also the supervising officer for Saffell's search. P. Ex. 3 at 45-48.

This false testimony materially shaped the reviewing court's opinion. Significant to the 7th Circuit's decision to give the Saffell defendants qualified immunity was the reason that the District Court gave to turn down Saffell's request for punitive damages. The district court denied punitive damages "because [Crews] was simply carrying out Customs' policy as she understood it" . . . Id., at *5. Because Crews was merely "carrying out customs' policy", the Court concluded that "she could not be acting maliciously." Id. This latter language was seized upon by the defendant in their appeal, based upon qualified immunity, of the District Court's $25,000 damages award.

In granting qualified immunity to Crews, the 7th Circuit paraphrased the above quote, as

21

well as the District Court's observations of Crews' experience:

> The district court found that Crews did not knowingly violate any law, but was following Customs policy as she understood it. Even if Crews made a mistake, which we do not think she did, qualified immunity provides ample room for mistaken judgments and protects government officers except for the plainly incompetent and those who knowingly violate the law. . . . Crews, an experienced Customs inspector, was neither incompetent, nor did the district court find that she intentionally violated the law.

Saffell, 183 F.3d at 658.[16]

Thus, qualified immunity was granted to Crews because she "was following Customs policy as she understood it." Had Crews' testimony on Customs policy not been adopted, Crews would have been seen to be violating policy and not entitled to qualified immunity. In a similar vein, the 7th Circuit also noted that qualified immunity was available because "Crews could not reasonably have known that in doing her duty and following the policies of Customs she would be violating any law."[17] Id., at 659.

Defendants here would have this Court believe that the sole basis providing reasonable suspicion to undertake a strip search is an inspector's alleged discovery of a foreign object during a pat down. Def. Mem. at 15. The facts here show, however, that feeling a bulge in the groin is a disputed fact and/or pretext to extend a search and not a policy mandating a search, as evidenced by the Customs Handbook. Moreover, even under the false premises that determined Saffell, there were still much more than the discovery of a mere alleged foreign object to obtain qualified immunity for that strip search:

> In the present case there was a sufficient objective basis, *including the canine alert and the revelations of the patdown search, as well as other factors*, to fully justify the partial strip search.

Saffell, 183 F.3d at 659 (emphasis added). In Saffell, in addition to the alleged (and in truth, not

---

16. That the lower court chose to believe Crews (because she was allegedly just following policy), and disbelieve Saffell, caused the Appellate Court to observe that had "Saffel's version alleging extreme intimat personal contact and intrusion been accepted by the district court this could have been more difficult." Saffe 183 F.3d at 657. This type of "extreme intimate contact and intrusion" is not now disputed by Customs. Se e.g., discussion regarding Milner search; Pltf. 56.1 Resp. 127.

17. These Appellate Court statements, along with the recent Supreme Court case of Hope supra, call into question this Court's grant of qualified immunity of routine pat downs. In doing non-intrusive pat downs wit "reasonable suspicion," defendants were violating Customs' written policy manual. Defendants should not b allowed to have it both ways. That is, defendants cannot both obtain qualified immunity because they were (allegedly) only following policy (as in Saffell), but yet avoid liability by obtaining qualified immunity whe are in violation of their own policy manual.

present) "sanitary napkin,"[18] there were the following "other factors": (1) a canine alert; (2) Saffell had just returned from a country with a "reputation for being a source of narcotics'" (3) frequent travel (Saffell had traveled to Jamaica 3 times in little over a year); (4) Saffell was argumentative;[19] and (5) Saffell had a low paying job.[20] Id.

The 7th Circuit also noted that Saffell's "argumentative" behavior was particularly material (a fact not present for any of the plaintiffs here). Saffell, 183 F.3d at 657. In granting qualified immunity, and notwithstanding all these factors (and false facts), the Appellate Court observed that this was not to be taken as a license by Customs inspectors that they would have *carte blanche* to do what they liked: "this case does not mean, however, that Customs agents have free license to exceed what is reasonable and proper under the law in order to accomplish their important responsibilities." Saffell, 183 F.3d at 659. Significantly, most of the "other factors" present in Saffell are either non-existent or disputed here.

**C.    The Defendants should not be Entitled to Qualified Immunity for Pat Down Searches**

As this relates to plaintiff Absolam only, defendants contend that it is the law of the case that they are entitled to qualified immunity for pat down searches because an inspector could reasonably believe that a pat down search could be conducted without any suspicion. After this Court's decision in Anderson v. Cornejo, 199 F.R.D. 228, 255-256 (N.D. Ill. 2000), however, the Supreme Court indicated that among the sources of information that will inform an officer of clearly established law is a particular agency's policies. Hope, supra at 2516 ("Regardless, in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post, we readily conclude that the respondents' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known'.")

As applied here, the Customs Service has had a long standing policy manual requiring

---

18. Thus, if there is a dispute in the facts, summary judgment cannot be granted. In Saffell, the District Court made its determination that there was no "sanitary napkin" at a bench trial.
19. These "other factors" were all expressly noted by the Appellate Court.
20. This was an additional factor used by Customs to undertake the strip search, as noted by the District Court. 1998 WL 832653, at *4.

some or mere suspicion before an inspector can conduct a pat down. Defs' Ex. 41. Beginning with the Seventh Circuit case of U.S. v. Dorsey, 641 F.2d 1213 (7th Cir. 1981), and continuing with this Court's opinion in Ekpo, 1992 WL 117121 at *5 (1992) (court determined, which Customs did not dispute, that they needed "reasonable suspicion" to detain during the pat down, before the strip search), and moving forward with Customs own policy manual, it is undisputed that Customs was charged, in this Circuit, with knowledge that they needed some suspicion to conduct a pat down. There is no case to the contrary. This Court is thus respectfully urged to re-visit its prior opinion in light of the above case law, particularly Hope.

## IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EQUAL PROTECTION VIOLATIONS

### A. The Law Governing Plaintiffs' Equal Protection Claims.

The guarantee of "equal protection of the laws" requires that similarly situated people be treated similarly. City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985). In other words, government employees run afoul of the Equal Protection Clause when they use race and, oftentimes, gender as a basis for their actions. Cleburne, 473 U.S. at 440-41; Chavez v. Illinois State Police, 251 F.3d 612, 637 (7th Cir. 2001) (state defendants "cannot legally decide whom to stop on the basis of gender any more than they can do so on the basis of race"). Although obscured by defendants here, plaintiffs allege two separate equal protection claims: first, that they were illegally stopped and detained because of their race and gender (African American women); and second, that they were forced to endure more intrusive personal searches than non-African American women.

"To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." Chavez, 251 F.3d at 635-36. Defendants argue that plaintiffs' equal protection claims should be disposed of on summary judgment for two reasons: first, the statistics thus far proffered by plaintiffs are insufficient as a matter of law to show a discriminatory effect; and second, that there is insufficient other evidence of intentional discrimination which is required because,

24

defendants' contend, statistics alone can never suffice in this type of case.[21]  Def. Mem. at 8-10.

However, as plaintiffs demonstrate below, there is ample evidence of equal protection violations

so as to allow these claims to proceed to trial.

> **B.**     **Plaintiffs Have Produced Evidence of Discriminatory Effect By Showing that
> Similarly Situated Travelers Were Not Stopped, Detained or Searched by
> Defendants.**

"To prove discriminatory effect, the plaintiffs are required to show that they are members

of a protected class, that they are otherwise similarly situated to members of the unprotected

class, and that plaintiffs were treated differently from members of the unprotected class."

Chavez, 251 F.3d at 636.  Plaintiffs "may show that [the defendants] treated them differently

than other similarly situated individuals by naming such individuals or through the use of

statistics. . ." Id.

To determine whether a named individual from the non-protected class is "similarly

situated" to a plaintiff, courts "must look at all relevant factors, the number of which depends on

the context of the case."  Chavez, 251 F.3d at 636, quoting Radue v. Kimberly-Clark Corp., 219

F.3d 612, 617 (7th Cir. 2000).  However, there is no "magic formula for determining whether

someone is similarly situated . . . and it would be imprudent to turn a common-sense inquiry into

a complicated legal one."  Id.  The 7th Circuit has cautioned, "[i]n determining who is similarly

situated, we have also been careful not to define the requirement too narrowly."  Id.

**Jacqueline Jones** has named three individuals who are similarly situated to her, none of

whom were stopped, detained or searched by defendants Gloria Banks and/or Victoria Diez.

These individuals are David Nesbitt, a white male, Jennifer SayGan, an Asian American female,

and Jennifer Tyler, a white female.  All three of these individuals were traveling with Jones on

---

21. Defendants repeatedly state that plaintiffs' have failed to produce evidence during discovery in support of
their Equal Protection claims. Def. Mem. at 3, 10.  This is simply not true. First, contrary to defendants'
representation, plaintiffs answered their February 10, 1999, interrogatory stating, in essence, that while there were
few African Americans on their flights, only or mostly African Americans were in Customs secondary.  Defs' Ex. 5
at Response 10, e.g.  These interrogatory answers were further supported during plaintiffs' depositions. Defendants
completely ignore this evidence. Further, as defendants well know, much of the evidence necessary to prove these
Equal Protection violations was in their control.  They consistently fought all efforts by plaintiffs to obtain much of
the information necessary to prove their claims.  See Sections IV.C & D, below.  However, despite defendants
efforts, defendants ultimately produced records which, when combined with plaintiffs' other evidence, are sufficient
to defeat summary judgment here.

her return flight from Germany to O'Hare. Pltf. Fact 14-17. All three of these individuals were
actors and were hired by MVP Communications to perform at a trade show in Berlin, as was
Jones. Pltf. Fact 16-17. Additionally, MVP Communications arranged Nesbit's travel plans and
paid for his tickets. Pltf. Fact 18. Nesbitt, like Jones, had never traveled internationally before
and had only recently obtained a U.S. Passport. Pltf. Fact 13-19. Yet neither Nesbitt nor the
non-African American women were stopped, detained or searched. Pltf. Fact 14-20.

Further, Jones was the *only* person on her United Airlines flight (which had more than 194
people on it)[22] who was personally searched by any U.S. Customs personnel. Pltf. Fact 46-47.
Inspector Diez did not personally search any other person from that flight, nor did Supervising
Inspector Banks give her approval for a personal search of any other passenger from that flight.
Pltf. Fact 46-47. See also Section IV, E.1, below (search statistics for Banks and Diez). This
comports with Jones' testimony that she noticed only two other male passengers (perhaps of
Hispanic or Middle Eastern descent) in Customs secondary during the time that she was having
her luggage searched, both of whom left sometime during her luggage search. Pltf. Fact 21.
Jones was also told by an Immigration and Naturalization Service agent at the passport
checkpoint that her passport had been "tagged" because she fit a "profile." Pltf. Fact 29. The
above-stated facts are clearly sufficient to satisfy the discriminatory effect prong for Jones. See
Chavez, 251 F.3d at 637 (Hispanic male plaintiff and white female were similarly situated where
both were driving down same interstate at same time and neither committed a traffic violation).

As with Jones, Absolam, Price and Allen were the *only* people personally searched from
their flights by any U.S. Customs personnel. Pltf. Fact 44-45, 48-49. From all of the passengers
on **Michelle Absolam's** flight (an incomplete passenger arrival list indicates that 82 people were
on the same flight), *only* she was subjected to any type of personal search. Pltf. Fact. 44-45.
Further, during her luggage search, Absolam noted that the only other people whose luggage was

_____

22. One of the databases produced by defendants, the Passenger Arrival database, identifies passengers arriving
from foreign destinations. It includes fields for the name and date of birth of the passenger, the passenger's crossing
date and time, and the passenger's airline and flight number. Plft. Fact 46. However, often, a passenger's airline and
flight number are missing. Id. This may result in the passenger arrival list for a particularly flight being
incomplete; for example, the passenger arrival data for Jones' flight lists her twice, but omits Nesbit and SayGan.
Id.

searched was one other black woman and perhaps another person, even though the majority of the passengers on her flight were white. Pltf. Fact. 2. **Adunni Allen**[23] and **Yvette Price** were traveling together. Again, Allen and Price were the *only* persons on their flight (out of at least 71 people), who were subjected to personal searches by Customs personnel. Pltf. Fact 43. Price noted, however, that there were very few African Americans (perhaps 5 individuals including Price and Allen) on board their flight, although the plane was about 80% full. Pltf. Fact 43.

From **Katherine Milner's** flight,[24] 8 people were subjected to personal searches, 7 of whom are black (the eighth person's race is not reported). Pltf. Fact 55. Of these 7 African Americans, 6 are women. Pltf. Fact 55. This means that 88% of the people personally searched from this flight are black, even though there were few African Americans, compared to others, on the flight. Pltf. Fact 41, 55. No white, Latino or Asian women were personally searched from this flight. Pltf. Fact 55.

For **Ruby Mendenhall**, 9 of the 12 people personally searched from her flight were black, 7 of whom were black women. Pltf. Fact 51-52. In other words, 82% of the people personally searched from this flight were black -- and 64% of these personally searched individuals were black women-- even though there were few African Americans, compared to others, on the flight.[25] Pltf. Fact 37-38, 51-52. Only one non-black woman (a white woman) was personally searched from Mendenhall's flights. Pltf. Fact 53. Significantly, this woman's IOIL lists the *exact* same reasons for search ("passive k-9 alert, high risk travel") as does Mendenhall's IOIL. Pltf. Fact 53. Yet, Mendenhall was stripped searched, while the white woman was merely patted down. Pltf. Fact 53. Finally, Mendenhall testified that, although she saw few black individuals on her flight, she observed mostly black people having their luggage searched. Pltf. Fact 37-38.

---

23. Customs' negative incident record for Allen incorrectly reports that her search took place on June 26, 1997. See Defs' Ex. 9 - Allen IOIL. Defendants do not dispute that Allen was in fact searched on June 23, 1997.

24. The passenger arrival data for Milner's flight consists of only those passengers who had a TECS (lookout) hit record (5 passengers). Plft. Fact 54. Without the declaration cards, there does not appear to be any way to reconstruct the passenger list for this flight. See Section IV.C, below.

25. The passenger arrival data for Mendenhall's flight consists of only those passengers who had a TECS (lookout) hit record (8 passengers). Plft. Fact 50. Absent the declaration cards, which were destroyed by defendants, there does not appear to be any way to reconstruct the passenger list for this flight. See Section IV.C, below.

27

These stark figures are compelling, particularly when contrasted with plaintiffs' testimony that their flights consisted of mostly non-black passengers. An inference of *purposeful discrimination* (let alone one of discriminatory effect) may arise from "the inexorable zero", e.g., evidence showing that only members of a protected class are treated adversely. International Brotherhood of Teamsters v. U.S., 431 U.S. 324, 342 n.23 (1977); see also EEOC v. O&G Spring Wire Forms Specialty Co., 38 F.3d 872, 878 (7th Cir. 1994).

Numerical evidence regarding the racial and gender make-up of these plaintiffs' flights and/or those referred to Customs' secondary, or specifically named similarly situated individuals would merely add to the other evidence presented in this response. See also Section III.E.1. (discussing search statistics of individual defendants). However, although Customs records existed in which these benchmark populations could have been determined, defendants either destroyed the records (declaration cards) or prevented plaintiffs from obtaining the necessary information from them (passenger arrival database).

C.      **This Court May Draw a Negative Inference that Other Evidence, that Defendants Destroyed or Prevented Plaintiffs from Obtaining, Would Have Supported Plaintiffs' Claims,**

**Destruction of Declaration Cards**: Passengers returning to the U.S. on international flights must complete a declaration card, which, *inter alia*, requires a passengers' name, address, arrival date and flight number. Pltf. Fact 129. Although the declaration cards do not themselves contain race or gender fields, such data could be gathered using them. Gender information can be gleaned from the passengers' names, while race information can be gathered by using passenger addresses and census data to determine the racial composition of the blocks on which each passenger lived. Alternatively, gender and race information can be gathered by surveying the passengers on the plaintiffs' flights. With this information (obtained via survey), statistical analyses could be done to document the number of African American women: (1) referred to Customs secondary, compared to their international traveling population arriving at O'Hare generally, or for specific flights; and (2) subjected to personal searches, compared to other individuals referred to Customs secondary for a luggage search.

Notwithstanding that defendants were on notice that declaration cards would be a key

28

piece of evidence in this case, the vast majority of them, including the ones for plaintiffs' flights here, have been destroyed. With the filing of a related class action complaint on May 7, 1998,[26] which alleged, *inter alia,* Equal Protection and 4th Amendment claims (Pltf. Fact 134), defendants were put on notice to retain documents that might be discoverable in litigation.[27] See e.g., China Ocean Shipping Group Co. v. Simone Metals, Inc., 1999 WL 966443, at *4 (N.D. Ill. 1999) ("The duty to preserve evidence includes any relevant evidence over which the non-preserving entity had control and reasonably knew or could reasonably foresee was material to the potential action."); Wm.T. Thompson v. General Nutrition Corp., 593 F.Supp.1443, 1455 (C.D. Cal. 1984) ("Sanctions may be imposed against a litigant who is on notice that documents...in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information."); see also Langley v. Union Electric Co., 107 F.3d 510, 514 (7th Cir. 1997).

Notwithstanding this notice – and defendants concurrent duty to not destroy the declaration cards – in August, 1998, the Customs Service at O'Hare destroyed all non-dutiable declaration cards that were more than 6 months old, which necessarily included the documents relating to plaintiffs' and their flights. Pltf. Fact 130-138. Defendants contend that this document destruction took place pursuant Customs' document retention policy. Pltf. Fact 139. Defendants had a legal duty, however, to retain the documents, regardless of its retention policy, once it "knew or could reasonably foresee" that the documents were relevant to litigation. This it failed to do.

Further, the timing of defendants' decision to implement its retention policy to destroy the declaration cards is suspicious, and gives rise to an inference of deliberate spoliation. Even though Customs at O'Hare had been notified on September 22, 1997, that "they should destroy

---

26. Indeed, even before the filing of the class action complaint, the importance of the declaration cards as discoverable evidence became apparent to the parties. Pltf. Fact 131-32.

27. Nor does the duty to preserve documents arise only once a document request is served. "A party clearly is on notice of [t]he relevance of evidence once it receives a discovery request. However, the complaint itself may also alert a party that certain information is relevant and likely to be sought in discovery." Cohn, 1995 WL 519968 at *5. Here, in addition to the May 1998, complaint , defendants were put on notice that the declaration cards were relevant evidence during an April 30, 1998, deposition. Pltf. Fact 131-32. Indeed, defendants produced a plaintiff's declaration card the day after the deposition. Pltf. Fact 133.

the baggage declarations after they were six months old," as of late May, 1998 (after the date the related class action complaint was filed), "years of customs declaration cards" were still being maintained for O'Hare. Pltf. Fact 140, 141. Defendants at O'Hare did not follow its own retention policy until *after* it received notice in late May, 1998, that the declaration cards should be destroyed. Pltf. Fact 140-43.

Because of defendants' actions, information necessary for plaintiffs to conduct the racial and/or gender targeting analysis has been lost.[28] This Court should exercise its authority to infer that the destroyed documents would have demonstrated that black women comprised only a small percentage of the passengers on these women's flights (as plaintiffs have testified). See, e.g., U.S. v. Golden Elevator, Inc., 27 F.3d 301, 303 (7th Cir. 1993) (court may exercise broad discretion in choosing sanction for discovery violation); Coates v. Johnson & Johnson, 756 F.2d 524, 551 (7th Cir. 1985) (noting bad faith destruction of relevant document gives rise to strong inference that document would be unfavorable to party responsible for destruction).

**Information from passenger arrival database**: An alternative source of information, incomplete though it may be (see, e.g., Pltf. Fact 46,48), is the information contained in the passenger arrival database. As with the declaration cards, the information contained in the passenger arrival database would have allowed plaintiffs to survey international travelers at O'Hare to obtain population benchmark information. Alternatively, plaintiffs could have, if allowed, contacted individuals listed on the plaintiffs' flights to obtain names of similarly situated individuals. Indeed, plaintiffs early on emphasized the importance of the information contained in this database: "The clear relevance of this data is underscored by defendants' repeated requests that plaintiffs' identify 'every similarly situated non-African-American traveler who was treated more favorably than plaintiffs.'" See Pltfs. April 17, 2000, Motion to Compel Computer Data at 9. However, even though this Court ordered the production of this information, it ultimately agreed with defendants' objections, and restricted plaintiffs from contacting any of the passengers disclosed on the databases. See Order dated March 6, 2001; Order dated June 1,

---

28. Plaintiffs have also lost information that might be relevant to their unreasonable search and seizure claims. Plft. Fact 131.

2002.

As an initial matter, plaintiffs submit that this limitation on their ability to use the information contained in the databases to obtain highly relevant evidence was simply wrong. See, e.g. Gile v. United Airlines, 95 F.3d 492, 499 (7th Cir. 1996). Notwithstanding, defendants should be precluded from arguing that plaintiffs here have failed to proffer the appropriate benchmark populations or similarly situated individuals for Allen, Price, Mendenhall, Milner, and Absolam. Defendants consistently fought all plaintiffs' efforts to obtain discovery on their Equal Protection claims.[29] Defendants persisted in their objections notwithstanding that plaintiffs specifically argued that "[p]laintiffs' equal protection claim requires proof that African-American women were subjected to intrusive personal searches under circumstances where other similarly-situated travelers where either not searched, or were searched in a less intrusive manner (e.g., a standard pat down rather than a strip search)." See Pltfs. Nov. 27, 2000, Motion at 4.

Defendants based their objections on the alleged privacy concerns of international travelers and the relevancy of these other searches to the ones conducted by individual defendants. See Defs. Resp. in Opp. to Pltfs. Motion to Compel Production of Names & Addresses of Persons Subjected to Negative Searches (filed Dec. 21, 2000). Having successfully used these objections as a shield to discovery, defendants should not now be able to turn them into a sword, by arguing that they are entitled to summary judgment on the grounds that plaintiffs have failed to provide appropriate benchmark populations, or to name similarly situated individuals not stopped, detained or searched by defendants. Such gamesmanship is neither fair, nor tolerable under analogous case law. See, e.g., Dorr-Oliver, Inc. v. Fluid-Equip, Inc., 834 F.Supp. 1008, 1012 (N.D. Ill. 1993) (defendants cannot evoke attorney-client privilege to limit discovery and then rely upon attorney advice to prevail on summary judgment); Keyes Fibre Co. v. Packaging Corp. of American, 763 F.Supp. 374, 376 (N.D. Ill. 1991) (same).

---

29. See, e.g., Pltfs. June 27, 2000, Motion to Compel Production of Computer-Readable Data Relating to Class Members in an Unredacted Form; Pltfs. Nov. 27, 2000, Motion to Compel Production in Computer-Readable Form of Names and Addresses of Persons Subjected to Negative Personal Searches; Pltfs. April 4, 2001, Motion to Expedite Response to Requests to Admit.

**D.** **Defendants Are Estopped From Denying that Similarly Situated Individuals Were Not Subjected to Intrusive Searches.**

The doctrine of law of the case[30] precludes defendants Reyther and Banks from arguing

that similarly situated non-African American women were subjected to the same search treatment

as that suffered by **Katherine Milner**. This Court has held:

> Plaintiffs contend they need to contact nonparties who are not African-American women ("comparables") to obtain further or more detailed evidence the comparables were treated more favorably. . . . . The other example given is being able to ask White women whether they were asked to remove tampons during searches, as some of the named plaintiffs were asked. Again, this would be seeking evidence favorable to defendants. *Defendants contend they followed a general policy of not making such requests* and apparently no evidence has been produced that such a request was ever made of a White woman. Since defendants oppose the further discovery, they would be precluded from contending otherwise.

See Order dated March 6, 2001, at 13 (emphasis added). Milner, who was menstruating,

was requested to remove her tampon by Banks and Reyther during her personal search. Pltf.

56.1 Resp. 127. Pursuant to this Court's order, no white woman has been similarly asked to

remove her tampon by any of the defendants, as was Milner.[31] Accordingly, Milner has shown

the requisite discriminatory effect of defendants' actions.

For the same reasons, defendants should be precluded from arguing that the other

plaintiffs subjected to strip searches (**Allen, Jones, Mendenhall** and **Price**), have failed to name

similarly situated individuals who were intrusively searched by the named defendants. In

addition to the discovery disputes detailed above, defendants fought all plaintiffs' efforts to

obtain discovery regarding other individuals who were negatively searched by Customs

inspectors. See, e.g., Pltfs' Nov. 27, 2000, Motion to Compel Production in Computer-Readable

Form of Names and Addresses of Persons Subjected to Negative Personal Searches; Plaintiffs'

---

30. The doctrine of law of the case "establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." Butera v. Apfel, 173 F.3d 1049, 1053 (7th Cir. 1999). This presumption applies absent a Court being convinced that a prior ruling is "clearly erroneous and would work a manifest injustice." Agostini v. Felton, 521 U.S. 203, 236 (1997); see also Waid v. Merrill Area Public Schools, 130 F.3d 1268, 1272 (7th Cir. 1997). Defendants have made no attempt to explain why they should not be bound by this Court's prior ruling.

31. This case highlights the gross inconsistencies in defendants' statements of what is, and is not, Customs "policy." Despite undisputed evidence that Customs employees at O'Hare ask women to remove tampons, defendants never corrected this Court's misapprehension of its actually policy and practices regarding these highly intrusive searches. After reaping the benefits of this misapprehension, they should now be forced to live with its consequences.

May 21, 2001, Renewed Motion to Contact Negative Search Subjects. Although the Court ordered defendants' to produce information of negative search subjects, it prohibited plaintiffs from contacting them to obtain information regarding their experiences. See Order dated March 6, 2001; Order dated June 1, 2002.

Again, plaintiffs contend that these orders limiting plaintiffs' ability to contact potential witnesses were incorrect. See, e.g. Gile, 95 F.3d at 499. For purposes of this motion, however, the Court should infer that, had they been allowed to contact white women searched by these (and other) defendants, plaintiffs would have produced evidence, for example, that the inspectors exercised their discretion by not asking white women to verify sanitary pads, even where the inspectors "felt something" doing the pat downs. See Pltf. Fact 264-65. See also Court Transcript dated April 11, 2001, at 3-4 (in response to plaintiffs' continued concern that they would not be able to obtain necessary evidence of similarly situated individuals, "particularly the whites [travelers] because the Court thought the defendants [were not] raising certain issues," this Court stated, "Right, and I will assure you further that I won't let them sandbag you.").

Defendants should not be allowed to successfully prevent plaintiffs from obtaining relevant discovery and, now after the close of discovery, claim that summary judgment is appropriate because plaintiffs cannot produce evidence that *they* refused to allow.[32]  And given their discovery objections and the limitations placed on discovery, defendants surely must be precluded from contending that white women are subjected to strip searches in equal proportion to black women upon being found to be wearing a sanitary pad. At a minimum, for purposes of this motion, this Court should infer that no white woman was subjected to a strip search even where an inspector felt or thought she felt something in the passenger's groin area.

**E.     Plaintiffs Have Produced Statistical Evidence of Discriminatory Effect.**

As an alternative to naming similarly situated individuals, plaintiffs may proffer

---

32. Further, at this stage in the litigation, it would be a manifest injustice not to allow plaintiffs an inference regarding the existence of similarly situated individuals who were not targeted and subjected to intrusive personal searches, as were plaintiffs. Having been blocked for almost 4 years from contacting potential similarly situated individuals, it would be clearly unfair to insist that plaintiffs contact individuals whose searches took place now almost 7 years ago.

statistical evidence showing the discriminatory effect of defendants' actions. <u>Chavez</u>, 251 F.3d at 636, 640. As in <u>Chavez</u>, the "statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." <u>Id.</u> at 638. Defendants argue here that plaintiffs have not produced sufficient statistical evidence because: (1) general statistics alone are not sufficient to satisfy the discriminatory effects element of an Equal Protection claim; and (2) that plaintiffs here, as in <u>Chavez</u>,[33] have failed to provide a proper benchmark for any statistics they have produced. Def. Mem. at 10.

Contrary to defendants' argument, the same concern with benchmark population data does not exist here because defendants: (1) maintain evidence from which the proper race and gender benchmark numbers for negative personal searches (negative search database) can be determined; or (2) had control over and destroyed (declaration cards) or precluded plaintiffs from fully utilizing (passenger arrival database) evidence from which the population statistics could be obtained. In this later instance, the inference of what the data would have shown should be given to the plaintiffs. <u>See</u> Section IV.C, above.

### 1. Statistical Evidence Shows that African American Women Were Subjected to Intrusive Personal Searches.

Each of the plaintiffs here was searched between June 11, 1997 and January 4, 1998. Less than three weeks before the first of these searches, an extraordinary event occurred. On May 24, 1997, four black women were found at O'Hare to be carrying drugs, as a result of what appeared to be a sting operation. Pltf. Fact 144-48. This amount of seizure activity in a single day was unprecedented at O'Hare, and the details of the seizure -- including the race and gender of the smugglers -- was generally discussed with Customs inspectors and supervisors. Pltf. Fact 144-51. Defendants' own records show that, during the four month period following May 24, the proportion of black women travelers subjected to personal searches at O'Hare -- measured against

---

33. <u>Chavez</u> involved allegations that the Illinois State Policy stopped, detained and searched drivers because of their race or ethnicity (black or Hispanic). In reviewing the plaintiffs' statistical evidence, the Court there found that the proxies (1990 Census data and a 1990 Nationwide Personal Transportation Survey) used to determine the number of African American and Hispanic drivers on Illinois roads were insufficiently reliable. <u>Chavez</u>, 251 F.3d at 644-45. The <u>Chavez</u> plaintiffs were forced to rely on proxies because no data was maintained that detailed the number of minority drivers on this state's highways. This is not the situation here.

the total number of personal searches occurring there -- went up by 71%. Contrarily, the proportion of white male passengers subjected to personal searches -- measured against the total number of personal searches at O'Hare -- decreased by 29%. Likewise, the search rate of white women decreased by 12%. Pltf. Fact 152.

The undisputed facts show that the defendants who were involved in these plaintiffs' searches were also involved in a large number of searches which disproportionately involved African American women. Each of the defendants' negative personal search activities (e.g., pat downs, strip searches and x-ray examinations) can be broken down by race and gender. Customs' records for negative personal searches (referred to as IOILs or incident logs) contain race and gender fields. Thus, the population benchmark for plaintiffs' equal protection claim that they were subjected to more intrusive personal searches because of their race and gender, are the number of negative personal searches in which each of the defendants was involved:

**Gloria Banks** was the Supervising Inspector who approved the searches of Jacqueline Jones,[34] Ruby Mendenhall, and Katherine Milner.[35] All of these searches occurred during the summer of 1997, in the four month period following May 24, 1997. For the period January 1, 1995 through March 25, 2000,[36] Banks approved personal searches of 231 black women, of which 38 were strip searches or x-ray examinations. Pltf. Fact 58. In contrast, while Banks approved personal searches of 328 white women, she approved a strip search or x-ray for only 9 of these white women. Pltf. Fact 59. In other words, 16.5% of all personal searches of black women were intrusive, whereas only 2.7% of all personal searches of white women were similarly intrusive. Astoundingly, only 0.75% of all personal searches of white men were intrusive (5 strip searches out of 664 total personal searches). Pltf. Fact 60. With Banks as the

---

34. Banks also participated as a witness in the personal search of Jones. During the period from January 1995 to March 2000, black women were 5 times more likely to be subjected to an invasive personal search than were white women (10.7% (3/28) for black women versus 2% (1/49) for white women), when Banks was the witness. Pltf. Fact 56, 57, 64-65.

35. For purposes of this summary judgment motion, defendants agree that Milner was subjected to a strip search, even though her incident log records her search as a pat down. Although the charts reporting Banks' search activities reflect Milner's search as a pat down, the change in type of search for this one plaintiff was taken into account for these mathematical computations.

36. Plaintiffs obtained IOILs from defendants for the period January 1, 1995, to July 2001. Plaintiffs omit the IOILs after March 25, 2000, because Customs implemented a new personal search option for passengers – a body scan.

supervisor, black women were almost 24 times more likely than white men, and 6 times more likely than white women, to be stripped searched or subjected to an x-ray once Banks approved any sort of personal search whatsoever. Pltf. Fact 61.

Further, during the summer of 1997 (when the plaintiffs' strip searches occurred), 66.6% of the strip searches (10/15) and 80% of the x-rays (4/5) approved by Banks were of black women travelers. (The only other x-ray Banks approved during this time period was for a black male.) Pltf. Fact 62. On the other hand, Banks approved strip searches of only two white males (13.3%) and only two white females (13.3%), measured against the total number of strip searches approved by her. Pltf. Fact 63. These disparate search statistics hold generally true for the period January 1, 1995 through March 25, 2000. Pltf. Fact 58.

Finally, for the flights specific to Jones, Mendenhall and Milner, Banks approved personal searches of *only* black females (and one male passenger whose race is unknown). Pltf. Fact 46-47, 50-55, 66.

**Victoria Diez** questioned Jacqueline Jones and conducted her strip search on September 16, 1997. For the period January 1, 1995 through March 25, 2000, Diez conducted personal searches of 113 black women, 15 of whom were strip searched or x-rayed. Pltf. Fact 67-68. During this same period, Diez conducted personal searches of more than twice as many white women (282), but decided to strip search only 9 of them. With Diez as the searcher, 13.3% of all personal searches of black women were intrusive, compared to only 3.2% of white females.[37] Pltf. Fact 69-70. Black women were thus 4 times more likely than white women to be stripped searched or subjected to an x-ray once Diez had them in Customs' search rooms. Pltf. Fact 71. Finally, Diez subjected only one person from Jones' flight to a personal search -- that being Jones herself. Pltf. Fact 46-47, 76.

**Michelle Belcastro** conducted the strip search of Ruby Mendenhall, which occurred on

---

37. Further, during the summer of 1997, two of the five women Diez strip searched were black, compared to only one white women. In addition, during this period, Diez participated in the hospitalization and x-ray of three people, all of whom were African American woman. Pltf. Fact 72-73, During this period, with Diez as the searcher, black women were seven times more likely to be subjected to an invasive personal search than were white women: 31% (5/16) for black women versus 4.5% (1/22) for white women. Pltf. Fact 72-73.

June 11, 1997. As with Banks and Diez, Belcastro conducted intrusive searches of black women at a disproportionate rate. For the period January 1, 1995 through March 25, 2000, 23.3% of all personal searches of black women conducted by this defendant were intrusive (7 strip searches out of 30 total personal searches of black women). Contrarily, only 9.1% of all personal searches of white females were intrusive (5/55). Pltf. Fact 77-78. Accordingly, with Belcastro as the searcher, black women were 2 ½ times more likely than white women to be stripped searched once she had them in Customs' search room. Pltf. Fact 79. Finally, all of the passengers Belcastro personally searched from Ruby Mendenhall's flight were black women. Pltf. Fact 50-53, 80.

**Melissa Zitowsky** participated in the strip search of Ruby Mendenhall as a witnessing officer. Overall, for the period January 1, 1995 through March 25, 2000, 16.7% of all personal searches of black women where Zitwosky acted as the witness were intrusive (8 strip searches or x-rays out of 48 total personal searches). Only 6.1% of all personal searches of white females were intrusive (3/49). Pltf. Fact 81-82. With Zitwosky as the witness, black women were almost 3 times more likely than white women to be stripped searched or subjected to an x-ray once they were in Customs' search room. Pltf. Fact 83. Finally, all of the passengers Zitwosky witnessed being personally searched from Mendenhall's flight were black women. Pltf. Fact 50-53, 80.

**Alma Reyther** conducted the strip search of Katherine Milner, which occurred on August 27, 1997. During the 5 ½ year period from January 1, 1995 through March 25, 2000, Reyther participated in 4 strip searches,[38] out of a total 101 personal searches. Pltf. Fact 85, 86, 89. Although these 4 strip searches were evenly divided between black and white women, black women were twice as likely as white women, given their respective numbers, to be subjected to an invasive personal search: 7.1% (2/28) for black women versus 3.3% (2/61) for white women. Pltf. Fact 87, 88, 90. In addition, all of the passengers Reyther personally searched from Katherine Milner's flight were black women. Pltf. Fact 54-55, 91.

---

38. Although the chart reflecting Reyther's search history indicates only 3 searches, this chart is corrected here to account for Milner's search, which defendants concede for summary judgment purposes was a strip search and not a pat down as the incident log reflects.

**William Desmond** was the Supervising Inspector who approved the strip searches of

Adunni Allen[39] and Yvette Price, both of which occurred on June 23, 1997. For the period

January 1, 1995 through March 25, 2000, Desmond approved personal searches for 236 black

women, of which 36 were strip searches or x-rays. Pltf. Fact 92-94. In contrast, Desmond

approved personal searches of 314 white women, of which only 15 were intrusive. Pltf. Fact 95.

Thus, 15.3% of all personal searches of black women were intrusive, compared to only 4.8% for

white women. Pltf. Fact 96. Incredibly, while Desmond approved personal searches of 861

white men, only 4 of these 861 searches (or 0.5%) were more intrusive than a pat down. Pltf.

Fact 95-96. Under Desmond's watch, black women were 30 times more likely than white men,

and 3 times more likely than white women, to be stripped searched or subjected to an x-ray once

they were taken into the Customs' search room for a personal search. Pltf. Fact 97.

Further, during the summer of 1997, 75% of the strip searches (3/4) and 86% of the x-

rays (6/7) approved by Desmond were of black travelers. Pltf. Fact 98. Contrarily, during this

same period, Desmond did not approve strip searches or x-rays of any white males or females,

notwithstanding that white men and women made up 44% of the people personally searched.

Pltf. Fact 99.

Finally, for Allen's and Price's flight, Desmond approved personal searches of *only* black

females. Pltf. Fact 48-49, 100. On this record, the discriminatory effect of Desmonds' approval

of intrusive personal searches for black women, compared to all other travelers he subjected to

personal searches, is clear.

**Olga Martinez** conducted the strip search of Adunni Allen,[40] and participated as the

witnessing officer for the strip search of Yvette Price. Both of these searches occurred on June

23, 1997. During the summer of 1997, 5 of the 6 women strip searched by Martinez were black,

compared to only one white woman. During the previous 2 ½ years, Martinez conducted only 2

---

39. For purposes of this summary judgment motion, defendants agree that Allen was subjected to a strip search, even though the incident log records a pat down. The charts reporting Desmond's search activities include Allen's search as a pat down. For these computations, the change in type of search for this one plaintiff was taken into account.

40. As with Desmond, the computations here take into account that Allen's search should have been recorded as a strip.

strip searches, one of which was a black woman. Pltf. Fact 101-02, 107. Overall, for the period January 1, 1995 through March 25, 2000, even though Martinez conducted personal searches on more white than black women (107 white women versus 99 black women), she conducted intrusive searches of 4 times more black women than white women (12 strip searches/x-rays of black women versus 3 of white women). Pltf. Fact 101-04, 106. In other words, 11.1% of all personal searches of black women involving Martinez as the searcher were intrusive, compared to 2.8% of white women. Pltf. Fact 105.

During the summer of 1997, 75% (3/4) of the women strip searched while Martinez acted as the witness were African American. Pltf. Fact 108. For the period January 1, 1995 through March 25, 2000, Martinez participated as a witness in 101 personal searches of black women, of which 17 were strip searches or x-rays (16.8%). Contrarily, only 9.3% of all personal searches of white females were intrusive (10/108). Pltf. Fact 109. With Martinez as the witness, black women were almost 2 times more likely than white women to be stripped searched or subjected to an x-ray. Pltf. Fact 110. Finally, Martinez subjected only two people from Allen's and Price's flight to personal searches -- namely, Allen and Price. Pltf. Fact 48-49, 111.

**Maria Rocha** conducted the strip search of Yvette Price, and participated as the witnessing officer for the strip search of Adunni Allen.[41] Both of these searches occurred on June 23, 1997. From January 1, 1995 to May 24, 1997, Rocha did not conduct any strip searches whatsoever, although she participated in 73 personal searches total. Pltf. Fact 112-14. After May 24, Rocha conducted 19 strip searches or x-rays, out of 134 total personal searches. Of these intrusive searches, 12 (63%) involved black women. Pltf. Fact 115. Overall, for the more than five year period from January 1, 1995 through March 25, 2000, Rocha conducted intrusive searches of black women at a disproportionate rate: 13% of all personal searches of black women involving Rocha as the searcher were intrusive (12 strip searches or x-rays out of 92 total personal searches). Contrarily, only 5.7% of all personal searches of white females were intrusive (4/70). Pltf. Fact 116. With Rocha as the searcher, black women were twice as likely

---

41. As with Desmond, the mathematical computations here take into account that Allen's search should have been recorded as a strip.

as white women to be stripped searched or subjected to an x-ray. Pltf. Fact 117.

During the summer of 1997, three of the four women strip searched where Rocha was the witness were African American. Pltf. Fact 118. Overall, for the period January 1, 1995 through March 25, 2000, 14.8% of all personal searches of black women, with Rocha acting as the witness, were intrusive (9 strip searches or x-rays out of 61 total personal searches of black women). Contrarily, only 4.4% of all personal searches of white females were intrusive (5/113). Pltf. Fact 121. With Rocha as the witness, black women were 3 times more likely than white women to be stripped searched or subjected to an x-ray. Pltf. Fact 118-21. Finally, Rocha subjected only two people from Allen's and Price's flight to personal searches -- namely, Allen and Price. Pltf. Fact 48-49, 122.

Michelle Absolam's search, a pat down, occurred on January 4, 1998. The defendants involved in this search are Supervising Inspector **Mary McCarthy**, Searching Officer **Guadalupe Corona**, and Primary Officer **Douglas Nathaniel**. For the defendants involved in the other plaintiffs' searches (all strip searches), an analysis demonstrating that black women travelers were disproportionately subjected to more intrusive personal searches, compared to white men and white women, could be completed with the data provided by defendants. For Absolam's pat down search, the analysis requires population data indicating the race and gender of the international traveling public arriving at O'Hare, and/or the demographics of the passengers referred to Customs secondary. This data would be used to test whether the number of pat downs of black women these defendants participated in is comparable to these two population benchmarks.

For example, during the period January 1, 1995 to March 25, 2000, 8.7% of the pat downs approved by McCarthy were of black women (21/242), 30.4% of the pat downs conducted by Corona were of black women (14/46), and 13% of the passengers referred for a pat down by Nathaniel were black women (3/23) (although 50% of the women referred by Nathaniel (3/6) were African American). Pltf. Fact 123, 125, 127. What is not known is how these percentages compare to the number of black women arriving at O'Hare from international flights and the racial/gender breakdown of passengers referred to Customs secondary. However, because

40

defendants destroyed and/or prevented plaintiffs from procuring the evidence necessary to obtain these benchmark figures, this analysis cannot be done. As discussed above, this Court should infer that this data would have shown that, while black women made up a small percentage of the international traveling public arriving at O'Hare during the relevant time period, they were disproportionately referred to Customs secondary.

Notwithstanding, Absolam was the *only* person from her flight (an incomplete passenger list has 82 people on the same flight), personally searched. Pltf. Fact 44-45. Further, during her luggage search, Absolam noted that only one other black woman and perhaps another person were having their luggage searched, even though the majority of the passengers on her flight were white. Pltf. Fact 2. For Absolam's flight, McCarthy did not approve any other personal searches, Nathaniel did not refer any other passenger to the search room, and Corona did not search anyone but a black women. Pltf. Fact 124, 126, 128. This, coupled with the inference which should arise because of defendants' objections and document destruction, show the discriminatory effect these defendants' actions had on Absalom.

### F. Plaintiffs Have Produced Sufficient Evidence of Discriminatory Purpose to Preclude Summary Judgment

In addition to showing discriminatory effect, plaintiffs must also produce evidence to support the inference that defendants acted at least *in part* because of the plaintiffs' race or gender.[42] Chavez, 251 F.3d at 645 (emphasis added); Dey, 28 F.3d at 1458. "Discriminatory purpose implies that the person of decision making authority acted or reaffirmed a particular course of action that had, at least in part, adverse effects upon a protected group." Shah v. Village of Hoffman Estates, 2002 WL 265181 at * 3 (N.D. Ill. Feb. 22, 2002).

Where, as here, intent is an element of the plaintiffs' claims, summary judgment is improper if the plaintiffs produce evidence which "create[s] a material issue of disputed fact

---

42. Defendants appear to argue that, because none of the "plaintiffs has claimed that any defendant made racial statements or remarks which could support an inference of discriminatory intent" (Def. Mem. at 8), there is insufficient evidence of such unlawful purpose. Id.; see also Def. Mem. at 10 (no "comment by an inspector indicative of racial discrimination"). However, the absence of such statements is simply irrelevant here. As the Seventh Circuit has noted, circumstantial evidence consisting of suspicious timing, ambiguous statements, etc. "is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written." Troupe, 20 F.3d at 736.

41

about [the defendants'] actual motivation." <u>Waters v. Churchill</u>, 511 U.S. 661 (1994). Indeed, "[a]ll that is required" to survive summary judgment "is evidence from which a rational trier of fact could reasonably infer" that the defendants acted with the prohibited discriminatory intent. <u>Troupe v. May Dept. Stores Co.</u>, 20 F.3d 734, 737 (7th Cir. 1994).

Few persons these days are so bold (or ignorant of the law) as to expressly acknowledge their discriminatory intent when acting. Recognizing the rarity of such evidence, courts readily accept inferential proof (circumstantial evidence) of discriminatory intent. <u>See</u>, <u>e.g.</u>, <u>Riordan v. Kempiners</u>, 831 F.2d 690, 697-98 (7th Cir. 1987) ("proof of [intentional] discrimination is always difficult. . . A plaintiffs' ability to prove discrimination indirectly, circumstantially, must not be crippled."). Two types of circumstantial evidence, which plaintiffs present here, have been expressly endorsed by the Seventh Circuit:

> (1) evidence which "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at others [] in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn", and

> (2) "evidence, whether or not rigorously statistical, that [persons] similarly situated to the plaintiff other than in the characteristic (. . . sex, race, or whatever) on which [a defendant] is forbidden to base a difference in treatment received systematically better treatment."

<u>Troupe</u>, 20 F.3d at 736; <u>see also</u> <u>Riordan</u>, 831 F.2d at 697-98. "Each type of evidence is sufficient by itself . . . to support a judgement for the plaintiffs; or they can be used together." <u>Id.</u>

Taking all of the evidence together, as this Court must, plaintiffs here have proffered more than enough evidence to infer racial and gender animus on the part of the defendants at issue here.

       1.    <u>Statistics</u>:  Where statistical evidence presents "a 'stark' pattern", it can suffice as the "sole proof of discriminatory intent under the Constitution", <u>McClesky v. Kemp</u>, 481 U.S. 279, 293 (1987)(citing cases), and statistical proof remains relevant to show intent, even where it is not dispositive. <u>Chavez</u>, 251 F.3d at 647-48; <u>Troupe</u>, 20 F.3d at 736; <u>Shah</u>, 2002 WL 265181 at *4 ("The seminal significance of the <u>Chavez</u> decision was its reference to the use of statistics to prove the requisite intent.")

42

Moreover, the Supreme Court has stated that an inference of purposeful discrimination can arise not only from statistical measures, however rough or fine-tuned, but from "the inexorable zero." International Brotherhood of Teamsters v. U.S., 431 U.S. 324, 342 n.23 (1977); see also EEOC v. O&G Spring Wire Forms Specialty Co., 38 F.3d 872, 878 (7th Cir. 1994). The situation here is the reverse of that presented in most "inexorable zero" cases: it is not that African American women make up almost none of the intrusively searched population, but that, for many of these defendants, white men and women do. See, e.g., Gloria Banks (only 2.7% of white women and 0.75% of white men intrusively searched, compared with 16.5% of black women); William Desmond (4.8% of white women and 0.5% of white men intrusively searched, compared with 15.3% of black women); Victoria Diez (3.2% of white women intrusively searched, compared with 13.3% of black women).

As demonstrated in detail in above, these defendants caused plaintiffs to be subjected to personal, highly intrusive negative searches in disproportionate numbers compared to white men and women. As also demonstrated above, defendants specifically (and Customs inspectors at O'Hare generally), dramatically increased the disproportionate rate at which they searched African American women after the May 24, 1997 seizures. Plaintiffs here were searched during this surge. A jury could reasonably infer that this dramatic increase in searches of African American females (with a corresponding decline in the search rate of other groups) was motivated by the fallacious and unfounded believe that African American females were more likely to be drug smugglers. A reasonable jury could further infer that the searches of these African American women, for which no reasonable suspicion otherwise existed (see Sections II & III, above), was motivated by the fact that they are African American women.

Finally, as also detailed above, defendants disproportionately selected African Americans, particularly black women, to be personally searched from the flights on which these plaintiffs were traveling. Of the 24 people subjected to personal searches from the same flights as plaintiffs here, 20 are black. (The remaining four people consist of two white males, a male of unknown race, and one white female). 17 of the 20 African American individuals are women. Indeed, from these 5 flights, only one white woman was subjected to a pat down, and no Asian

43

American or Hispanic women were personally searched at all. Pltf. Fact 44-45. This despite plaintiffs' testimony that there were mostly non-African Americans on their flights. See Teamsters, 431 U.S. at 337 (statistical evidence bolstered by individual testimony); EEOC v. O&G Spring Wire Forms Specialty, 38 F.3d at 878 (statistics considered in tandem with anecdotal evidence). All of the evidence strikingly shows defendants' disparate treatment of plaintiffs, and black women generally, and gives rise to a clear inference that, but for plaintiffs' status as black women, they would not have been selected for an intrusive search. This is discriminatory purpose under the Equal Protection Clause.

        2.    **No reasonable justification to search plaintiffs:** A plaintiff can show that the proffered reasons for her search are a pretext by showing: "(1) the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate . . . [her search], or (3) that they [the reasons] were insufficient to motivate [her search]." Collier v. Budd, 66 F.3d 886, 892 (7th Cir. 1995)(internal quotations omitted). As detailed above, defendants did not have reasonable bases for searching these plaintiffs, and much of their evidence as to their reasons for search, as well as Customs "policy" regarding personal searches generally, have been shown to be contradictory or simply unbelievable.[43]

        When a defendant in a discrimination case gives a reason for her or his conduct that appears to be false or pretextual, an issue of fact arises as to the real reasons for the defendant's conduct. Summary judgment should not be awarded in these circumstances. See, e.g., Reeves v. Sanderson Plumbing, 120 S.Ct. 2097, 2108 (2000); Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 275 (7th Cir. 1996) (summary judgment reversed where defendant offered explanations for its actions that appeared to be a pretext).

        3.    **Hispanic inspectors accused of targeting people of color:** Raymond Smith, a former Customs Inspector at O'Hare, accused Hispanic inspectors -- which included

---

43. However, even if this Court were to find that the 4th Amendment was not violated by defendants' actions here, the Equal Protection Clause prohibits defendants from treating black women unequally. See, e.g., Whren v. U.S., 517 U.S. 806, 813 (1996) (Equal Protection violation if plaintiffs show that they were subjected to unequal treatment based upon race during otherwise lawful arrest). Here, defendants subjected black women to verifying sanitary pads and to tampon removals where they did not do the same to white women.

defendants Maria Rocha and Olga Martinez -- of targeting African Americans for search. Smith, an African American, testified that he expressed concern that a disproportionate number of people of color were being referred to the secondary area for searches, particular by Latina inspectors. Pltf. Fact 174, 176-77. His concerns were based on his observation that a majority of passengers coming through Customs were of European descent, while the majority of people in secondary were people of color. Pltf. Fact 175. Smith's observations confirm plaintiffs' statements regarding the disproportionate number of minorities in Customs' secondary when they were there as well as Customs Supervisor Larry DiGianntonio's observation, in response to a passenger's complaint, that there "did appear to be a lot of blacks in secondary." Pltf. Fact 184.

       **4.**    **Dissent stifled:** When former Inspector Raymond Smith voiced his complaint about the disproportionate number of people of color in secondary, Mario Cornejo (who, in turn, reported directly to Hoteko), suggested that Smith needed psychiatric help. Pltf. Fact 178. Cornejo also articulated to Inspector Smith the stereotypically racist view, unsupported in fact, that African-American passengers are more likely to be found carrying drugs than white passengers. Pltf. Fact 179; see also Pltf. fact 180-183.

       **5.**    **Improper Oversight:** Further, Customs inspectors during the time period at issue here did not have proper oversight. Pltf. Fact 268-71. They did not need supervisory approval to select a passenger for a pat down nor did supervisors inquire as to the factors allegedly justifying a strip search before the search occurred. Pltf. Fact 268-69, 271.

       **6.**    **Inspectors trained to target women:** In support of their summary judgment motion on plaintiffs' equal protection claims, defendants rely, *inter alia*, on statements that Customs inspectors are trained not to use race or gender as reasons for selecting passengers to be searched. Defendants ignore, however, that the Customs Service promulgated written policies that espoused the use of gender, at the least, as proper search criteria, which include training manuals promulgated by the U.S. Customs Service. These materials instructed inspectors to place special focus, and heightened suspicion, on women travelers. The Custom Service's "Basic Training" manual specifically instructed Customs employees to "Pay special attention to females." Pltf. Fact 186-87; see also Pltf. Fact 185, 188-93.

45

7. **Targeting process and PAU document destruction**: Defendants **Carol Czech, Lynda Hall**, and **Guadalupe Corona** targeted Michelle Absolam, Adunni Allen, Yvette Price and Katherine Milner for search before these plaintiffs arrival at O'Hare. According to a Customs headquarters official, Michael Perron, these defendants, as part of their efforts to pre-identify passengers for search activity, are able to determine the race of a passenger to be searched prior to the passenger's arrival at the airport. Pltf. Fact 162, see, also Pltf. Fact 154-61. PAU "daily reports" would then be created, which listed the names of the passengers who had been pre-targeted for search activity at O'Hare. Pltf. Fact 167.

Prior to the production of sample PAU "daily reports" as discovery in this lawsuit, a number of Customs officials testified that the "daily reports" did *not* contain data regarding a passenger's race. Pltf. Fact 168. Such testimony, however, is contradicted by (a) the PAU "daily reports", themselves, which contain a field for, and information about, the race of those passengers who had been targeted by PAU members for search activity; and (b) the sworn testimony of other Customs officials who admitted, under oath, that the PAU "daily reports" *do* contain data regarding a passenger's race. Pltf. Fact 169-70. A jury is entitled to consider these contradictory statements about a key issue in this case -- the targeting of African American women -- as evidence of the defendants' guilt. See, e.g., Reeves, 120 S.Ct. at 2108.

Despite plaintiffs' request that the defendant produce *all* PAU "daily reports" for a five year period (1995-2000), defendants produced "daily reports" for only a period after May 1999. Pltf. Fact 171. All of the plaintiffs' searches at issue here occurred prior to this date. Customs employees testified that the PAU "daily reports" had been shredded, and continued to do so after plaintiffs' request for their production. Pltf. Fact 172. Moreover, even prior to plaintiffs' specific request for the "daily reports," defendants were on notice to retain relevant or possibly relevant documents. This they clearly failed to do. See Section IV.C., incorporated herein by reference.

8. **Passenger complaints of racial targeting**: Numerous complaints were made by passengers regarding racial profiling by O'Hare Customs employees. Pltf. Fact 194. Defendants Martinez, Rocha, and DiGiannantonio were involved in at least three of the incidents where non-plaintiff passengers complained of racially disparate treatment. Pltf. Fact 195. In one

46

of the complaint letters, the passenger describes being referred to as a "fat black bitch" and a "nigger" by Customs inspectors at O'Hare; defendant Olga Martinez was an inspector involved in this passenger's search. Pltf. Fact 196.

Further, in addition to written complaints by plaintiffs, numerous plaintiffs verbally complained that they had been improperly searched, on account of their race, by Customs inspectors at O'Hare. Pltf. Fact 197. Nothing of substance was done, however, in response to complaints of race and gender discrimination.[44] Pltf. Fact 198-200. In fact, the only written complaints that Customs received were from black passengers. Pltf. Fact 201.

        9.    **Cash Award system**: Customs inspectors at O'Hare received cash or other rewards – as much as $2,000 to a single inspector – for searches at O'Hare that turned-up contraband on travelers. Notwithstanding that this type of award system has already been called into doubt by one federal court, Customs continued to use this incentive program. Pltf. Fact 205-215.

### G.    The GAO Report and Customs' Reforms

Defendants indicate that they are "disturbed" by this Court's statement in its March 14, 2002, Order (fn. 38), that the reforms Customs instituted were "aimed at decreasing discrimination in selections for personal searches...." Def. Mem. at 12. Defendants contend that this Court "has not been presented with evidence that the purpose of the 1999 reforms was to decrease discrimination." Id. This contention is simply not true. Plaintiffs supplied this Court with amply evidence on which it based its statement. See Pltfs. Resp. to Management Defs. Motion for Summary Judgment, particularly at 6-8, and accompanying Statements of Fact. The GAO report found, inter alia, that black women were more likely than white women to be subjected to an x-ray, but much less likely to be found carrying contraband. In response to this

---

44. Defendant Noonan's actions were typical of the management defendants' disregard for, and cover-up of, passenger complaints. Noonan, who was the point-person at O'Hare for investigating passenger complaints, has testified that no documentation was made of verbal, telephonic complaints in 1997 and 1998. Noonan never talked to witnesses, nor to other inspectors on duty, in connection with any passenger's complaint. Noonan never made one note, nor wrote anything down, in connection with a passenger complaint investigation. Noonan has confessed: "I may have dropped the ball". Pltf. Fact 98-99. In response to a passenger's complaint that 7 out of 10 passengers chosen to be searched by Customs officials happened to be "people of color", Noonan simply responded: "White is also a color". Pltf. Fact. 200.

report, former Customs Commissioner Ray Kelly stated: "We don't necessarily disagree with the [GAO] report. . . . I think we have taken the problem head on." Kelly also indicated that "broad racial profiling doesn't make sense." See Ex. 270. Taken together, the evidence produced in this litigation and the GAO report demonstrate an unmistakable disparity of black women being subject to more frequent and more intrusive personal searches than any other racial/gender groups. Customs subsequent reforms were clearly designed to combat this discrimination.[45]

**H.    Defendants Hoteko, Trotter[46] and Noonan**

Defendants argue that, even if plaintiffs Mendenhall, Milner, Price and Allen show that their stops, detentions, and searches violated the Equal Protection Clause, they still must show a "causal connection" between their unconstitutional searches and the actions of management-level Customs employees Sergei Hoteko and Patrick Noonan. Def. Mem. at 10-11. As detailed above, the individual defendant inspectors and supervisors disproportionately targeted black women for search and subjected them to more intrusive searches, particularly after the events of May 24, 1997. Defendant Hoteko encouraged this discriminatory targeting through his communications with inspectors at O'Hare which necessarily includes the defendants. See Pltf. Fact 149. Given the evidence compiled to date (including that submitted with Plaintiffs' Response to Management Defendants' Motion for Summary Judgment), Hoteko's actions and inactions were indeed

---

45. Defendants also note that "[u]nfortunately, minorities are over-represented in many ways in the criminal justice system in this country." Def. Mem. at 12. However, such over-representation may be caused not by the illegal conduct of minorities, compared to whites, but rather by law enforcement personnel targeting minorities for heightened scrutiny:

> Blackness will become an indicator of suspicion of drug crime involvement. This, in turn, means that the belief that blacks are disproportionately involved in drug crimes will become a self-fulfilling prophecy. Because police will *look* for drug crime among black drivers, they will *find* it disproportionately among black drivers. More blacks will be arrested, prosecuted, convicted, and jailed, thereby reinforcing the idea that blacks constitute the majority of drug offenders. This will provide a continuing motive and justification for stopping more black drivers as a rational way of using resources to catch the most criminals. At the same time, because police will focus on black drivers, white drivers will receive less attention, and the drug dealers and possessors among them will be apprehended in proportionately smaller numbers than their presence in the population would predict.

David A. Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265, 297 (Dec. 1999).

46. Although defendants refer to Trotter in their memorandum (at 11), they nowhere explain why they do so. Pursuant to this Court's May 14 Order, Trotter may only be held liable under the Equal Protection Clause for searches that took place after July 21, 1998. (Order at 51-52). None of these plaintiffs' searches occurred after that date.

causally connected to the Equal Protection violations of these 6 plaintiffs.

Noonan has admitted to "dropping the ball" regarding passenger complaints regarding racial targeting at O'Hare. Pltf. Fact 198-200. Three African American women, all plaintiffs not at issue here, verbally complained about their searches; these searches occurred on July 10, 1996 (with Desmond as the supervisor), May 28, 1997 (with Martinez as the searching officer and Zitowsky as the witness), and October 11, 1997 (with Rocha as the searching officer and Banks as the supervisor). Pltf. Fact 202-204. Noonan was supposed to investigate all passenger complaints. Pltf. Fact 198. He did not. Given Noonan's gross failings regarding passenger complaints, he should be similarly held liable for the Equal Protection deprivations suffered by plaintiffs.

## V. SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON PLAINTIFFS' DUE PROCESS CLAIMS

On plaintiffs' Due Process claim, this Court previously held:

> Defendants contend that Customs inspectors may, without obtaining judicial authorization, detain incoming passengers in separate rooms for the period of time necessary to complete a search. As to nonroutine searches, however, defendants must have at least reasonable suspicion. [citations] Defendants do not contend that such a rule was not well established prior to July 10, 1996. It is clear that, even at the border, a citizen cannot be subjected to a nonroutine search and held *in communicado* without judicial authorization during such a search where no basis at all existed for searching the person.

Anderson v. Cornejo, 199 F.R.D. 228, 246-247 (N.D.Ill., 2000).

Defendants now appear to contend that either they are entitled to qualified immunity, or that under the doctrine of Parratt v. Taylor, 451 U.S. 527 (1981), plaintiffs are precluded from bringing this claim because these acts are a result of random and unauthorized actions. As an initial matter, defendants' latter claim is simply frivolous. Defendants point to no facts indicting that the actions taken were random and unauthorized. Indeed, it has been their position throughout this litigation that they are entitled to hold persons *incommunicado* without judicial authorization while they are conducting their searches. In any event, Customs employees have consistently testified that persons are held *incommunicado* without judicial authorization for an indefinite period of time. E.g., Pltf. Fact 216-219.

49

Defendants are also not entitled to qualified immunity on this issue. As far back as 1970, the Seventh Circuit has held that persons detained in non-routine contexts by Customs are entitled to certain due process rights, including their <u>Miranda</u> rights. <u>U.S. v. De La Cruz</u>, 420 F.2d 1093 (7th Cir. 1970). The entire point of <u>Miranda</u> rights was that persons should not be held *incommunicado*, without judicial authorization, while they were being subjected to police abuses. <u>Miranda v. Arizona</u>, 384 U.S. 436, 457-458 (1966) ("The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles--that the individual may not be compelled to incriminate himself.") Thus, it is evident that the law is and has been clearly established on due process rights and that qualified immunity is not available on this issue.

Further, while there are other issues connected to plaintiffs' due process claim, defendants have chosen not to raise them at this time.[47] Since it is the moving parties' obligation to raise in its initial brief all issues upon which it intends to prevail upon, other issues not raised, are waived. <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.") Plaintiffs' thus respectfully submit that summary judgment should be denied on their due process claims.

## VI.     FEDERAL TORT CLAIM ACT CLAIMS

The FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a *private individual* under like circumstances ..." 28 U.S.C. § 2674 (emphasis added). Under Illinois law, a claim of assault must include an allegation of a reasonable apprehension of an imminent battery. The elements of a battery must include an intentional act on the part of the defendants and a resulting offensive contact with the plaintiff's person. <u>McNeil v. Carter</u>, 318 Ill.App.3d 939, 944, 742

---

47. They are aware of this through previous briefing on this issue.

N.E.2d 1277, 1281 (3d Dist. 2001). The essential elements of a cause of action for false

imprisonment are that plaintiff was restrained or arrested by defendant, and that defendant acted

without having reasonable grounds to believe that offense was committed by plaintiff. Meerbrey

v. Marshall Field & Co., Inc., 139 Ill.2d 455, 474, 564 N.E.2d 1222, 1231 (1990).

Turning 28 U.S.C. § 2674 on its head, defendants claim that the "*private* individual" to

which the United States should be analogized under Section 2674 is not a private individual but

"the corresponding *public* employee under Illinois law." Def. Mem. at 27 (emphasis added).

From this they conclude that the proper standard of liability comes from the Illinois Local

Government and Governmental Employees Tort Immunity Act and that the proper standard is the

willful and wanton standard. Def. Mem. at 28. However, defendants' substitution of "public

employee" for "private individual" does not honor the plain language of the statute, and the "first

step in determining the intent of Congress is to examine the plain language of the statute."

Condo v. Sysco Corp., 1 F.3d 599, 603 (7th Cir.1993). "If the intent of Congress is clear, that is

the end of the matter; for the Court . . . must give effect to the unambiguously expressed intent of

Congress." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,

842-43 (1984).

Defendants rely on several Illinois district court cases for their conclusion. The Seventh

Circuit has not yet addressed this issue,[48] but a district court case out of the Second Circuit,

which honors the plain language of the FTCA statute has held that the application of the Illinois

Local Government and Governmental Employees Tort Immunity Act standard in FTCA cases is

incorrect. It also makes clear that a private individual "under like circumstances" means a

private individual committing the same state tort that the government is charged with violating:

> [T]his Court does not find it appropriate to apply the Illinois Tort Immunity Act to
> plaintiff's claims. The FTCA's language clearly states that "[t]he United States shall be
> liable ... in the same manner and to the same extent as a private individual under like
> circumstances[,]" 28 U.S.C. § 2674, and it is clear that a private individual making a

---

48. Defendants cited Cooks v. U.S., 815 F.2d 34 (7th Cir. 1987). However, in Cooks, both parties agreed to the
limited idea that "[t]he liability of the United States in respect to defects in the streets that it controls is the same as
the liability of a municipality in the same jurisdiction, or the liability of any other political subdivision in control of
streets." 815 F.2d at 35. Gordon v. Degelmann, 29 F.3d 295 (7th Cir. 1994), also cited by defendants, was not an
FTCA case.

citizen's arrest, or a private shopowner who falsely imprisons a shopper or employee for stealing, or, finally, a private individual who prosecutes a civil action against another individual, is not afforded the protection of the higher "willful and wanton" standard which the Illinois Tort Immunity Act affords to Illinois government officials.

Hyatt v. U.S., 968 F.Supp. 96, 108 (E.D. NY 1997).

Further, contrary to defendants' contention, plaintiffs' claims are not barred by the "discretionary function exception" to the FTCA. Claiming that searches by customs inspectors are based on discretionary criteria, defendants contend that plaintiffs' claims of assault, battery, and false imprisonment are barred under 28 U.S.C § 2680(a), which provides immunity from suit for acts or omissions based upon the performance of a discretionary function. Def. Mem. at 28-29. However, for three reasons, the discretionary function exception does not apply here. First, as defendants concede, the "discretionary function exception does not encompass conduct which violates the Constitution, a statute, or an applicable regulation." Def. Mem. at 29. As discussed *supra*, defendants' searches were unconstitutional.

Second, plaintiffs' claims are not barred by the discretionary function exception because they are specifically allowed under the more specific "law enforcement proviso." 28 U.S.C. § 2680(h). The exceptions to the waiver of sovereign immunity under the FTCA are enumerated in 28 U.S.C. § 2680. However, plaintiffs' claims fall squarely under a more specific provision of the same section, § 2680(h) (known as the "law enforcement proviso"), that explicitly states that the government *is liable* for assault, battery, and false imprisonment by investigative or law enforcement officers who are empowered by law to execute searches, to seize evidence, or to make arrests for violation of federal law:

> [W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of [the FTCA] shall apply to any claim arising, on or after the date of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For purposes of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violation of Federal law.

28 U.S.C. § 2680(h). Thus, even if the customs inspectors did utilize a degree of discretion in their searches, the general waiver of liability in § 2680(a) for discretionary conduct is superseded by the clear mandate in § 2680(h) of government liability for the inspectors'

actions.

An interpretation that a claim for assault, battery, and false imprisonment in which the law enforcement officers used discretion in their search is barred under § 2680(a) would eviscerate the plain meaning of § 2680(h). The Fifth Circuit in Sutton v. U.S., 819 F.2d 1289 (5th Cir. 1987), examined at length the interaction between § 2680(a) and § 2680(h). The court noted that according to the legislative history of the 1974 bill that added the law enforcement proviso amendment, the government is liable for the specified intentional torts regardless of whether the acts involved the inspectors' use of their discretion:

> The government is to be liable *whenever* its agents commit constitutional torts and *in any case* in which a Federal agent commits acts which under accepted tort principles constitute one of the intentional torts enumerated in the proviso. Significantly, neither the legislative history, nor the text of the proviso itself, makes reference to the discretionary function exception.

819 F.2d at 1296 (emphasis in original). The court concluded "that if the law enforcement proviso is to be more than an illusory . . . remedy, the discretionary function exception cannot be an absolute bar which one must clear to proceed under § 2680(h)." 819 F.2d at 1297. See also Nurse v. U.S., 226 F.3d 996, 1002 (9th Cir. 2000) (FTCA claims of false imprisonment, invasion of privacy and negligence against airport customs agents falls within the FTCA's "law enforcement officer" proviso, and are not protected by the discretionary function exception.); Beran v. U.S., 759 F.Supp. 886, 892 (D.D.C 1991) (FTCA claims of assault and battery and false arrest/false imprisonment did not come under discretionary function exception; a contrary interpretation would "require this court functionally to read § 2680(h) out of the FTCA" and "to disregard basic principles of statutory construction").

Finally, plaintiffs' claims are not barred by the discretionary function exception because the customs inspectors' conduct did not involve discretion in the exercise of policy choice. The discretionary function covers acts that (1) are discretionary in nature and (2) are based on considerations of public policy. U.S. v. Gaubert, 499 U.S. 315,322-23 (1991). Since *every* decision could be classified as discretionary, thus allowing the discretionary exception to swallow the immunity rule, in applicable cases, courts have interpreted what is meant by "discretionary functions" so that the law enforcement proviso is not eviscerated. See, e.g., Caban

53

v. U.S., 671 F.2d 1230 (2nd Cir. 1982) ("If we classify as discretionary the basically mechanical duty [by INS agents] to ascertain whether an applicant meets the minimal standards for entry into this country, we will jeopardize a primary purpose for enacting § 2680(h).); Pooler v U.S., 787 F.2d 686, (3rd Cir. 1986) ("Reading [section 2680(h)] as limited to activities in the course of a search, a seizure or an arrest as a practical matter largely eliminates the likelihood of any overlap between section 2680(a) and section 2680(h).").

The cases cited by defendants for the proposition that plaintiffs' claims are barred by the discretionary function exemption are not persuasive. Attallah v. U.S., 955 F.2d 776 (1st Cir. 1992), is inapposite because the claims did not implicate the law enforcement proviso. The Attallah plaintiff brought claims against customs agents for negligently failing to provide adequate security for assets under their control and for negligent supervision. 955 F.2d at 778-79. Neither of these claims is included in the intentional torts specified in the law enforcement proviso. The scattered district court cases cited by defendants do not overcome the circuit court decisions cited above that hold that the government *is liable* for assault, battery, and false imprisonment by investigative or law enforcement officers who are empowered by law to execute searches

## VII. CONCLUSION

For the reasons stated here and in their Local Rule 56.1 materials, plaintiffs respectfully request that the Court deny, in its entirety, defendants' motion for summary judgment against Michelle Absolam, Adunni Allen, Jacqueline Jones, Ruby Mendenhall, Katherine Milner, and Yvette Price.

Respectfully submitted,

One of the Attorneys for Plaintiffs

Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170

Ed Fox & Associates
134 N. LaSalle Street, Suite 1908
Chicago, IL 60602

Chicago Lawyers' Committee
  for Civil Rights Under Law, Inc.
100 N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 630-9744

Bridget Arimond
14 W. Erie St.
Chicago, IL 60610