# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William T. Hart | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7556 | **DATE** | 9/4/2003 |
| **CASE TITLE** | SHARON ANDERSON, et al. vs. MARIO CORNEJO, etc., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/1/2003 at 11:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  **Defendants' motion to strike [380] is denied. Defendants' motion for summary judgment [413] is granted in part and denied in part. Plaintiff Michelle Absolam's Count I, II, III (damages), V, & VI (damages) claims dismissed. Plaintiffs Adunni Allen's and Yvette Price's Count I (Desmond & Corona), II (Noonan), III (Corona), & VI (Corona) claims dismissed. Plaintiff Jacqueline Jones's Count I, II, III (damages), & VI (damages) claims dismissed. Plaintiff Ruby Mendenhall's Count I (Banks) and II (Noonan) claims dismissed. Plaintiff Katherine Milner's Count I, II, III (Hall), V (patdown), and VI (Hall) claims dismissed.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **7** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 05 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/4/2003 | 431 |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| cw | courtroom deputy's initials | | rjm mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

03 SEP -4 PM 4:38

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


SHARON ANDERSON, et al.,           )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )      No. 97 C 7556
                                   )
MARIO CORNEJO, individually and    )
in his official capacity,          )
et al.,                            )
                                   )
                Defendants.        )

**DOCKETED**

SEP 0 5 2003


## MEMORANDUM OPINION AND ORDER


        As presently constituted, this case has approximately 90

named plaintiffs, virtually all of whom are African-American

women with United States citizenship[1] who allegedly were searched

by employees of the United States Customs Service at Chicago's

O'Hare International Airport ("O'Hare") following their arrival

on international flights.  The searches of the named plaintiffs

allegedly occurred between March 1996 and August 1999.  Named as

defendants are the United States, the United States Customs

Service, and approximately 70 current or former employees of the

Customs Service.  Management officials, lower-level supervisors,

_____

        [1]Although it is alleged in the complaint that all
plaintiffs are United States citizens, plaintiff Michelle Absolam
testified she is an "alien resident."  Compare Absolam Dep. at 11
with 7th Am. Compl. ¶ 51.  Plaintiff Katherine Milner testified
she is a permanent resident.  Compare Milner Dep. at 12 with 7th
Am. Compl. ¶ 33.

431

and nonsupervisory employees have been sued in their individual capacities. A ruling was recently issued regarding a summary judgment motion brought by Managerial Defendants. <u>See</u> <u>Anderson v. Cornejo</u>, 225 F. Supp. 2d 834 (N.D. Ill. 2002) ("<u>Anderson VIII</u>"). Thereafter, defendants moved for summary judgment on the claims made by six selected plaintiffs. There is an expectation that ruling on the present motion may aid in the resolution of the similar claims of the other plaintiffs.

## I. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. <u>Turner v. J.V.D.B. & Associates, Inc.</u>, 330 F.3d 991, 994-95 (7th Cir. 2003); <u>Palmer v. Marion County</u>, 327 F.3d 588, 592 (7th Cir. 2003); <u>Abrams v. Walker</u>, 307 F.3d 650, 653-54 (7th Cir. 2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. <u>Outlaw v. Newkirk</u>, 259 F.3d 833, 837 (7th Cir. 2001); <u>Wollin v. Gondert</u>, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Binz v. Brandt Construction Co.</u>, 301 F.3d 529, 532 (7th Cir. 2002); <u>Traylor v. Brown</u>, 295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. <u>Celotex</u>, 477 U.S. at 324. Also, it is

not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. <u>See</u> <u>NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991); <u>Collins v. Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.), <u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Logan v. Commercial Union Ins. Co.</u>, 96 F.3d 971, 978 (7th Cir. 1996) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" <u>Logan</u>, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." <u>Id.</u> (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." <u>McGinn v. Burlington Northern R.R. Co.</u>, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" <u>Logan</u>, 96 F.3d at 978 (quoting <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

<u>Outlaw</u>, 259 F.3d at 837.

## II. PENDING CLAIMS

Following prior rulings on motions to dismiss, for class certification, and for summary judgment, the following claims remain pending in the Seventh Amended Complaint. <u>See</u> <u>Anderson VIII</u>, <u>supra</u>; <u>Anderson v. Cornejo</u>, 199 F.R.D. 228 (N.D. Ill. 2000) ("<u>Anderson IV</u>"); <u>Anderson v. Cornejo</u>, 1999 WL 258501 (N.D. Ill. April 21, 1999) ("<u>Anderson II</u>"). <u>See also</u> <u>Anderson v. Cornejo</u>, 1999 WL 35307 (N.D. Ill. Jan. 11, 1999) ("<u>Anderson I</u>").[2] Count I is an equal protection claim that Customs Inspectors targeted African-American women for nonroutine personal

---

[2]As required by <u>Anderson I</u>, 1999 WL 35307 at *4, 7, for the Fifth Amended Complaint and thereafter, plaintiffs have provided a more definite statement listing the following information for each named plaintiff: (a) the date of the alleged unlawful search, (b) the known defendants alleged to have been involved in the unlawful search, and (c) whether unknown defendants are also alleged to have been involved in the unlawful search.

searches.[3]  Count III is a Fourth Amendment claim that Customs

Inspectors lacked sufficient cause or suspicion to seize, detain,

and search plaintiffs.  Count V is a Federal Tort Claims Act

("FTCA") claim against the United States that the conduct of the

individual defendants constitutes false imprisonment, assault,

and battery.  Count VI is a Fourth and Fifth Amendment claim that

Customs Inspectors[4] denied due process by not obtaining judicial

authorization for the searches and by holding plaintiffs "in

communicado."[5]

Count II is an equal protection claim that Managerial and

Supervisory Defendants failed to take proper action to prevent or

stop the discriminatory selection of African-American women for

nonroutine personal searches alleged in Count I.  Count IV is a

Fourth Amendment claim that Managerial and Supervisory Defendants

failed to take proper action to prevent or stop the illegal

seizures, searches, and detentions alleged in Count III.  Only

the official capacity injunctive relief aspect of Count IV

remains pending.  See Anderson VIII, 225 F. Supp. 2d at 864-65;

---

[3]By "nonroutine personal searches," plaintiffs mean
patdown searches, strip searches, and visual and physical body
cavity searches generally conducted in an enclosed room, and also
off-premises medical examinations (including X-rays) and
monitored bowel movements.  7th Am. Compl. ¶ 113.  This court has
also distinguished "standard" and "intrusive" patdown searches.
See Anderson IV, 199 F.R.D. at 258-59.

[4]Although Count I, Count III (with the exception of one
Supervisory Defendant), and Count VI refer to the actions of
Customs Inspectors, plaintiffs' statements of more definite facts
also identify Supervisory Defendants as being liable for direct
involvement in many of the searches.

[5]Count VI has been dismissed in part.  See Anderson IV,
199 F.R.D. at 246-47, 263.

Minute Order dated March 27, 2002 [342]. Count VII is a Fourth and Fifth Amendment due process claim that Managerial and Supervisory Defendants promulgated and executed a "policy and practice allowing the Customs Inspectors, on nothing more than alleged 'reasonable suspicion,' (a) to detain plaintiffs for an indefinite and wholly discretionary time-period; (b) to conduct the non-routine personal searches described herein without judicial authorization; (c) while holding the plaintiffs in communicado." 7th Am. Compl. ¶ 175. Only the official capacity injunctive relief aspect of Count VII remains pending. See Anderson VIII, 225 F. Supp. 2d at 865-66; Minute Order dated March 27, 2002 [342]. Counts VIII, IX, and X have previously been dismissed. See Order dated April 25, 2002 [250]; Anderson VIII, 225 F. Supp. 2d at 866-67.

The damages claims of each count are on behalf of the named plaintiffs only.[6] Classes were certified for injunctive relief only as to Counts II, IV, VII, VIII, IX, and X.[7] Anderson IV, 199 F.R.D. at 237-45, 264-65, 267. As previously indicated, Counts VIII, IX, and X have been dismissed in their entirety.

---

[6]Claims of certain named plaintiffs have been dismissed in whole or in part. See Anderson IV, 199 F.R.D. at 252-53, 259-62, 263, 265-66; Anderson II, 1999 WL 258501 at *5. Damages claims against certain Supervisory Defendants have been dismissed. See Minute Order dated March 27, 2002 [342]. Most of the damages claims against Managerial Defendants have been dismissed. See Anderson VIII, 225 F. Supp. 2d at 869-70.

[7]The class for Count VIII is national in scope and is not limited to African-American women. For all other counts, the class is limited to African-American women arriving at O'Hare.

The pending summary judgment motion concerns the Count I, II, III, V, and VI damages claims of six named plaintiffs: Michelle Absolam, Adunni Allen, Jacqueline Jones, Ruby Mendenhall, Katherine Milner, and Yvette Price (the "Summary Judgment Plaintiffs"). The defendants that are alleged to have been involved in the searches of the Summary Judgment Plaintiffs are Customs Inspectors Michelle Belcastro, Carol Czech, Guadalupe Corona, Victoria Diez, Lynda Hall, Olga Martinez, Douglas Nathaniel, Alma Reyther, Maria Rocha, and Melissa Zitowsky; Supervisory Defendants Gloria Banks, William Desmond, and Mary McCarthy; and Managerial Defendants Sergei Hoteko and Patrick Noonan. See Anderson VIII, 225 F. Supp. 2d at 838 n.2. The United States is the defendant as to the Count V FTCA claim.

### III. SEARCH FACTS

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiffs' favor, the facts assumed to be true for purposes of summary judgment are as follows.

#### A. GENERAL SEARCH PROCEDURES

International passengers arriving at O'Hare first pass through the Customs Services' primary inspection area. If the passenger's luggage or person is to be searched, the passenger is referred to an adjoining area known as "secondary." A person will also be questioned in secondary and sometimes no further search is conducted there. There are a number of ways in which passengers may be selected for secondary. One is by roving Inspectors who observe and sometimes question passengers passing

through the primary area. Another basis would be alerts by narcotics-sniffing canines. A third possible basis is a "lookout" entered into the Treasury Enforcement Communications System by the Customs Passenger Analysis Unit ("PAU"). PAU lookouts are based on pre-arrival review of airline passenger manifests and reservation information for passengers. Information considered includes country of travel, length of trip, hotel information, travel agency used, how far in advance tickets were purchased, prior trips, traveling alone, location of ticket purchase, form of payment, and address of passenger. Being listed as a PAU lookout only gets a passenger to secondary where the passenger is questioned to determine if a personal search is necessary. Another method of selection for secondary is that some passengers were randomly selected for luggage searches.

Incident logs, also called negative search reports or IOILs, were kept for the searches of the Summary Judgment Plaintiffs. They are official records maintained in the ordinary course of business. The IOIL should state all the grounds for conducting a personal search, but Customs employees do not always record such information. The Inspector listed on the IOIL as the "primary officer" is the Inspector who requested the secondary search, usually the one who interviewed the passenger, and is normally the Inspector who completes the IOIL. The Inspector listed on the IOIL as the "searching officer" is the Inspector who conducts the search. If the primary officer is of a different gender than the passenger, the primary officer will not

be the searching officer as well. A search is to be witnessed by another officer of the same gender, who is listed as "witness" on the IOIL. Plaintiffs point to testimony that the witness's participation need not be limited to being a passive observer. The Personal Search Handbook in effect during the pertinent time period provided that a witness's responsibility was to observe and record facts about the search and to protect the searching officer both from physical harm and from false accusations by the passenger. See Def. Exh. 41 § 1(d). The "authorizing officer" listed on the IOIL is a supervisor involved in the search and who generally approves the search, though that approval may be performed cursorily without knowledge of the grounds for the search. During the relevant time period, supervisory approval was not needed to conduct a patdown.

Plaintiffs do not dispute that the IOIL for their searches are evidence of what occurred. However, the searching officers generally do not recall the particular search and thus cannot add to what is stated on the IOIL. More importantly, where a plaintiff's testimony contradicts the IOIL for her search, that plaintiff's testimony, to the extent it is favorable to the plaintiff, must be taken as true for purposes of resolving defendants' summary judgment motion. Cf. Chavez v. Illinois State Police, 251 F.3d 612, 634 (7th Cir. 2001).

Countries from which illegal narcotics may be smuggled are often referred to as "source" countries or "high risk

travel."[8]  Some Inspectors distinguish source countries from

"transit" or "conduit" countries, using source country to refer

to a country in which the narcotic is grown or produced and

transit or conduit to refer to a country through which the

narcotic may travel before being smuggled into the United States.

Some Inspectors use the term "source" broadly to refer to either

a country of origin or a transit or conduit country.  Unless

otherwise indicated, this opinion will use "source" in this

latter broader sense.

Plaintiffs point to the testimony of five supervisory or

nonsupervisory Customs Inspectors, see Pl. 56.1 Facts ¶¶ 221-22,[9]

whose testimony supports that virtually any country from which

flights arrive at O'Hare is considered a source country.  None of

these Inspectors could identify a country that would not be

considered a source country except that one of them testified

that Canada is a country from which narcotics are rarely found on

incoming flights.  They also testified that, even if they

considered a country to be a source country, that alone would not

be enough to arouse suspicion, questioning of the passenger about

the travel or other issues would be necessary in order to arouse

suspicions.  Defendants provide no evidence to show that flights

from particular countries are more likely to be ones on which

---

[8]High risk travel may also incorporate that it was a trip
of short duration to and from a source country.

[9]Plaintiffs also cite to the testimony of a sixth
inspector, but the cited page of her transcript has not been
provided.  See Pl. 56.1 Facts ¶ 222 (citing Def. Exh. 34, Diez
Dep. at 112).

narcotics are smuggled. Defendants point to the fact that five of the six Summary Judgment Plaintiffs arrived from Jamaica, which defendants contend is obviously a source country, citing cases which refer to it as having a reputation as a source of narcotics. See, e.g., Saffell v. Crews, 183 F.3d 655, 657 (7th Cir. 1999) ("Saffell III"). Such statements in other cases are not a sufficient basis for establishing facts on a summary judgment motion in the present case. Defendants also point to the fact that Germany is not expressly referred to as a source country on the IOIL for Jones. It is true, however, that travel from Germany is a fact mentioned in the statement of reasons for searching Jones. Similarly, in the statement of reasons on Price's and Absolam's IOILs, it is mentioned that Jamaica was where those two plaintiffs traveled from, but it is not expressly referred to as a source country or by some other similar description. On Milner's IOIL statement of reasons, it is not even mentioned that she was traveling from Jamaica. On defendants' summary judgment motion, it cannot be taken as established, without more, that a passenger traveling from Jamaica is significantly more likely to be smuggling narcotics than a passenger traveling from some other country.

## B. ALLEN AND PRICE SEARCH FACTS

Plaintiffs Allen and Price were traveling together. On June 23, 1997, they arrived at O'Hare on a return flight from Jamaica. Their trip had been for three days. Other than Allen and Price, only one other passenger on their flight was subjected to a personal search, a White male. Including Allen and Price,

there were a total of five African-Americans on the flight. Both Allen and Price were directed to secondary by an officer with a dog. The dog did not alert to either of them. Both Allen and Price were strip searched[10] based on the searching officer purportedly feeling a foreign object in the groin area, though nothing foreign was found in that area during either strip search, nor was there any piece of clothing that might have been mistaken for an object. Since nothing was found on either of these plaintiffs that could have been felt to be a foreign object, on defendants' summary judgment motion, the reasonable inference must be drawn that no foreign object was actually felt on either plaintiff.

For Allen, Martinez was the searching officer,[11] Rocha was the witness, and Desmond was the authorizing officer. Corona had entered a PAU lookout which recommended "100% exam & PD [patdown]; Susp Internal." The reasons stated on the IOIL for the search were: "high risk travel, short trip, appeared to be nervous and bulky. The passenger was also a PAU lookout." Contrary to the IOIL, Allen was wearing a tightfitting, short-sleeve body suit. Allen truthfully answered questions about how she paid for her trip, how long she stayed, whether she knew anyone in Jamaica, purchases she had made, her travel agency, and

---

[10]Allen's IOIL incorrectly indicates she was patted down and not strip searched. It also incorrectly indicates that the date of the search was June 26, 1997.

[11]The IOIL lists Martinez as the primary officer, but a different Inspector actually questioned Allen first and referred her to secondary. Price's testimony supports that Rocha was the one who initially questioned Allen and referred her to secondary.

the name of her job. She said she worked two jobs and paid cash for her trip. Allen showed receipts for her purchases, provided her work badge and number, and showed her itinerary and ticket. Allen's luggage was searched with nothing being found. Allen contends she was not nervous, but points only to testimony that she did not show emotion despite being angry during the actual strip search. See Pl. 56.1 Resp. ¶ 162 (citing Allen Dep. 76-77). That testimony does not show that Allen did not appear nervous while being questioned. After being questioned, Allen followed instructions to put her hands against the wall and spread her feet apart, and Martinez patted her down. Martinez stated that she felt a pad. There was, however, no pad or any other object or bulk in plaintiff's clothes.[12] In being strip searched, Allen raised up her body suit and pulled down her underwear. Martinez then conducted a visual inspection and did not touch Allen. Allen was then allowed to dress and leave.

For Price, Rocha was the primary and searching officer, Martinez was the witness, and Desmond was the authorizing officer. Corona had entered a PAU lookout which recommended "100% exam & PD; Susp Internal/Inserter." The reasons stated on the IOIL for the search were "PAX [passenger] returned from a 3 day trip from Jamaica. PAX was a PAU lookout, she appeared very nervous and wore loose fitting clothing. When asked how her trip was she almost wanted to cry and said that all she wanted to do

---

[12]There is evidence that, as to at least five plaintiffs, Martinez claimed to have felt (or witnessed) something bulky in each woman's crotch area even though no bulkiness was there.

-13-

was to see her kids.  Drivers lic. was issued the day of departing to Cancun."  Price was cooperative during questioning and the search of her luggage, which disclosed nothing suspicious.  She explained what her job was and said that she paid cash because she had no credit cards and also because she was reimbursing Allen who had made all the arrangements.  Price did not cry nor did she say anything about wanting to see her child.[13]  Price was wearing a one-piece bathing suit, loose overall shorts, and nothing else.  As did Martinez with Allen, Rocha claimed she felt something in the crotch area during her patdown of Price even though there was nothing there to be felt.  Price had to remove her bathing suit, bend over, and twice spread her buttocks while being visually inspected, but not touched.  Price was allowed to dress and Desmond was brought in to request that Price consent to an X-ray examination.  Price did not want to consent and asked to call her mother, which was allowed, but there was no answer.  After being told she would be held for three bowel movements if she did not consent, Price signed the consent form.  However, she was then permitted to leave and was not X-rayed.

### C.  ABSOLAM SEARCH FACTS

Plaintiff Absolam is a permanent resident of the United States with Jamaican citizenship.  On January 4, 1998, she arrived at O'Hare on a flight from Jamaica.  She had been there since December 19, 1997.  The defendants involved in Absolam's

---

[13]Price only has one child, not "kids" as indicated on the IOIL.

search were primary officer Nathaniel, searching officer Corona, authorizing officer McCarthy, and Czech who listed Absolam as a lookout. Witness Debbie James is not a named defendant. Absolam was subjected to a patdown search in secondary. The grounds listed on the IOIL are: "Drug paraphernalia in PAX's luggage, and income not commensurate with travel." The lookout, which was issued on January 14, 1997 and scheduled to expire a year later, stated: "Subject may attempt to smuggle cocaine from Jamaica in to the United States. Subject is associated with the Gold Star Jamaican Posse." Czech states in a declaration that she has no specific recollection of the lookout, but that it had to have been based on "criminal intelligence information" from another law enforcement agency.

As of January 1998, Absolam was employed as a nurse's assistant earning approximately $8.30 per hour. Her mother assisted her with rent and she stayed with relatives while in Jamaica. This would indicate sufficient income for a trip, since she stayed with relatives. However, at the time of the search, no defendant asked her any questions about her income. Plaintiff has never associated with any Jamaican gang nor been involved in any drug smuggling. Since 1992, Absolam generally took trips to Jamaica around Christmastime each year. The majority of passengers on Absolam's flight were White, but the only two persons searched were Absolam and another African-American woman.

Although listed as the primary officer, Nathaniel was the one who questioned Absolam in secondary and searched her luggage. Absolam testified that a different Customs Inspector directed her

to secondary. In Absolam's luggage, Nathaniel found a single sheet of rolling paper with two telephone numbers written on it. Nathaniel did not seize that or any other item. Nathaniel requested a patdown search which was approved by McCarthy and assigned to Corona because Nathaniel is male. During the patdown, Corona did not place her hands under Absolam's clothes. After the patdown, Corona allowed Absolam to leave.

### D. JONES SEARCH FACTS

Plaintiff Jones was searched on September 16, 1997 following a flight from Germany to O'Hare. Diez was the searching officer[14] and Banks was the authorizing officer and witness. The IOIL lists the following as the reason for Jones's search:

> Passenger stated that she was a lawyer and an actress/Ticket was paid for by MVP company for work at a trade show in Germany/However, Passenger could not provide many details of the company until she produced a brochure during the luggage exam/Newer issued passport (end of July) and even newer issued state ID (August)/First trip outside of U.S./Very loose-fitting over jacket/partial strip to verify pad/Passenger had to be stopped in the searchroom from removing clothing/At the end of the exam, passenger wanted to know who to write to about a "Profile" being on her passport, so she was given the Local PSR contact SCI Banks talked to INS supervisor about the INS inspector making statement to passenger that her name was "Profile."

Jones works primarily as an actress, but also is admitted to practice law. As of 1997, her legal-related work primarily

---

[14]The IOIL refers to Diez as the primary officer, but the evidence establishes that Jones was referred to secondary by an Immigration officer.

consisted of being appointed as a guardian *ad litem*. The trip to Germany is the only time she has ever been outside the United States. Jones was traveling with three other colleagues, a White male (David Nisbet), a White female, and an Asian-American female. None of the others were searched. Like Jones, Nisbet had never before traveled outside the United States; his travel plans were arranged and paid for by MVP Communications; and Nisbet had obtained his passport shortly before departure.

Jones was referred to secondary by an Immigration officer who informed her that her passport had been "tagged" because she fit a "profile." Upon arriving at secondary, Diez immediately began to search her luggage. While searching the luggage, Diez questioned her about her travel. Jones cooperated in all aspects of the questioning and search. Jones truthfully described the purpose of her trip and the travel arrangements. Jones testified that she provided details of her travel arrangement both before and after the brochure was found. She also provided a copy of her itinerary which referred to MVP Communications. The only loose fitting article of clothing was the jacket, which was somewhat big, not "very" loose fitting and which Diez could have asked Jones to remove to see what was underneath. Diez did not attempt to confirm Jones's description of her travel arrangements and purpose with any of Jones's companions. Jones informed Diez it was her first trip outside the United States, which could be an explanation for the recently issued passport.

After the luggage search, Diez requested a patdown search which Banks approved and witnessed. After the patdown, Diez

stated that she felt something between Jones's legs and requested that Jones lower her pants. Jones was wearing a makeshift sanitary pad consisting of toilet paper. Jones briefly lowered her pants so that Diez could see this and Jones was thereafter permitted to leave.

### E. MENDENHALL SEARCH FACTS

On June 11, 1997, plaintiff Mendenhall was searched following arriving at O'Hare on a flight from Jamaica. She had been in Jamaica for four days. Belcastro is a canine officer who is listed as the primary and searching officer on the IOIL, Zitowsky is listed as the witness, and Banks was the authorizing officer. However, Mendenhall's testimony is not consistent with Belcastro being the searching officer and Zitowsky being a witness. Mendenhall saw a female officer with a dog walking around while she waited for her luggage. It must be assumed that this was Belcastro and that Belcastro referred Mendenhall to secondary. According to Mendenhall's testimony, in secondary a male questioned Mendenhall and searched her luggage. That could not have been Belcastro or Zitowsky, who are both female. He referred Mendenhall for a personal search and Banks approved the personal search and convinced Mendenhall to cooperate in being searched. According to Mendenhall, two women Customs Inspectors went into the search room, neither of whom were the canine officer, but one left before the search actually occurred. Thus the IOIL supports that Belcastro conducted the search, but Mendenhall's testimony does not and the parties refer to both

-18-

Belcastro and Zitowsky as being the searching officer.[15]  For
purposes of summary judgment it will be assumed that either
Belcastro or Zitowsky was the searching officer and that Zitowsky
was the searching officer or witness.  It will be considered
whether Zitowsky would be liable as the searching officer or as
the witness to a search conducted by Belcastro.  The IOIL
describes the reason for the search as follows:  "Passive K-9
alert, high risk travel."  There is no evidence that the decision
to search Mendenhall was based on any response during the initial
questioning nor based on anything found in Mendenhall's luggage.
It must be assumed that the searching officer was aware the
luggage search disclosed no grounds for suspicion.  The searching
officer patted down Mendenhall.  There is no indication on the
IOIL that the searching officer felt anything during the patdown.
After the patdown, the searching officer asked if Mendenhall was
menstruating.[16]  Mendenhall responded affirmatively and the

-------

[15]Mendenhall testified that the woman conducting the
search appeared to be Hispanic.  Neither side points to any
evidence regarding whether either Belcastro or Zitowsky appear to
be Hispanic.  In ¶ 97 of their Rule 56.1 Statement, defendants
recite who is listed on the IOIL without affirmatively stating
that it is accurate.  Plaintiffs respond that they do not dispute
that the IOIL is as described and further admit Belcastro
actually was the searching officer and Zitowsky actually was the
witness.  However, the next four paragraphs of defendants'
statement state that Zitowsky was the searching officer and
plaintiffs' admit that is true in their response to each of those
statements.

[16]It would be a reasonable, but not necessary, inference
that the searching officer asked this question because she had
felt something.  On defendants' summary judgment motion, however,
that inference will not be drawn because it is not the only
possible inference and it does not favor plaintiff.

searching officer asked that she lower her pants to show the pad.
Mendenhall pulled down her pants and underwear to show a pad.

Mendenhall saw the dog walk past her. It did not stop by
her or perform any other act that defendants contend is a passive
alert. No Customs employee stated to Mendenhall during the
search that there had been a canine alert. Instead, an employee
told her she was randomly selected. On defendants' summary
judgment motion, it must be taken as true that there was no
actual canine alert. Since Belcastro is listed on the IOIL, it
must also be assumed that whoever the searching officer or
witness was, she was aware that a canine had been near Mendenhall
without alerting.

The only non-African-American woman on Mendenhall's
flight who was searched has the exact same reasons for a search
listed on her IOIL. However, that woman was only patted down and
not strip searched. The other woman was searched by someone
other than Belcastro or Zitowsky. Banks testified that a canine
alert and traveling from Jamaica should only be enough to justify
a patdown. Ordinarily, there would have to be more before an
inspector would conduct a strip search.

### F. MILNER SEARCH FACTS

On August 27, 1997, plaintiff Milner arrived at O'Hare on
a flight from Jamaica. Milner is a permanent resident of the
United States and a citizen of Guyana. Milner's ticket was
purchased at Alpha One Travel. The searching officer was Reyther
and Banks was the authorizing officer. The witness is not a
named defendant. The reasons for the search contained on the

IOIL are: "Alpha travel, traveling w friend, but friend stayed behind, stayed at Quality In. Student at Loyola, and a caregiver." The IOIL incorrectly lists the search as only being a patdown. The IOIL indicates that Reyther was also the searching officer and Milner testified that she was initially questioned by the same person who searched her and at the same place where her luggage was searched. Therefore, it is unclear whether the initial questioning that she testified about occurred in secondary and, if so, how she was routed to secondary. It may have been because a PAU lookout had been issued two days before her return flight and/or because a rover Inspector directed her there. The PAU lookout was entered by Hall and stated: "100% exam for narc/$$ is recommended. Report occupation in remarks section of inspection results."

Milner purchased her ticket at Alpha One because it is near her house and her friend worked there. Reyther testified that the PAU had informed Inspectors that a number of passengers found with drugs had purchased their tickets there. There is, however, no evidence to show that customers of Alpha One were more likely to have contraband. Also, even if it were true, it would still mean that most Alpha One customers did not have contraband. There would still need to be additional reasons to support a personal search, particularly a strip search. There is no evidence that the Quality Inn was a hotel frequented by narcotics traffickers. Milner returned separate from her friend, but she also flew to Jamaica separate from her friend.

Upon deplaning, Milner passed a Customs Inspector with a dog and the dog did not alert to Milner. In secondary, Milner was questioned by Reyther and was cooperative. She showed Reyther her passport and "green card." Milner provided the information about staying at the Quality Inn and traveling separate from a friend. Milner's luggage was searched and nothing suspicious was found. Milner was wearing a white see-through blouse and baggy pants. Reyther directed Milner to a room where she was patted down, including under her blouse even though it was a see-through blouse. Reyther patted down Milner's breasts, but did not reach under her bra. Reyther also patted down Milner's fully visible stomach. Reyther then directed Milner to lower her pants and thereafter to pull down her underwear, which revealed a soiled pantiliner. Reyther asked if Milner was using a tampon and, after an affirmative response, directed Milner to show her the tampon which Milner did.

## IV. COUNT III AND COUNT VI SEARCH CLAIMS

### A. APPLICABLE STANDARD OF SUSPICION

The same suspicion standards that apply to the Count III Fourth Amendment claims for unlawful searches also apply to the Count VI Fourth Amendment and due process claim that plaintiffs were unlawfully detained during the time they were searched. See Anderson IV, 199 F.R.D. at 246-49, 264-65. Therefore, these two counts will be considered together. As has been discussed or held in ruling on prior motions in this case, current Seventh Circuit case law provides that routine questioning and searching

of luggage at the border does not require any level of suspicion. See id. at 255 (citing <u>United States v. Dorsey</u>, 641 F.2d 1213, 1217-18 (7th Cir. 1981)). See also <u>Kaniff v. United States</u>, 2002 WL 370210 *9 (N.D. Ill. March 8, 2002). Performing a standard patdown search, requires some level of suspicion that the person has contraband on his or her person, with the level of suspicion required being balanced against the level of indignity imposed on the traveler. See <u>Anderson IV</u>, 199 F.R.D. at 255-56 (citing <u>Saffell III</u>, 183 F.3d at 657; <u>Dorsey</u>, 641 F.2d at 1215-19; <u>Saffell v. Crews</u>, 1998 WL 832653 *1-3 (N.D. Ill. Nov. 20, 1998), aff'd in part, rev'd in part on other grounds, <u>Saffell III</u>). See also <u>Kaniff</u>, 2002 WL 370210 at *7; <u>United States v. Brown</u>, 2000 WL 33155619 *3-4 (N.D. Ill. Dec. 8, 2000). Compare <u>United States v. Ruimwijk</u>, 148 F. Supp. 2d 947, 948-49 (N.D. Ill. 2001). But see <u>Bradley v. United States</u>, 299 F.3d 197, 204 n.8 (3d Cir. 2002). Intrusive patdowns[17] and whole or partial strip searches require reasonable suspicion that contraband is secreted under clothing or internally. <u>Anderson IV</u>, 199 F.R.D. at 248-49, 258 (citing inter alia <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531 (1985); <u>Saffell III</u>, 183 F.3d at 658-59; <u>Saffell v. Crews</u>, 1998 WL 142372 *5 (N.D. Ill. March 19, 1998) ("<u>Saffell I</u>")). See also <u>Kaniff</u>, 2002 WL 370210 at *7. The parties do not contend that Seventh Circuit or Supreme Court precedent as to the standards applicable to the different types

---

[17]The definitions of a standard patdown search and an intrusive patdown search are set forth in <u>Anderson IV</u>, 199 F.R.D. at 258.

of searches has changed since the ruling in <u>Anderson IV</u>.[18]
"'Reasonable suspicion' is defined as 'a particularized and
objective basis for suspecting the particular person' of
smuggling contraband." <u>United States v. Johnson</u>, 991 F.2d 1287,
1291 (7th Cir. 1993) (quoting <u>Montoya</u>, 473 U.S. at 541 (quoting
<u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)).

## B. SEARCH OF ALLEN

Resolving disputed factual issues in her favor, Allen was
patted down based on the following. Allen had made a three-day
trip to Jamaica and appeared to be nervous. Additionally,
Martinez knew that nothing was found in her luggage and it can be
inferred that she also knew that a canine had been close to Allen
without alerting. Allen was also cooperative in answering
Martinez's questions and provided information about her
employment, travel, and purchases, as well as providing purchase
receipts, work identification, and a written itinerary. Allen
was not traveling alone and no lubricants or stomach medications
often used by internal narcotics smugglers had been found in
Allen's luggage. Additionally, before the strip search, Allen
had been patted down with no bulges or suspicious objects felt.
There was no reasonable suspicion justifying the strip search.
<u>Cf.</u> <u>Anderson IV</u>, 199 F.R.D. at 261-62.

_____

[18]Plaintiffs presently argue that <u>Anderson IV</u>'s qualified
immunity holding as to when the some level of suspicion standard
for standard patdown searches was clearly established, <u>see</u> 199
F.R.D. at 256-57, should be reconsidered in light of recent
Supreme Court precedent regarding qualified immunity, <u>see</u>
§ IV(K)(1) <u>infra</u>, but they do not disagree as to what the current
standard is.

As to the patdown, a sufficient level of suspicion was also lacking in light of the exculpatory information available prior to the patdown being performed. That is true even if it is assumed, without sufficient support, that Jamaica is a likely source for narcotics smuggling. Because of qualified immunity, however, no damages may be obtained on the Count III or Count VI claims based on a standard patdown search even if the patdown was based on no suspicion whatsoever. See § IV(K)(1) infra.

### C. SEARCH OF PRICE

Resolving disputed factual issues in her favor, Price was patted down based on the following reasons. She had made a three-day trip to Jamaica for which she paid cash and she had renewed her driver's licence shortly before she left the country. Additionally, Rocha knew that nothing was found in Price's luggage and it can be inferred that she also knew that a canine had been close to Price without alerting. Price was also cooperative in answering Rocha's questions and provided information about her cash purchase of the tickets. Price was not traveling alone and no lubricants or stomach medications often used by internal narcotics smugglers had been found in Price's luggage. Additionally, before the strip search, Price had been patted down with no bulges or suspicious objects felt. There was no reasonable suspicion justifying the strip search. Cf. Anderson IV, 199 F.R.D. at 261-62. There was also an insufficient basis for the standard patdown, but, as is discussed in § IV(K)(1) infra, qualified immunity precludes any damages claim based on the patdown.

## D. SEARCH OF ABSOLAM

Resolving disputed factual issues in her favor, Absolam was patted down by Nathaniel based on the following reasons. Absolam was returning from Jamaica, a PAU lookout indicated she might be a narcotics smuggler,[19] and a rolling paper with telephone numbers was found in her luggage. No other support for being a narcotics smuggler was found in the luggage. Also, Absolam was not on a short trip to Jamaica. The PAU report and rolling papers would constitute some basis for suspicion. Therefore, there was adequate grounds for the standard patdown. Even if there was an insufficient basis for some level of suspicion, defendants would be entitled to qualified immunity. See § IV(K)(1) infra. Absolam's Count III and Count VI damages claims will be dismissed.

## E. SEARCH OF JONES

Resolving disputed factual issues in plaintiff's favor, Jones was patted down based on the following reasons. She had a recently issued passport and state ID, was wearing a loose-fitting jacket, and stated she was an actress and lawyer. Additionally, before conducting a patdown, Diez had searched Jones's luggage and found nothing incriminating. The loose-fitting jacket is not a basis for a patdown because the passenger can instead be asked to remove the jacket. Being an actress and lawyer is not a ground for suspicion, especially since Jones

---

[19]While a fact dispute may exist regarding whether Czech had an actual intelligence report, there is no evidence that the other defendants knew the report lacked foundation.

cooperated in answering questions, explained the nature of her trip, and provided brochures corroborating the nature of her trip. Jones also informed Diez it was the first time she had been out of the country, which would explain the new passport. Diez also made no attempt to confirm Jones's statements by questioning her traveling companions. In light of the other information provided and the failure to find anything suspicious in the luggage, there was no level of suspicion supporting the standard patdown. However, as is discussed in § IV(K)(1) infra, qualified immunity bars any damages claim based on the patdown alone.

Before, the strip search of Jones, there was the additional factor that Diez felt something between Jones's legs. That provided a reasonable suspicion supporting the request to see if there was a pad.[20] Cf. Kaniff, 2002 WL 370210 at *9; Ruimwijk, 148 F. Supp. 2d at 949. Moreover, the bulge felt between Jones's legs would have felt more suspicious than the ordinary sanitary pad since it was a makeshift pad of toilet paper, not the more consistent form and texture of the usual sanitary pad. Furthermore, Jones was only required to briefly lower her pants; Diez did the minimum necessary to confirm what

---

[20]Even if it were held that reasonable suspicion did not exist because a bulge between a woman's legs may often be a sanitary pad and there were insufficient other indicia of narcotics smuggling, defendants would be entitled to qualified immunity from damages because there is no clearly established law that feeling a bulge between a passenger's legs is an insufficient basis for searching further in order to confirm it is not contraband.

-27-

she felt was a sanitary pad. Jones's Count III and Count VI damages claims will be dismissed.[21]

## F. SEARCH OF MENDENHALL

Resolving disputed factual issues in Mendenhall's favor, she was patted down based on being on a flight from Jamaica following a four-day trip. Additionally, she was strip searched after responding that she was menstruating. The searching officer would have also been aware that a canine did not alert to Mendenhall and nothing suspicious was found in her luggage. Before the strip search, the searching officer had already patted down Mendenhall and felt nothing suspicious. Simply being on a flight from Jamaica after a relatively short trip does not constitute some suspicion justifying a standard patdown. As is discussed in § IV(K)(1) infra, the damages claim based on a standard patdown is barred by qualified immunity. Being told that a woman is menstruating does not add suspicion justifying a strip search. Mendenhall was strip searched without reasonable suspicion. See Anderson IV, 199 F.R.D. at 261-62.

## G. SEARCH OF MILNER

Resolving disputed factual issues in Milner's favor, she was searched based on purchasing a ticket from Alpha Travel and returning separately from a friend with whom she had met in Jamaica but had not traveled with on her way to Jamaica. There

_____

[21]Qualified immunity would not preclude an injunctive relief claim based on the patdown without adequate suspicion. However, Jones has never traveled outside the United States other than this one trip so she would lack standing to pursue injunctive relief. Compare Anderson II, 1999 258501 at *1-2; Anderson IV, 199 F.R.D. at 244 & n.10, 245 & n.13.

is no evidence in support of finding that passengers who use Alpha Travel are so frequently smugglers of contraband that that factor alone constitutes some or reasonable suspicion. Before being patted down, Reyther was also aware that a canine had not alerted to Milner, nothing suspicious had been found in her luggage, and Reyther could see through Milner's blouse. Some suspicion did not exist for a standard patdown, but, as is discussed in § IV(K)(1) _infra_, any damages claim for a standard patdown is barred by qualified immunity. However, Reyther also reached under Milner's blouse and patted her directly on the skin of her stomach and on her bra. That would be an intrusive patdown requiring a higher level of suspicion. See Anderson IV, 199 F.R.D. at 258-59. However, it was not clearly established in 1997 that touching under clothes but over a bra and directly touching the stomach under clothes constituted an intrusive patdown requiring reasonable suspicion. Cf. id. (collecting cases). Therefore, any damages claim based on the patdown is barred by qualified immunity. By the time of the strip search, Reyther also knew that he had patted down Milner and felt nothing suspicious. Reasonable suspicion did not support the strip search of Milner, including asking Milner to remove her tampon even though nothing suspicious had been felt or observed.

The foregoing discussion only considers the liability of the searching officer. The liability of the other participants in each search must also be considered.

## H. LIABILITY OF SUPERVISORY CUSTOMS INSPECTORS

As to supervisory liability, it has previously been held

in this case:

> In a Bivens claim . . ., defendants cannot be held liable based on respondeat superior. Del Raine v. Williford, 32 F.3d 1024, 1047 (7th Cir. 1994). The rule is essentially the same as that for constitutional claims under 42 U.S.C. § 1983. Id. To be liable for a constitutional violation, a supervisory defendant need not have directly participated in the deprivation of rights, but he or she must have been personally involved in the deprivation. Id.; Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001); Chavez, 251 F.3d at 651. "A defendant 'will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.'" Sanville, 266 F.3d at 740 (quoting Chavez, 251 F.3d at 652). "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." Chavez, 251 F.3d at 651 (quoting Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988)). Thus, where there is a formal policy that is unconstitutional, an official will be liable for "formulating and directing" the policy. Del Raine, 32 F.3d at 1052 (Manion, J., concurring); Neilis v. Ward, 2000 WL 1372870 *3 (N.D. Ill. Sept. 21, 2000); Bolden v. Peters, 1994 WL 695524 *4 (N.D. Ill. Dec. 9, 1994). Where there is a custom, practice, or pattern of unconstitutional conduct by subordinates that is not pursuant to a formal policy, the supervisor must facilitate, approve, condone, or deliberately ignore the practice in order to be liable. Clinkscales v. Sheahan, 1998 WL 292402 *2 (N.D. Ill. May 19, 1998).

Anderson VIII, 225 F. Supp. 2d at 859-60.

Here, the IOILs are evidence that the authorizing officer

approved a strip search on the grounds known to the searching

officer. While it may be true that some of the supervisors
involved in the searches of the Summary Judgment Plaintiffs
approved a particular search without actual knowledge and thus
acted negligently at best, no conclusive evidence to that effect
has been presented. On defendants' summary judgment motion, it
is a reasonable inference from each IOIL that the supervisor
acted knowingly in approving the particular search. To the
extent Allen's, Price's, Mendenhall's, and Milner's Count III and
Count VI damages claims remain pending against the searching
officer, those claims also remain pending as against the
particular supervisor involved in each search, Desmond or Banks.

### I. LIABILITY OF WITNESSES

Allen and Price each had their searches witnessed by a
defendant other than the authorizing officer and possibly
Mendenhall as well. Plaintiffs contend the witnesses should be
liable because they participated in and observed the searches.
Additionally, before 1997, the law in this circuit was well
established that the "responsibility to intervene applies equally
to supervisory and nonsupervisory officers. [Byrd v. Brishke,
466 F.2d 6, 11 (7th Cir. 1972).] An officer who is present and
fails to intervene to prevent other law enforcement officers from
infringing the constitutional rights of citizens is liable under
§ 1983 if that officer had reason to know: (1) that excessive
force was being used, (2) that a citizen has been unjustifiably
arrested, or (3) that any constitutional violation has been
committed by a law enforcement official; and the officer had a
realistic opportunity to intervene to prevent the harm from
occurring." Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994),

cert. denied, 525 U.S. 1140 (1999). This includes intervening to prevent unlawful searches. Knox v. Wainscott, 2003 WL 21148973 *7 (N.D. Ill. May 14, 2003); Sims ex rel. Sims v. Forehand, 112 F. Supp. 2d 1260, 1274-75 (M.D. Ala. 2000). The aforementioned duty to intervene applies equally to Bivens actions like the present one as to § 1983 actions. See Del Raine, 32 F.3d at 1047; Anderson VIII, 225 F. Supp. 2d at 859-60; Gonzalez v. Babasa, 2003 WL 21196245 *2 (N.D. Ill. May 19, 2003); Avina v. Hosko, 1999 WL 184165 *2 & n.3 (N.D. Ill. March 25, 1999)

On the evidence before the court, unless otherwise indicated, it would be inferred that the witnesses were aware of the same information as the searching officers. Therefore, the witnesses would have been aware of the factual circumstances that did not constitute reasonable suspicion supporting the strip searches.[22] Even with identical knowledge, it would still have to be determined whether the evidence supports that each witness had a realistic opportunity to intervene to stop the strip search.

As to Rocha's witnessing of Martinez searching Allen, it is undisputed that Martinez stated out loud that she felt a pad. Similarly when Martinez witnessed Rocha's searching of Price, Rocha stated out loud that she felt something. If the witness in each situation did not know the statements were false, those

---

[22]The facts in the present case are distinguishable from Brent v. Ashley, 247 F.3d 1294, 1305-06 (11th Cir. 2001), and Saffell I, 1998 WL 142372 at *8, which are cited by defendants. In those cases, the courts indicated that the witnesses did not have the knowledge necessary to know that the search of the plaintiffs were without adequate suspicion.

statements would have provided the witness with knowledge that would support reasonable suspicion. Cf. discussion of Jones's situation in § IV(E) supra. However, Allen was wearing a tight body suit and Price was wearing a bathing suit. As closely observing witnesses, each witness could have seen that these plaintiffs did not have a pad or other bulge that would have been felt. On defendants' summary judgment motion, that reasonable inference must be drawn. Therefore, it must be taken as true that, as witnesses of the respective searches, Rocha and Martinez were aware of facts that would not constitute reasonable suspicion. It can also be inferred that each witness could have stated to the searching officer that adequate suspicion was lacking and that such a statement would have had a reasonable possibility of preventing each strip search. Allen's and Price's remaining Count III and Count VI damage claims will not be dismissed as against each witness.[23]

To the extent Mendenhall was searched by Belcastro or another Inspector and Zitowsky was the witness, it may be inferred that Zitowsky was aware of the same facts as the searching officer, which did not constitute reasonable suspicion supporting a strip search. It is also reasonable to infer that, if Zitowsky had raised an objection, there was a reasonable possibility Mendenhall would not have been strip searched. As to Mendenhall's remaining Count III and Count VI damage claims, the

_____

[23]The present record does not contain conclusive evidence that authorizing officer Desmond was falsely told something was felt before approving each of these strip searches. Therefore, these claims as against Desmond will not presently be dismissed.

claim against Zitowsky based on her being a witness will not be dismissed.

### J. LIABILITY OF PAU DEFENDANTS

Corona issued a PAU lookout for Allen and Price and Hall issued one for Milner. Regardless of whether the PAU lookouts were accurate or not, at most they caused these plaintiffs to be referred to secondary. Corona and Hall were not the Inspectors who decided to strip search these plaintiffs, they were not aware of any additional facts that were developed, and they were not present to intervene to prevent the strip searches. The Count III and Count VI claims of Allen and Price against Corona and of Milner against Hall will be dismissed.

### K. QUALIFIED IMMUNITY

### 1. STANDARD PATDOWN SEARCHES

It was held in <u>Anderson IV</u>, 199 F.R.D. at 256-57, that the some level of suspicion requirement for standard patdown searches was not clearly established as of the date of the Summary Judgment Plaintiffs' searches, which occurred between June 11, 1997 and January 4, 1998. Plaintiffs presently contend that the some level of suspicion standard was clearly established as of the pertinent time period because the Customs Service's own Personal Search Handbook contained a "some or mere suspicion" requirement even if Seventh Circuit caselaw was unsettled. This contention was previously rejected on a motion to reconsider <u>Anderson IV</u>. It was held that "violation of an administrative rule or regulation does not preclude applying qualified immunity where the pertinent constitutional law is not clearly

-34-

established." Id. at 265-66 (citing Davis v. Scherer, 468 U.S. 183, 194-96 (1984); Stevens v. Umsted, 131 F.3d 697, 707 (7th Cir. 1997); Krocka v. Riegler, 958 F. Supp. 1333, 1344-45 (N.D. Ill. 1997)). Citing Hope v. Felzer, 122 S. Ct. 2508, 2516 (2002), plaintiffs contend that Supreme Court precedent now holds that a government body's own policies can be considered in determining if the law is clearly established. See also Toms v. Taft, 338 F.3d 519, 527 n.5 (6th Cir. 2003); Treats v. Morgan, 308 F.3d 868, 875 (8th Cir. 2002); Niziol v. Pasco County District School Board, 240 F. Supp. 2d 1194, 1213 (M.D. Fla. 2002).

In Hope, the Supreme Court considered whether it was clearly established for Alabama Department of Corrections employees that handcuffing a work squad inmate to a hitching post without an opportunity for regular water or bathroom breaks violated the constitutional prohibition against cruel and unusual punishment. The Supreme Court held that existing Eleventh Circuit precedents were close enough to provide fair warning that the above-described handcuffing to a hitching post was unconstitutional. Hope, 122 S. Ct. at 2516-17. The Supreme Court relied on a case holding that it was unconstitutional to punish inmates by handcuffing them to fences for prolonged periods of times. See Gates v. Collier, 501 F.2d 1291, 1306 (5th Cir. 1974). The Supreme court also relied on Ort v. White, 813 F.2d 318, 324-26 (11th Cir. 1987), which had held it was not unconstitutional to withhold water for a short period of time as a work incentive for a recalcitrant farm squad inmate. That case

cautioned that it might or would violate the Constitution if water were withheld as a punishment or if the coercive means reached the point of threatening a recalcitrant inmate's health. The Supreme Court also noted that it was "relevant" to consider that the Department's own regulations allowed for use of the hitching post for recalcitrant workers, but that the inmate had to be offered water and bathroom breaks every 15 minutes, a log needed to be kept of these offers, and the inmate was to be permitted to return to work whenever he tells an officer he is ready.  In Hope's situation, this procedure was not followed during his seven hours of being handcuffed to the hitching post. See Hope, 122 S. Ct. at 2517-18.  The finding of clearly established law was also "buttressed" by a United States Department of Justice report finding that the provisions of the regulation were consistently ignored and therefore use of the hitching post should be discontinued to avoid continued constitutional violations.  See id. at 2518.

The present case is distinguishable from Hope. Plaintiffs point to a March 1997 Personal Search Handbook.  In its Foreword, the Handbook states in part:

> This handbook sets forth procedures and guidelines for the conduct of searches of persons and their papers at the border by Customs officers. . . .
>
> * * *
>
> Each Customs officer must know the limits of Customs authority, and must use this authority judiciously, conscientiously, and courteously. This attachment sets forth Customs policy with respect to this authority in the border search context.
>
> * * *

This handbook does not limit the search
authority of Customs officers.  The goal is to
assist Customs officers in performing their
enforcement duties in a manner that will ensure
personal integrity and will also permit officers
to perform a professional service for the public.
This handbook is not intended to create or confer
any rights, privileges, or benefits upon any
private person, but is merely for internal
guidance.

Def. Exh. 41, Foreword.

The Handbook is written in a choppy and cursory manner.

Chapter 3 concerns patdowns and does not distinguish standard

patdowns from intrusive patdowns.  Section 3(b) provides in its

entirety.

b.  <u>Some or Mere Suspicion</u> is Required

<u>Example</u>:  An informer's tip indicated that a man
named Jesse or Jesus Rivera, would be bringing
hard narcotics across the border at San Ysidro on
a particular day.  On that day, officers
subjected four men named Rivera to intensive
patdown searches.  The defendant was the fourth
patted down and a large lump was detected in the
genital area.  The lump was a condom containing
197 grams of cocaine.

<u>Held</u>:  The officers had some or mere suspicion
for the patdown.  <u>United States v. Rivera-
Marquez</u>, 519 F.2d 1227 (9th Cir. 1975).

While the courts have not held that articulable
facts (i.e., facts which you can testify to in
court) must be present to substantiate "mere"
suspicion, the preferred practice is to base <u>any</u>
personal search on an objective factor (i.e.,
known or perceived as distinguished from purely
subjective) which can be articulated prior to the
commencement of the search.

Def. Exh. 41 § 3(b).

Hope does not change the general qualified immunity standard. "The question would still 'be whether a reasonable official in the position of these defendants, considering all relevant sources of guidance to the law, might have thought it reasonably possible that [the Seventh Circuit] or eventually the U.S. Supreme Court would hold' that his or her challenged conduct was lawful." Anderson IV, 199 F.R.D. at 257 (quoting Burgess v. Lowery, 201 F.3d 942, 944 (7th Cir. 2000)). For purposes of qualified immunity, it is still assumed that the government official is aware of all pertinent precedents. In Hope, Eleventh Circuit precedent was close on point, but not precisely on point. By itself, however, it was probably still enough to clearly establish the unconstitionality of the defendants' conduct. In any event, the pertinent regulation made it more clear that the challenged conduct was unlawful.

The present case is different. As is discussed in Anderson IV, 199 F.R.D. at 257, the then-existing Seventh Circuit and related precedents did not even clearly establish the general standard to be applied to standard patdown searches, whether no suspicion or some suspicion. The Handbook's statement that a "some or mere suspicion" standard applies to all types of patdowns did not clear up the ambiguity in existing precedents for the Seventh Circuit, especially when the statement was based on a citation to a 22-year-old Ninth Circuit case that also predated Montoya and which does not even contain a holding that a "some or mere suspicion" standard applies to standard patdown

searches.  The pertinent discussion in _Marquez-Rivera_ reads in its entirety:

> We find no constitutional flaw in the search.  Rivera's claim that the pat-down search should be examined by "strip search" standards is frivolous.  See _United States v. Chase_, 503 F.2d 571, 574 (9th Cir. 1974).  And the informer's tip, including as it did the name of the suspected smuggler as well as the other information justifying particular scrutiny when Rivera crossed the border, clearly supported the kind of "pat-down" used by officers checking for weapons or other contraband at the border.
>
> Rivera argues that the statute which allows border searches requires suspicion; and that the officers had none in this case.  This argument is frivolous.  Rivera misapprehends 19 U.S.C. § 482.  See _United States v. Storm_, 480 F.2d 701, 703-704 (5th Cir. 1973).  "(T)here is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone."  _Witt v. United States_, 287 F.2d 389, 391 (9th Cir.), _cert. denied_, 366 U.S. 950 (1961); _see Klein v. United States_, 472 F.2d 847, 849 (9th Cir. 1973).
>
> We do not decide whether a strip-search occurred when Rivera dropped his trousers.  After the lump was discovered, the officers had a "real suspicion" (_see Henderson v. United States_, 390 F.2d 805, 808 (9th Cir. 1967)) that Rivera had concealed contraband in his nether-garments.  This suspicion would have justified a strip-search if Rivera was subjected to one.

519 F.2d at 1218.

The _Anderson IV_ holding as to qualified immunity regarding standard patdown searches will continue to stand. Since, during the pertinent time period, it was not clearly established that a standard patdown search could not be conducted based on no suspicion whatsoever, none of the Summary Judgment

Plaintiffs can succeed on Count III or Count VI damages claims based on a standard patdown search.[24]

### 2. STRIP SEARCHES

Defendants contend that they would be entitled to qualified immunity for the remaining damage claims based on strip searches. Defendants contend there was no law establishing that it was unlawful to conduct a partial strip search after feeling objects during a patdown. As to the remaining Count III and Count VI claims of Allen, Price, Mendenhall, and Milner, however, the facts assumed to be true for purposes of summary judgment do not include that any foreign object was felt or observed prior to each plaintiff's strip search. Therefore, that is not a basis for applying qualified immunity. The remaining claims all involve situations where the plaintiff was returning from Jamaica and little else to arouse suspicion. Moreover, as to each of them, it was also known that a canine had not alerted to them and that nothing had been found during a luggage search or patdown. Under those circumstances, a Customs Service employee could not have reasonably believed that reasonable suspicion existed to support a strip search. Defendants are not entitled to qualified immunity as to the remaining Count III and Count VI claims of the Summary Judgment Plaintiffs. See Anderson IV, 199 F.R.D. at 261-62.

---

[24]This qualified immunity ruling does not apply to the Count I and Count II equal protection claims.

## V. COUNT V FTCA CLAIMS

Count V is an FTCA claim based on defendants' conduct constituting the torts of false imprisonment, assault, and battery. The United States contends, and plaintiffs do not dispute, that none of these claims can succeed to the extent that the searches were legally justified, that is, there was adequate suspicion for the search. See Kaniff, 2002 WL 370210 at *8 (false imprisonment); Kraushaar v. Flanigan, 45 F.3d 1040, 1049-50 (7th Cir. 1995) (assault and battery).[25] To the extent adequate suspicion was lacking, the United States contends willful and wanton conduct is an additional element of each offense that plaintiffs cannot show. Alternatively, defendants contend that their conduct falls within the FTCA's discretionary function exception. See 28 U.S.C. § 2680(a).

### A. ADEQUATE SUSPICION

As is discussed in § IV supra, adequate suspicion did not exist to either pat down or strip search Allen, Price, Mendenhall, and Milner. Therefore, their FTCA claims cannot be dismissed based on the searches being based on adequate suspicion. As to Absolam, adequate suspicion existed to pat her down. See § IV(D) supra. Absolam's FTCA claim will be dismissed in its entirety. As to Jones, there was not adequate suspicion to pat her down. Therefore, there would not have been adequate suspicion to strip search her if not for the improper patdown.

---

[25]No issue is raised regarding whether the strip searches qualify as a battery without any actual touching. See Kraushaar, 45 F.3d at 1049-50.

Therefore, her FTCA claim cannot be dismissed based on adequate suspicion for the search.

## B. WILLFUL AND WANTON CONDUCT

Under the FTCA, the United States is liable for the negligent or wrongful conduct of one of its employees acting within the scope of his or her employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2672. See also id. §§ 1346(b)(1), 2674, 2679-80. Thus, the FTCA incorporates state tort law, in this case the substantive law of Illinois. White v. United States, 148 F.3d 787, 793 (7th Cir. 1998); Kaniff, 2002 WL 370210 at *7. In the situation of law enforcement officers such as defendants, defendants contend this includes incorporating the Illinois Tort Immunity Act, 745 ILCS 10/2-202, which provides: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." Plaintiffs contend this standard is inapplicable, under the FTCA, because that is a state law standard applicable to a public employee, not a state law standard applicable to a "private person."

Plaintiffs contend that the plain language of the FTCA ("private person" in § 1346(b)(1) and § 2672; "private individual" in § 2674) makes clear that state law immunities for municipalities or municipal employees do not apply because such entities or persons are not private persons. The language, however, is not so plain and clear. Within a few years after the

FTCA became law, courts were already construing "private individual" to include municipalities.  See Gilroy v. United States, 112 F. Supp. 664, 665-66 (D.D.C 1953).  At least two appellate court cases have held that state tort law applicable to local governmental employees may apply under the FTCA.  See Crider v. United States, 885 F.2d 294, 296-97 (5th Cir. 1989); Louie v. United States, 776 F.2d 819, 825 (9th Cir. 1985).  Cases from the federal district courts in Illinois have consistently reached the same conclusion regarding Illinois's Tort Immunity Act.  See, e.g., Kaniff, 2002 WL 370210 at *7-8; Rose v. United States, 929 F. Supp. 305, 307-08 & n.2 (N.D. Ill. 1996); Estate of Warner v. United States, 743 F. Supp. 551, 553-55 (N.D. Ill. 1990).  In Cooks v. United States, 815 F.2d 34 (7th Cir. 1987), the parties agreed that the same standard applied under the FTCA as would apply to an Illinois municipality.  See id. at 35.  While the issue, therefore, was not in dispute, the Seventh Circuit clearly indicated agreement with the parties.  See id. at 36 ("Since under the present state of Illinois law an Illinois municipal corporation is not liable for injuries resulting from minor defects in a sidewalk, we refuse to impose a stricter standard upon the United States, holding it liable for a ½ inch elevation in a sidewalk.  Gilroy v. United States, 112 F. Supp. 664, 666 (D.D.C. 1953); Smith v. United States, 237 F. Supp. 675, 676 (D.D.C. 1965).").  One case from New York that considered Illinois law has declined to apply the Tort Immunity Act, see Hyatt v. United States, 968 F. Supp. 96, 108 (E.D.N.Y. 1997), and a Second Circuit case has held that state law applicable to

-43-

municipal officials should not apply under the FTCA, see Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994). This court will follow the majority view and the authoritative dictum in Cooks. For the reasons stated in Kaniff, 2002 WL 370210 at *7-8, it is held that, in the present situation, the United States cannot be liable under the FTCA unless the conduct of the pertinent Customs employee or employees was willful and wanton.

Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. It is a higher standard than mere negligence that "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." Chapman v. Keltner, 241 F.3d 842, 847 (7th Cir. 2001) (quoting Loitz v. Remington Arms Co., 138 Ill. 2d 404, 563 N.E.2d 397, 402 (1990)).

Not every search that is conducted without adequate suspicion constitutes willful and wanton conduct. Cf. Gordon v. Degelmann, 29 F.3d 295, 299 (7th Cir. 1994) (arrest without probable cause). However, where the search is clearly lacking adequate suspicion, the conduct can be found to be willful and wanton. Cf. Brandon v. Village of Maywood, 157 F. Supp. 2d 917, 935 (N.D. Ill. 2001) (arrest without probable cause); Hyatt, 968 F. Supp. at 108 n.4 (same). Where the defendant makes false statements to perpetrate the conduct or cover it up, it may also

-44-

be found to be willful and wanton.  See <u>Niebur v. Town of Cicero</u>, 212 F. Supp. 2d 790, 820 (N.D. Ill. 2002).  To the extent the decision to unlawfully search a plaintiff was motivated by racial/gender discrimination, that would also constitute willful and wanton conduct.  See <u>Briggs v. North Shore Sanitary District</u>, 914 F. Supp. 245, 252 n.7 (N.D. Ill. 1996).

As to Allen, Price, Mendenhall, and Milner, adequate suspicion to strip search them was clearly lacking, based on the facts presently assumed to be true for purposes of summary judgment.  Therefore, a reasonable trier of fact could find that strip searching them was willful and wanton.  Additionally, as to Allen and Price, the searching officer falsely stated that she felt something during the patdown.  The IOIL for each of them also included the false statement that each was wearing bulky or loose-fitting clothing.  Price's IOIL included additional false information as to statements she purportedly made.  Allen's and Milner's IOILs both falsely indicated that they had been only patted down, and not strip searched.  Mendenhall's IOIL contained a false statement that there was a canine alert.  As to the strip searches of these four, a reasonable trier of fact could find that the strip searches were willful and wanton.

The patdowns of each of these four plaintiffs are different.  As was discussed regarding qualified immunity, the law as to the necessary suspicion for a patdown search was unsettled.  Therefore, it cannot be found that the decision to pat them down was clearly lacking a sufficient basis.  However, the false statements on the IOIL are a basis for finding that the

patdowns of Allen, Price, and Mendenhall were willful and wanton. There is no similar evidence regarding Milner's patdown search.[26]

As to Jones, it is also true that the law was unsettled so that it cannot be found that the lack of adequate suspicion was clear. Also, once she was patted down, adequate suspicion for strip searching her was found. Therefore, it cannot be found that the decision to search her was clearly lacking adequate suspicion. As to Jones, however, it is arguable that the failure to attempt to confirm facts by seeking verification from her traveling companions would be a basis for finding that the searching officer acted wantonly and willfully. Compare Gordon, 29 F.3d at 299.

As to all the search claims except the patdowns of Milner and Absolam, an adequate basis exists for finding willful and wanton conduct. Still to be considered regarding Milner's patdown is the question of whether her search was motivated by a discriminatory animus, in which case a basis for finding willful and wanton conduct would exist. As is discussed in § VI(C)(2)(k)(v) infra, there is insufficient evidence that her search was motivated by a discriminatory intent. Therefore, her FTCA claim is limited to being based on the strip search. As to Allen, Price, and Mendenhall, there is adequate evidence of a discriminatory motive in being referred to secondary and patted down. See § VI(C)(2)(k) infra. That would be an additional

---

[26]The only false statement on Milner's IOIL is the description of her search as a patdown instead of a strip search. That, however, does not go to the grounds for patting her down.

basis for finding the patdown searches of these plaintiffs to be willful and wanton.

## C. DISCRETIONARY FUNCTION

Excepted from the FTCA's waiver of sovereign immunity is:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

This exception does not apply to the facts before the court. As the United States concedes, this exception does not apply to any conduct that violates the Constitution. Garcia v. United States, 896 F. Supp. 467, 473 (E.D. Pa. 1995). As was discussed in § IV supra, all the searches for which an FTCA claim remains pending are searches that, on the facts presently assumed to be true, lacked the necessary suspicion to be constitutional. Additionally, § 2680(h) specifically provides that claims based on false imprisonment, assault, and battery may be brought if based on the conduct of an investigative or law enforcement officer. This provision has been construed as making the discretionary function exception inapplicable to such claims, which includes claims against Customs Inspectors. See Sutton v. United States, 819 F.2d 1289, 1296-97 (5th Cir. 1987); Nurse v. United States, 226 F.3d 996, 1002 (9th Cir. 2000); Beran v. United States, 759 F. Supp. 886, 892 (D.D.C. 1991).

The Count V FTCA claims will not be dismissed except for (a) the entire claim of plaintiff Absolam and (b) the claim of plaintiff Milner based on the patdown search alone, but not based on the strip search.

## VI. COUNT I AND COUNT II EQUAL PROTECTION CLAIMS

### A. EQUAL PROTECTION STANDARDS

In Count I, each Summary Judgment Plaintiff alleges she was discriminatorily selected for a nonroutine search because she is an African-American woman. Count II contains related claims against Managerial Defendants Hoteko and Noonan. Such claims may be made even if adequate suspicion existed to satisfy Fourth Amendment search standards. Bradley, 299 F.3d at 205. In order to succeed on their equal protection claims, plaintiffs must show both that defendants' actions had a discriminatory effect and that selection for a nonroutine search was motivated by a discriminatory purpose. Id.; Chavez, 251 F.3d at 635-36.

"To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." Chavez, 251 F.3d at 636. They may show they were treated differently than other similarly situated individuals either by naming such individuals or through the use of statistics. Id. Any statistical analysis that is used must be both relevant and reliable. Id. at 641.

-48-

As to specific similarly situated individuals there is no

magic formula for determining whether someone is
similarly situated.  This is due, seemingly, to
the essentially factual nature of the inquiry.
Different factors will be relevant for different
types of inquiries--it would be imprudent to turn
a common-sense inquiry into a complicated legal
one.  In determining who is similarly situated,
we have also been careful not to define the
requirement too narrowly.  <u>See, e.g.</u>, <u>Freeman v.</u>
<u>Madison Metro. Sch. Dist.</u>, 231 F.3d 374, 382-83
(7th Cir. 2000); <u>cf. Radue [v. Kimberly-Clark</u>
<u>Corp.]</u>, 219 F.3d [612,], 619 [(7th Cir. 2000)]
(noting that the similarly situated requirement
requires employees to demonstrate that they
shared "common features essential to a meaningful
comparison" to ensure that the employee who
received the more favorable treatment was
similarly situated).

<u>Chavez</u>, 251 F.3d at 636.  The fact that one similarly situated

person from the unprotected class was treated the same as a

plaintiff does not disprove discriminatory effect, <u>id.</u> at 637,

but one similarly situated person from the unprotected class who

was treated differently is enough to satisfy the discriminatory

effect requirement, <u>id.</u> at 637, 645.

As to discriminatory intent:

Plaintiffs must show that the "decisionmakers in
[their] case acted with discriminatory purpose."
<u>McCleskey v. Kemp</u>, 481 U.S. 279, 292 (1987);
<u>Nabozny v. Podlesny</u>, 92 F.3d 446, 453 (7th Cir.
1996).  "'Discriminatory purpose' ... implies
more than . . . intent as awareness of
consequences.  It implies that the decisionmaker
. . . selected or reaffirmed a particular course
of action at least in part 'because of' . . . its
adverse effects upon an identifiable group.'"
<u>McCleskey</u>, 481 U.S. at 298 (quoting <u>Pers. Adm'r</u>
<u>of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979));
<u>Hearne v. Bd. of Educ. of City of Chi.</u>, 185 F.3d
770, 776 (7th Cir. 1999) (same).

<u>Chavez</u>, 251 F.3d at 645.

Statistics alone generally will be insufficient to prove an intent to discriminate, but even if insufficient by themselves, the statistics combined with other evidence may be sufficiently probative of discriminatory intent.  <u>See</u> <u>id.</u> at 647-48; <u>EEOC v. O & G Spring & Wire Forms Specialty Co.</u>, 38 F.3d 872, 876 (7th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1198 (1995); <u>Anderson v. Cornejo</u>, 2001 WL 219639 *4 (March 6, 2001) ("<u>Anderson VI</u>").  Also, as to the damages claims presently before the court, any intentional discrimination that is shown must be linked to particular plaintiffs and defendants.  <u>See</u> <u>Chavez</u>, 251 F.3d at 647-48; <u>Anderson VIII</u>, 225 F. Supp. 2d at 860.

## B. MOTION TO STRIKE STATISTICAL EVIDENCE

Defendants move to strike the declaration of Whitman Soule, whose declaration contains quantitative information. Plaintiffs do not contend that Soule is a statistical expert. Instead, his declaration contains quantitative totals and summaries of data that were compiled from the raw records and data provided by defendants.  Soule does not attempt to statistically analyze the numbers that are provided.  Soule's declaration recites and summarizes the data and also explains corrections made to records in reaching the totals.  Soule does not state any conclusions or inferences that may be drawn from the data nor does he provide any statistical significance calculations.  Defendants move to strike on the ground that the data was not disclosed during the discovery and on the ground that the statistical information is not usable without expert testimony explaining it.

In February 1999, defendants served an interrogatory
seeking facts plaintiffs intended to introduce at trial to show
an equal protection violation, including, but not limited to,
statistics, statistical analysis, summaries, and persons who will
provide analyses or be witnesses. Plaintiffs objected that this
improperly asked for work product and was premature since
defendants had not yet provided the raw data. Without waiving
this objection, plaintiffs pointed to 1997 strip search data and
that, according to the IOILs, there was a lower success rate for
searches of African-American women. See Anderson VIII, 225 F.
Supp. 2d at 849. No mention was made of Soule or his data. On
the same date, defendants also requested reports, analyses, or
other documents of expert witnesses or investigators. Plaintiffs
objected that defendants were only entitled to reports of experts
who would be witnesses, not reports of investigators which would
be protected as work product. Defendants also requested
documents containing statistical analysis, summaries,
compilations, or raw data related to Count I. Plaintiffs
objected to that request on the grounds that the data would not
be available until the pretrial order is prepared and the raw
data was equally available to defendants to be compiled by them.
Plaintiffs nevertheless represented that no such statistical
documents existed at the time of their answer.

Defendants do not dispute that they have known since, at
least late 1999, that Soule has been acting as at least a
consultant for plaintiffs. A number of prior briefs filed by
plaintiffs have been supported by declarations of Soule. Data

-51-

presented in relation to the summary judgment motions ruled upon in Anderson VIII were supported by a declaration of Soule that is similar to his present declaration. There was no objection to that declaration. Cf. NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776, 786-87 (7th Cir. 2000). While plaintiffs should have supplemented their prior responses to interrogatories and document requests, it cannot be found that the present Soule declaration comes as a surprise. See Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003); Petit v. City of Chicago, 2002 WL 10481 *5 (N.D. Ill. Jan. 3, 2002). Moreover, defendants were granted an extension of time to file their reply brief which provided them with an opportunity to confer with their own statistical consultant before replying. Also, to the extent summary judgment is denied on the related claims, defendants will have further time to consider Soule's data prior to any actual trial. Cf. Petit v. City of Chicago, 1999 WL 66539 *1-2 (N.D. Ill. Feb. 8, 1999). Soule's declaration will not be stricken based on a failure to properly disclose Soule or the contents of his declaration during discovery.

Defendants' other objection is that the data contained in Soule's declaration should not be considered because it is not accompanied by testimony of a statistical expert. Plaintiffs do not contend that Soule is a statistical expert nor do they attempt to present any statistical evidence that requires an expert. Soule primarily compiled data from Customs Service records of individual searches that did not produce contraband,

that is, negative searches. He does not attempt to analyze the data nor did he perform anything more complicated than simple arithmetic. He categorized searches by type, race and gender of passenger, date, and searching officer. He added up the totals in various combinations of categories and provided the percentages. Such data does not require an expert to be presented. Stratton v. Department for Aging for the City of N.Y., 132 F.3d 869, 877 (2d Cir. 1997); Lott v. Westinghouse Savannah River Co., 200 F.R.D. 539, 546 (D.S.C. 2000). Whether this data shows anything about discriminatory effect or discriminatory intent is an issue distinct from admissibility. To the extent necessary, it will be considered below whether any of the statistical evidence is probative of discriminatory effect or intent.

The motion to strike Soule's declaration will be denied.

## C. EVIDENCE OF DISCRIMINATION

Plaintiffs point to various evidence which they contend would support a finding of discriminatory effect and/or discriminatory intent. Some of this evidence is the same or similar to the evidence that was presented in response to the Managerial Defendants' motion for summary judgment. See Anderson VIII, 225 F. Supp. 2d at 847-59.

### 1. DISCRIMINATORY EFFECT

#### a. Similarly Situated Individuals

First, based on a ruling during discovery, plaintiffs contend that defendants are estopped from denying that similarly situated non-African-American-women were treated more favorably.

Defendants repeatedly opposed plaintiffs' attempts to obtain the names and addresses of nonparty passengers, as well as plaintiffs' request to survey or interview such persons. See Anderson VI, 2001 WL 219639 at *2-3. The court eventually required that defendants provide the name, birth date, and address information for passengers listed in certain databases so that records for the same passengers could be correlated. Id. at *5, 6. Plaintiffs were not permitted to contact any of the nonparties because they never made a sufficient showing of need to contact any particular nonparty. See id. at *5-6. In reaching this conclusion, it was stated:

> Plaintiffs still have not identified any particular person that they desire to contact. Perhaps this is because they need the identifying information necessary for correlation before they can determine whom they would contact. Plaintiffs indicate that they would first attempt to survey the nonparties before determining specific persons from whom they would seek more detailed information. Plaintiffs contend they need to contact nonparties who are not African-American women ("comparables") to obtain further or more detailed evidence the comparables were treated more favorably. Plaintiffs give two examples of information they would solicit that does not already appear in the databases they have. One example is that there is evidence that some named plaintiffs were listed as having been subjected to standard patdowns even though the particular plaintiffs testified their searches were more intrusive. Plaintiffs want to question comparables to learn if their searches were more intrusive than listed in the databases. Such evidence, however, would be favorable to defendants, not plaintiffs. Since defendants have not sought such discovery, plaintiffs do not need to pursue this avenue to be able to rebut any evidence of defendants. The other example given is being able to ask White women whether they were asked to remove tampons during searches, as some of the named plaintiffs were asked. Again, this would be seeking evidence

> favorable to defendants. Defendants contend they
> followed a general policy of not making such
> requests and apparently no evidence has been
> produced that such a request was ever made of a
> White woman. Since defendants oppose the further
> discovery, they would be precluded from
> contending otherwise. Plaintiffs have not
> pointed to sufficient reasons supporting a need
> to survey, interview, or depose comparables.

Id. at *5.

Plaintiffs contend this paragraph implies that defendants are also estopped from contending there were not similarly situated comparables who were not subjected to searches. The ruling, however, is limited to the specific contentions mentioned in the text. Plaintiffs had access to the negative search database, which contained the IOILs for all international passengers subjected to personal searches. The IOILs state the purported ground for the search and the type of search conducted and consistently identifies the passenger's race, gender, and citizenship. See id. at *3. Plaintiffs also had the passenger targeting database, which listed PAU lookouts. See id. While race and gender was not necessarily in the latter database, inferences about gender could have been made from the passenger's name and inferences about race could have been drawn from addresses. Also, as to many, gender and race could have been determined from correlation with the negative search database or by interviewing following a showing of need. Plaintiffs had adequate data to find comparables. They also had data from which they could have made specific requests for interviews, but never

did. Defendants are not estopped from denying the existence of similarly situated passengers outside the protected class.

Plaintiffs provide evidence generally showing that, for each Summary Judgment Plaintiff's arriving flight, African-American women and African-Americans of both genders represented a small minority of passengers, yet they represented all or a substantially overrepresentative proportion of those selected from these flights to be sent to secondary. The problem with this evidence is that it generally is irrelevant to the claims presently at issue. If the claim being considered was the official capacity Count II injunctive relief claim, then the conduct of all Customs Service employees would be at issue. With the exceptions of the claims against Managerial Defendants Hoteko and Noonan, the claims presently at issue concern the direct involvement of the named defendants. With the exception of the three primary officer defendants and the three PAU defendants, none of the named defendants were involved in selecting a Summary Judgment Plaintiff for secondary. Even assuming a discriminatory effect is shown regarding each arriving flight, such a showing does not go to showing liability on the part of the searching officers, authorizing officers, and witnesses. As to defendants in those roles, a discriminatory effect must be shown by pointing to other similarly situated individuals whom these defendants encountered in secondary.

As to Belcastro's selection of Mendenhall for secondary, there is no evidence that Belcastro selected any person for secondary other than Mendenhall. On defendants' summary judgment

motion, it is assumed that Belcastro's dog did not alert to
Mendenhall.  Therefore, the only basis for Belcastro selecting
Mendenhall was that Mendenhall had been on a flight from Jamaica.
That would be true of all other passengers on Mendenhall's
flight.  Therefore, all the other passengers were similarly
situated.  While the evidence does not support how many of the
other passengers on the same flight were observed by Belcastro,
it is reasonable to infer that Belcastro observed at least one
other passenger who was not an African-American woman and did not
select that passenger for secondary.  Mendenhall has satisfied
the discriminatory effect requirement as regards Belcastro
selecting her for secondary.

During the pertinent time period, PAU lookout forms
contained blocks where the passenger's race and gender could be
placed.  Such information, however, generally was not available.
As to the four Summary Judgment Plaintiffs who were PAU lookouts,
only Absolam's lookout form lists her race and gender.  PAU
officers could make assumptions about race based on the person's
home address, which was generally available, as well as possibly
based on the person's name.  Assumptions about gender could also
be based on name.  There is no evidence presented, however, that
Allen, Price, or Milner had addresses that would have indicated
they were likely to be African-American.  There is also no
information as to why they were identified as PAU lookouts.
Without such information nor any specific information about other
passengers who were not African-American women and not listed as
PAU lookouts, it is not possible to find similarly situated

passengers who were treated more favorably than Allen, Price, and Milner.[27] There is also no statistical evidence regarding lookouts issued by the PAU defendants presently under consideration. The discriminatory effect requirement cannot be satisfied as to the claims of these three plaintiffs against the PAU officers involved in their searches.[28] Allen's and Price's Count I claims against Corona and Milner's Count I claim against Hall will be dismissed.

As to Absolam, the PAU lookout shows that Czech knew Absolam was an African-American woman. However, Absolam points to no other similarly situated person for whom Czech did not issue a lookout. There is no evidence of another person outside the protected class for whom Czech had some unsubstantiated information about possible gang affiliation. Absolam's Count I claim against Czech will be dismissed.

Hoteko was the Chief Inspector of Passenger Operations for the Port of Chicago from July 1995 until June 1999. Hoteko had managerial responsibility for and regularly met with Customs Inspectors and Supervisory Customs Inspectors. On the Managerial Defendants' motion for summary judgment, it was held that there was sufficient evidence to find Hoteko personally responsible for

---

[27]There is also no evidence as to whether all other passengers on the same flight are the appropriate group to compare. There is no evidence that one PAU officer considers possible lookouts for an entire flight. That is not the situation as to Absolam, whose PAU lookout was issued almost a year prior to her departing and return flights.

[28]Also, since it cannot be shown that the PAU officer knew these plaintiffs' race, a discriminatory animus cannot be shown.

encouraging race-conscious conduct resulting in increased searches of African-American women during a particular time period. See Anderson VIII, 225 F. Supp. 2d at 863. The remaining Count II damages claims against Hoteko are limited to searches occurring from May 25, 1997 through September 15, 1997. Id. at 863, 870. Since Absolam's and Jones's searches occurred outside this time period, they have no possible claim against Hoteko. Since Hoteko was responsible for the conduct of all Customs Inspectors, including those selecting passengers for secondary, the broader statistical evidence and evidence about other passengers on the same flight are pertinent to Allen's, Price's, Mendenhall's, and Milner's claims against Hoteko.

On Allen's and Price's arriving flight, there were at least 71 passengers of whom only three others were African-American.[29] Only three passengers were subjected to personal searches, with two of them, Allen and Price, being African-American women. The other was a White male. Allen and Price were searched based on having made a short trip to Jamaica. As to Allen, it was also considered that she looked nervous and, as to Price, it was also considered that she paid cash and had a new driver's license. Plaintiffs make no attempt to show that any of

---

[29]Plaintiffs complain that the Customs Service destroyed international flight declaration cards from which information about passengers' race and gender might have been indirectly derived. Plaintiffs contend they could have used this information to prove that each of their flights had few African-American women. Plaintiffs request that such an inference be drawn based on the destruction of the declaration cards. No such inference need be drawn. Plaintiffs' own testimony establishes the flights had few African-Americans, which would also mean few African-American women.

the other passengers on the flight satisfied similar criteria. However, it would not be unusual for others on the flight to have made short trips to Jamaica. Also, since these facts do not even support the some suspicion standard for conducting a patdown, they are not materially distinguishing facts. Cf. Chavez, 251 F.3d at 612. There is adequate proof of a similarly situated person outside the protected class as regards Allen's and Price's Count II claim against Hoteko. Similarly, Rocha questioned Allen and Price. There is no evidence as to who else on their flight that she questioned, but it may be inferred that she questioned at least some others, including those outside the protected class. For the same reasons, the similarly situated standard is satisfied as to Rocha selecting Allen and Price for secondary.[30]

Mendenhall was searched because she returned on a flight from Jamaica after a four-day trip. A substantial majority of the passengers on her flight were not African-American, and thus not African-American women. All passengers were on a flight from Jamaica and presumably some others were returning from short trips. In any event, as with Allen and Price, this is not a materially distinguishing fact because it would not support the some suspicion standard for a search. Also, a White woman was similarly situated to Mendenhall in that her IOIL also indicated a canine alert and high risk travel, yet that woman was not

---

[30]In any event, as is discussed in § VI(C)(1)(b)(i) infra, the discriminatory effect requirement is satisfied as regards Rocha being Price's searching officer and Rocha being Allen's witness.

subjected to a strip search. The similarly situated requirement is satisfied as to Mendenhall's Count II claim against Hoteko.

Milner was searched because she was on a flight from Jamaica, had purchased a ticket from Alpha Travel, and returned separately from a friend. All the other passengers on her flight were on a flight from Jamaica. There is no evidence of others on the flight who had purchased their tickets from Alpha. However, there is also no evidence that purchasing tickets from Alpha is a particularly incriminating fact that would support conducting a patdown or strip search. As with the other three, Milner has satisfied the similarly situated standard as to her Count II claim against Hoteko.[31]

Jones points to her traveling companions as similarly situated individuals, particularly Nisbet. However, Jones was referred to secondary by a nondefendant Immigration officer. None of the traveling companions were referred to secondary and thus are not similarly situated as to Jones's Count I claim against Diez and Banks.

None of the plaintiffs point to specific, similarly situated passengers outside the protected class who were examined in secondary by the same searching officer, had a search witnessed by the same witness, or had searches approved or not

---

[31]To the extent Reyther was also Milner's primary officer and questioned others on her flight, it could be found that Reyther treated others outside the protected class more favorably than Milner. In any event, as is discussed in § VI(C)(1)(b)(i) infra, the discriminatory effects requirement is satisfied as to Milner's Count I claim against Reyther in her capacity as Milner's searching officer.

approved by the same authorizing officer.  Therefore, as to the claims against searching officers, witnesses, and authorizing officers, the Summary Judgment Plaintiffs must rely on statistical evidence to show a discriminatory effect.

## b. Statistical Evidence

Plaintiffs provide statistics regarding searches in which each of remaining equal protection defendants were involved. Plaintiffs draw their statistics from the negative search database, which is derived from the IOILs.  The data used covered the time period from January 1, 1995 through March 25, 2000, when a new procedure was implemented.  The negative search database does not include all passengers referred to secondary.  It only includes passengers who were subjected to a personal search, that is those who were patted down (frisked), strip searched, or X-rayed.  It does not include those who were referred to secondary and only questioned or had their luggage searched.  Also, excluded from the negative search database are all those passengers who were referred to secondary, but for whom contraband was found.  Since, that represents a tiny portion of all those subjected to personal searches, their absence does not distort the data.[32]  However, since there is no evidence establishing the race/gender composition of all passengers referred to secondary (either as a whole or as to particular

---

[32]Defendants also complain that plaintiffs use inbound search data only.  That, however, is the type of searches at issue.  Searches of outbound passengers involve distinct smuggling and contraband issues and therefore are properly excluded from the statistics being used.

defendants), it cannot be established whether African-American women referred to secondary were disproportionately selected for patdown searches. Since passengers who are subjected to the more intrusive search of a strip search or X-Ray are first patted down, it can be determined whether African-American women are disproportionately selected for more intrusive searches once they are patted down.

Plaintiffs contend that it should be assumed that African-American women were disproportionately selected for secondary and patdowns because defendants did not preserve or provide the evidence from which they could have determined what percentage of international passengers or those referred to secondary were African-American women. Plaintiffs contend they could have indirectly obtained such information either from the declaration cards that were destroyed or the passenger arrival database. Neither source directly contained the information; plaintiffs would have had to extrapolate based on addresses and names and by surveying or otherwise contacting some of the passengers. The destruction of the declaration cards is irrelevant since plaintiffs contend they also could have similarly obtained the information from the passenger arrival database, which they received. Plaintiffs complain, however, that they were never permitted to contact any of those passengers. Plaintiffs, however, could have contacted the passengers if they had made an adequate showing. See Anderson VI, 2001 WL 219639 at *5-6. Plaintiffs, though , never

made such a showing prior to the close of discovery. Thus, the failure to have the information available cannot be blamed on defendants. This is not a situation in which an adverse inference may be drawn. Plaintiffs cannot provide adequate statistics to show a discriminatory effect of African-American women being selected for secondary or patdowns, either overall or as to specific defendants.

### i. Authorizing Officers, Searching Officers, and Witnesses

From the negative search database for January 1, 1995 through March 25, 2000, plaintiffs provide the following statistics regarding intrusive searches and defendants who were searching officers, authorizing officers, or witnesses.

As to negative personal searches in which Desmond was the authorizing officer, the percentage of those subjected to intrusive searches were: 15.3% (36/236) of African-American women; 4.6% (15/314) of White women; 0.5% (4/861) of White men; and 5.9% (20/341) of African-American men.

As to negative personal searches in which Banks was the authorizing officer, the percentage of those subjected to intrusive searches were: 16.5% (38/231) of African-American women; 2.7% (9/328) of White women; 0.75% (5/664) of White men; and 5.1% (13/255) of African-American men. When Banks acted as a witness, the percentages of those subjected to intrusive searches

were: 10.7% (3/28) of African-American women; 2.0% (1/49) of White women.[33]

As to negative personal searches in which Martinez was the searching officer, the percentage of those subjected to intrusive searches were: 11.1% (11/99) of African-American women and 2.8% (3/107) of White women.[34] When Martinez acted as a witness, the percentage of those subjected to intrusive searches were: 16.8% (17/101) of African-American women and 9.3% (10/108) of White women.

As to negative personal searches in which Rocha was the searching officer, the percentage of those subjected to intrusive searches were: 13.0% (12/92) of African-American women and 5.7% (4/70) of White women. When Rocha acted as a witness, the percentage of those subjected to intrusive searches were: 13.1% (8/61) of African-American women and 4.4% (5/113) of White women.

As to negative personal searches in which Diez was the searching officer, the percentage of those subjected to intrusive searches were: 13.3% (15/113) of African-American women and 3.2% (9/282) of White women.

As to negative personal searches in which Belcaster was the searching officer, the percentage of those subjected to

---

[33]Banks generally would not have witnessed males, particularly ones who were strip searched, though the records indicate she witnessed the personal searches of five males, none of whom were strip searched.

[34]Martinez generally would not have personally searched males, particularly ones who were stripped search, but she did pat down 2 White males and 1 African-American male, none of whom were subjected to an intrusive search.

intrusive searches were: 23.3% (7/30) of African-American women and 9.1% (5/55) of White women.

As to negative personal searches in which Reyther was the searching officer, the percentage of those subjected to intrusive searches were: 7.1% (2/28) of African-American women and 3.3% (2/61) of White women.

As to negative personal searches in which Zitowsky was the witness,[35] the percentage of those subjected to intrusive searches were: 16.7% (8/48) of African-American women and 6.1% (3/49) of White women.

With only one exception, African-American women are subjected to intrusive searches more than twice as often as the compared groups in each type of situation in which a defendant is involved.[36] Defendants contend the statistical evidence cannot satisfy the discriminatory effect requirement because no expert testimony is provided to show statistical significance. See Chavez, 251 F.3d at 642-43. While Chavez indicates in dictum that evidence of the statistical significance of statistical disparities would help support that the disparities are sufficient to support the discriminatory effect requirement, Chavez does not state that such evidence is required in order to show a discriminatory effect through statistics. See id.

_____

[35]No statistics are provided as to Zitowsky acting as the searching officer.

[36]The one exception is when Martinez acts as a witness, in which case African-American women are subjected to intrusive searches at 182% of the rate for which White women are subjected to intrusive searches.

Defendants do not point to any case with such a holding.  It is within the discretion of the district court (or the trier of fact depending on the posture of the case) to determine the validity and value of statistical evidence.  See O & G Spring, 38 F.3d at 876.

Most of the data for the individual searches involve a substantial number of searches and substantial disparities. Without doing an actual calculation, it would appear that statistical significance would exist for most, if not all, of the disparities recited above.[37]  It is noteworthy, however, that defendants retained a statistical expert who analyzed the data, but he presents no evidence that any of the statistical disparities for individual defendants lacks statistical significance.  See Stratton, 132 F.3d at 877 ("If defendants felt an expert witness would have helped clarify the charts, they could have called such a person to testify.").  It must be kept in mind that the discriminatory effect requirement is presently under consideration.  Whether the statistical disparity is sufficient to infer discriminatory intent is a separate issue that may require a stronger statistical showing if based on statistics alone.  See O & G Spring, 38 F.3d at 876 ("statistics, like any evidence, are not irrefutable:  strong statistics may prove a case on their own, while shaky statistics may be

_____

[37]The few exceptions involving less searches percentages are Banks as a witness, Belcaster, and Reyther, particularly Reyther where her having searched one less African-American women would have produced a lower intrusive search percentage than for White women.

insufficient unless accompanied by additional evidence").  As
defendants concede, at least as to searching officers, the data
pool is appropriate for comparison, the disparities are
substantial, and a pattern exists.  See Def. Reply at 22.  Even
without evidence of statistical significance, discriminatory
effect is adequately shown.

As to supervisors, defendants contend the data is
deficient because there is no data as to how often approval was
sought for intrusive searches.  Although defendants do not state
it, the implication is that searching officers are requesting
that a higher percentage of African-American women be searched
and that supervisors are only approving what is presented to
them, that is, the searching officers cause the effect, not the
supervisor.  For example, if searching officers request that 20%
of patted down African-American women be intrusively searched and
the supervisor approves 50% of those requests, statistics would
indicate the supervisor approved intrusively searching 10% of all
African-American women who were searched.  If the searching
officers request that 10% of White women be intrusively searched
and the supervisor also approves 50% of those requests,
statistics would indicate the supervisor approved intrusively
searching 5% of all White women who were searched.  Thus, the
type of statistics plaintiffs have presented would indicate the
supervisor approves intrusive searches for African-American women
at twice the rate of White women, that is 10% compared to 5%.
The actual approval rate by the supervisor, however, would be the
same for both African-American women and White women.  While the

analysis would have to be further refined to take into account that the supervisor may also be involved in approving the patdown and the possibility that the decision to consider an intrusive search may be more interactive than simply hierarchical, the point is well taken. Plaintiffs have not sufficiently shown the statistical effect of the supervisor's participation in the decision to conduct an intrusive search. The statistical evidence is insufficient to show a discriminatory effect in the conduct of authorizing officers Banks and Desmond.

Defendants also contend the data shows nothing as to the witnesses because witnesses do not decide whether to proceed from a patdown to a more intrusive search and thus could not be the cause of any effect that is shown. Evidence exists, however, that witnesses may intervene to prevent searches from proceeding further. Witnesses are involved in the process of deciding to proceed to an intrusive search.[38] The data as to witnesses is held to be sufficient to support a discriminatory effect regarding intrusive searches.

### ii. Hoteko

It has already been determined that, as to Hoteko and four of the Summary Judgment Plaintiffs, adequate evidence of similarly situated individuals that were treated more favorably has been presented to support the discriminatory effect requirement. See § VI(C)(1)(a) supra. However, the treatment of the similarly situated persons still must be causally linked to

---

[38]This would be particularly true of Banks who acted as a witness on some occasions, but also had supervisory authority.

Hoteko.  In <u>Anderson VIII</u>, 225 F. Supp. 2d at 863, it was held
that evidence was sufficient to link Hoteko to discriminatory
searches of African-American women during the May 25, 1997
through September 15, 1997 time period.  This was based on a
discussion Hoteko had at one of his regular meetings with Customs
Inspectors and their supervisors.  On May 24, 1997, four African-
American women traveling from Jamaica were found to have
narcotics, three of whom had the narcotics hidden internally and
one of whom had the narcotics hidden somewhere where the
narcotics were found during a strip search.  Plaintiffs presented
statistics supporting that personal searches of African-American
women increased during the aforementioned time period following
the May 24 seizures.  <u>See</u> <u>id.</u> at 852.

Defendants presently raise new questions regarding the
analysis of the May to September 1997 statistics.  They contend
that the increased searches of African-American women can be
explained by reasons other than directly targeting African-
American women.  Defendants contend that, for that time period,
there was an increased emphasis on targeting flights from
Jamaica.  They contend that the increased representation of
African-American women among those being searched is explained by
the purported fact that African-American women represent a higher
percentage of passengers on flights from Jamaica than on flights
from other destinations.

Defendants' contention fails for two reasons.  First,
there is no sufficient proof that African-American women make up
a higher percentage of passengers on flights from Jamaica.

Defendants present no direct proof of that proposition. Instead, they contend that the increased presence of African-American women on flights from Jamaica can be inferred from the fact that Jamaica's population is approximately 90.9% Black. There is, however, no evidence that Jamaican flights are primarily or substantially filled by Jamaican residents or Jamaican immigrants to the United States. Population data for Jamaica shows little regarding the percentage of Black passengers on flights from Jamaica. Cf. Chavez, 251 F.3d at 644 (minority population data from Census shows very little about the minority population of drivers on interstate highways). And even if racial data about Jamaica shows something about the race of those on flights from Jamaica, it would also have to be considered whether women and men of Jamaican origin have differences in how often they take flights from Jamaica.

Second, the data does not show that the search rates of African-American women did not change during the pertinent time period. The four Summary Judgment Plaintiffs that have claims within the specified time period were all on flights from Jamaica. Defendants' data[39] shows that, on flights to or from Jamaica, African-American women represented 15.6% of those searched prior to May 25, 1997; 34.9% of those searched from May 25 through September 25, 1997; and 20.8% of those searched after September 25, 1997. Thus, the evidence still supports an

---

[39]The data is slightly distorted by including searches on outbound flights. That data, however, represents a small portion of searches so it should not involve much distortion.

increased targeting of African-American women during the time period for which Hoteko is being held responsible.[40]  As to the Summary Judgment Plaintiffs who were on flights from Jamaica, there is certainly no basis for changing the Anderson VIII ruling regarding Hoteko.  An adequate link is shown as well as an adequate discriminatory effect.

### iii. Noonan

Noonan was the Passenger Service Representative from 1993 or 1994 through May 2000. Noonan's responsibilities included investigating passenger complaints regarding Customs Inspectors, including complaints of discrimination.  In ruling on the Managerial Defendants' motion for summary judgment, the following was stated regarding Noonan.

> [I]t must be assumed to be true that Noonan repeatedly failed to perform adequate investigations of the complaints of discrimination.  This is not a situation where Noonan failed to investigate one particular complaint or employee.  Instead, the facts before the court are that he repeatedly performed superficial and inadequate investigations.  While a reasonable trier of fact might find otherwise or that Noonan's conduct was only negligent, it can also be reasonably inferred that Noonan intentionally turned a blind eye to the possibility that Customs inspectors were engaging in discriminatory selection practices.  Moreover, the deficient investigations condoned and failed to discourage the discriminatory conduct that was occurring.  Further, if Noonan had acted properly, the discriminatory conduct of specific Customs inspectors may have been curtailed and it

---

[40]On flights to or from other destinations, searches of African-American women, as represented by a proportion of those searched, did decrease during the specified time period, but also thereafter as well.  Before May 25, 1997, it was 7.6%; May 25 through September 25, 1997, it was 6.6%; and after September 25, 1997, it was 5.6%.

is even possible that findings of discriminatory
conduct would have sooner led to implementation
of institutional reforms.  There is sufficient
evidence to find that Noonan acted with
deliberate indifference and therefore can be
liable for discriminatory searches of the named
plaintiffs.  Since Noonan was responsible for
investigating passenger complaints throughout the
time period of named plaintiffs' searches, none
of the Count II damages claims against Noonan
will be dismissed.  Any issues as to a causal
relationship between his conduct and the searches
of particular plaintiffs is not raised by the
pending motions.

Anderson VIII, 225 F. Supp. 2d at 862-63.  The issue is now

raised as to whether a causal relationship can be shown between

Noonan's conduct and the searches of any of the Summary Judgment

Plaintiffs.

Plaintiffs point to evidence purporting to show that

Noonan failed to investigate adequately particular complaints

regarding five of the defendants at issue.  As to complaints

involving Desmond and Banks as the authorizing officers, the

claim against Noonan must fail because plaintiffs cannot show a

discriminatory effect based on Desmond's and Banks's conduct as

authorizing officers.  This leaves two complaints that plaintiffs

rely upon.

One complaint is the May 28, 1997 verbal complaint by

named plaintiff Doris Chalk regarding a search in which Martinez

was the searching officer and Zitowsky was the witness.[41]

------

[41]Although plaintiffs do not refer to it in their brief,
Pl. Answer Brief at 49, their statement of fact and the pertinent
IOIL shows Corona was the PAU lookout.  In any event, for the
reasons stated in the text, this complaint does not link Noonan
to the conduct of any the defendants that were the subject of the

However, there is no evidence that Chalk complained to Noonan or that Noonan would have had any knowledge of verbal complaints that Chalk made to others. This evidence does not link Noonan to any discriminatory effect related to Martinez and Zitowsky.

The other complaint is an October 11, 1997 verbal complaint by named plaintiff Tonya Byrd-Brown regarding a search in which Rocha was the searching officer and Banks was the authorizing officer.[42] Byrd-Brown's testimony, however, is that she asked to talk to the supervisor and raised questions about the search with the supervisor (apparently Banks) and that the next day she tried to call the Customs Service but no one answered the telephone. Again, there is no evidence that Noonan had any knowledge of the complaint or incident. This evidence does not link Noonan to any discriminatory effect related to Rocha or Banks.

### iv. Summary

In sum, the discriminatory effect requirement is satisfied as to the Count I and Count II equal protection claims against the following defendants: (a) Allen's claims against Hoteko (managerial), Martinez (searching officer), and Rocha (witness/primary officer); (b) Price's claims against Hoteko (managerial), Rocha (searching officer/primary officer),

---

complaint.

[42]Although no discriminatory effect has been shown regarding Banks acting as an authorizing officer, a discriminatory effect has been shown regarding her conduct as a witness.

and Martinez (witness); (c) Jones's claims against Diez (searching officer) and Banks (witness/authorizing officer); (d) Mendenhall's claims against Hoteko (managerial), Belcaster (searching officer/primary officer), and Zitowsky (witness); and (e) Milner's claims against Hoteko (managerial) and Reyther (searching officer/primary officer). As to Hoteko and those in the role of primary officer, the equal protection claim may go to all aspects of being selected for a personal search. As to all others, the equal protection claim is limited to being subjected to a strip search. No evidence is provided regarding a discriminatory effect that would be pertinent to Absolam's Count I or Count II claim. Absolam's Count I and Count II claims will be dismissed in their entirety.

## 2. DISCRIMINATORY INTENT

Plaintiffs point to various evidence as proof of discriminatory intent. Defendants also point to one piece of evidence that they contend provides a nondiscriminatory explanation for at least some of the statistical disparity. Each type of evidence will be generally considered before discussing its application to the remaining equal protection defendants and plaintiffs.

As to Hoteko, it has previously been held that there is sufficient evidence to infer a discriminatory purpose on his part. See Anderson VIII, 225 F. Supp. 2d at 863. To the extent plaintiffs Allen, Price, Mendenhall, and/or Milner can show they were subjected to discriminatory treatment, their respective Count II claims against Hoteko will not be dismissed. The

discussion that follows will be limited to evidence that would relate to the searching officers, witnesses, and primary officers for whom an adequate showing of discriminatory effect has been shown.

### a. Statistical Evidence

Especially strong statistical proof may be sufficient to draw an inference of discriminatory intent, see McCleskey v. Kemp, 481 U.S. 279, 293 (1987); O & G Spring, 38 F.3d at 876, but only within limited contexts, see Chavez, 251 F.3d at 647. Plaintiffs contend that, at least as to certain defendants, the statistical evidence is, standing alone, compelling enough to draw an inference of discrimination. Two of the defendants to whom plaintiffs point, however, are authorizing officers Banks and Desmond. As discussed in § VI(C)(1)(b)(i) supra, that evidence is not even a sufficient basis for showing discriminatory effect. The other defendant that plaintiffs point to is Diez because she conducted intrusive searches on African-American women at over four times the rate for White women, 13.3% compared to 3.2%. But even if this disparity were, standing alone, otherwise sufficient to infer intent, such an inference would not be drawn absent expert evidence that the disparities were statistically significant. The statistics would not be found to be sufficiently strong without evidence of statistical significance.

The statistical evidence for each defendant must be considered along with the other available evidence.

### b. Purported Reasons for Searches

Plaintiffs cite employment discrimination cases applying the indirect method of proof. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-48 (2000); Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995). Relying on these cases, plaintiffs contend summary judgment should be denied if the stated grounds for searching can be shown to be pretextual.

In the employment discrimination context, proffered grounds for an adverse employment action can be shown to be pretextual by showing the unlawful criteria was a motivating factor in the employer's decision or by presenting a material factual dispute as to the sincerity of the proffered reasons. Freeman v. Madison Metropolitan School District, 231 F.3d 374, 379 (7th Cir. 2000); Collier, 66 F.3d at 892 (quoting Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992)). As to the latter, it must be shown (a) that the proffered reason had no basis in fact, (b) that the proffered reason did not actually motivate the decision, or (c) that the reason was an insufficient reason to motivate the adverse action. Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002); Freeman, 231 F.3d at 379; Collier, 66 F.3d at 892 (quoting Cliff v. Board of School Commissioners of City of Indianapolis, Ind., 42 F.3d 403, 412 (7th Cir. 1994)).

This rule from employment cases is not fully applicable to the present context. Anderson VIII, 225 F. Supp. 2d at 853. In the employment discrimination context, the employee must first present a prima facie case of discrimination from which a

discriminatory purpose may be inferred. Thus, when the employer's proffered reason is shown to be pretext, the original inference remains intact and summary judgment must be denied. See Reeves, 530 U.S. at 148; Anderson VIII, 225 F. Supp. 2d at 853. In the present context, proof of the pretextual nature of the grounds for a search may be a basis for inferring a discriminatory motive, see Reeves, 530 U.S. at 147-48, but is not necessarily, by itself, a basis for denying summary judgment.

Here, it must be recognized that only one officer involved in each search was the one responsible for completing the IOIL. Thus, any inference to be drawn from pretextual statements on the IOIL would apply only to that defendant. However, regardless of who completed the IOIL, generally as to both the searching officer and witness, some inference of discrimination could be drawn from the fact that a strip search was conducted even though reasonable suspicion did not exist.

Additionally, it must be recognized that, at the time of the searches, no suspicion was required to refer a passenger to secondary and search her luggage. The law was also unclear as to whether any suspicion was required to conduct a standard patdown search. See § IV(K)(1) supra. Therefore, any evidence regarding pretext goes most directly to showing discriminatory intent in conducting a strip search. However, to the extent the searching officer or witness was also the primary officer, it may be inferred that one who acted discriminatorily in deciding to conduct a strip search also acted discriminatorily in initially selecting the plaintiff for secondary.

### c. Employee Complaints of Discrimination

In August or September 1998, Customs Inspector Ray Smith complained that certain Customs Inspectors were discriminatorily targeting African-Americans for searches.[43]  Rocha was one of the Inspectors he complained about.  This evidence is not probative as to the claims presently before the court.  Cf. Anderson VIII, 225 F. Supp. at 855-56.  It is not evidence that discrimination actually occurred.  Neither is it relevant evidence that any of the Supervisory or Managerial Defendants failed to adequately follow up on a complaint of discrimination because the complaint occurred after the searches of the Summary Judgment Plaintiffs. In any event, no discriminatory effect was shown as to an authorizing officer and the equal protection claims against Managerial Defendants Hoteko and Noonan have already been resolved.  This evidence will not be considered in determining whether there is adequate evidence of discriminatory intent.

### d. Improper Oversight

Plaintiffs contend there was inadequate oversight of Customs Inspectors in that a supervisor's approval was not required for a patdown and supervisors did not always require they be adequately informed about the situation before approving an intrusive search.  It is unclear whether this is meant to be evidence of discriminatory intent by the Customs Inspectors or their supervisors.  If the latter, it need not be considered

---

[43]This evidence was also presented in response to the Managerial Defendants' summary judgment motion.  See Anderson VIII, 225 F. Supp. 2d at 855-56.

because such claims are otherwise being dismissed. As to the former, it is not understood how this would be probative of a discriminatory intent on the Inspector's part. This evidence will not be considered in determining whether there is adequate evidence of discriminatory intent.

### e. Training As To Women Travelers

At least one Customs Service training manual contained instructions to pay special attention to females. It also indicated that married women traveling without their husbands constitute high-risk passengers.[44] There is also evidence that employees were instructed to be wary of women traveling alone.

This evidence can only be relevant as regards the primary officer defendants who selected plaintiffs for secondary. It is not relevant to selecting passengers for strip searches since, with very limited exceptions, defendants only pat down women and thus only have women to further consider for strip searches. Any discrimination against African-American women at that point involves treating them less favorably than other women who have been patted down, that is, it is a question primarily of racial discrimination, not gender discrimination. As to those defendants who selected a primary defendant for secondary, there is no evidence that those defendants recall or follow this training. This evidence calls for only a very weak inference

---

[44]This evidence is described in greater detail in Anderson VIII, 225 F. Supp. 2d at 850-51. It is from a Revised April 1999 manual, but there is no contention that similar language did not exist in manuals in use when the defendants at issue were trained.

that the primary officer defendants were motivated by gender discrimination.

### f. PAU Process

This evidence is directed at the PAU officer defendants. Since discriminatory effect has not been shown as to any of those defendants, this evidence need not be considered. Also, it was previously held that no adverse inference can be drawn from the destruction of PAU records. See Anderson VIII, 225 F. Supp. 2d at 856.

### g. Passenger Complaints

Passenger complaints are not admissible evidence that discriminatory treatment actually occurred. This evidence will not be considered as against the remaining equal protection defendants.

### h. Cash Award Program

Plaintiffs contend a cash award incentive program provides an incentive to conduct improper searches. It was previously held that this evidence was insufficient to show that it unduly influenced Customs Inspectors to search without adequate suspicion. See Anderson VIII, 225 F. Supp. 2d 856-59. As to the issue presently being considered, plaintiffs do not explain how the incentives also encourage that African-American women be treated less favorably than other passengers. Moreover, plaintiffs make no attempt to link this program to any of the defendants presently being considered. This evidence will not be considered in determining whether there is adequate evidence of discriminatory intent.

### i. GAO Report

A March 2000 General Accounting Office report regarding targeting of passengers ("GAO Report") is discussed in Anderson VIII, 225 F. Supp. 2d at 848-49. The national statistics contained in that report showed a discriminatory effect in African-American women being subjected to intrusive searches. See id. The GAO Report did not provide statistics regarding whether African-American women were disproportionately selected for searches. See id. at 848 n.27. Plaintiffs do not explain how the GAO Report is relevant to the issue presently under consideration. It provides national statistics. The statistics previously discussed are the statistics pertinent to the defendants at issue. The GAO Report will not be considered in determining whether there is adequate evidence of discriminatory intent on the part of any specific defendant.

### j. Tampon Use

Defendants attempt to explain African-American women being disproportionately selected for strip searches on their purported greater use of sanitary pads as compared to White women. The contention is that a study shows that menstruating White women use tampons only at a higher rate than menstruating African-American women. This is claimed to result in African-American women being more likely to have a sanitary pad that might be viewed as suspicious during a patdown and prompt a strip search.

This evidence does not take away from plaintiffs' evidence of discriminatory intent. Defendants rely on Jordan

Finklestein & Alexander von Eye, "Sanitary Product Use by White, Black, and Mexican American Women," 105 Public Health Report 491 (Sept./Oct. 1990). The first problem is that the survey population was women of predominantly low socioeconomic background and the survey was conducted eight to ten years before the searches at issue. Women's tampon-using habits may change when they travel. Also, the socioeconomic background of women on international flights may be different than those in the survey and this may affect tampon use. Further, in light of changing information regarding tampon use and health and the aging of the existing population when toxic shock syndrome was more publicized, tampon use habits may have changed between 1988-89 and 1997-98. On defendants' summary judgment motion, it cannot be taken as true that this survey is representative of the tampon habits of women on international flights arriving at O'Hare in 1997 and 1998.

But even accepting the statistics in the report as being representative of the pertinent traveling population, it does not provide any significant nondiscriminatory explanation. The report states that 26% of White women of menstruating age use tampons alone while 16% of Black women of menstruating age use tampons alone.[45] Menstruating women, however, represent only a small portion of the traveling public. First, not all women who

---

[45]It is unclear if this means these women never use sanitary pads or if it means that they use tampons alone at some point during their periods, but may use sanitary pads at other points. It will be assumed that this means they never use sanitary pads.

travel are at the age of menstruation. Perhaps of greater impact, women generally menstruate three to five days out of a 28-day cycle. Thus, approximately 14% of women of menstruating age are actually menstruating on any particular day Of that 14%, the cited study indicates 84% of African-American women and 74% of White women would be using sanitary pads. While possible greater use of sanitary pads by African-American women may explain a small portion of their disproportionate selection for strip searches, it would not explain the substantial disparity (double and more) shown by the statistics regarding individual defendants. In any event, the underlying data is not even useful.

Defendants tampon-use evidence, particularly on their own motion for summary judgment where disputes must be resolved in plaintiffs' favor, provides no nondiscriminatory explanation of even a portion of the disproportionate searches of African-American women.

### k. Application to the Parties

As is discussed above, the only pertinent evidence regarding discriminatory intent is the statistical evidence, see §§ VI(C)(1)(b)(i), VI(C)(2)(a) supra, and the insufficient grounds for strip searches, see § VI(C)(2)(b) supra. As to the primary officers, there is also some weak evidence of training regarding women travelers. See § VI(C)(2)(e) supra.

### i. Allen

As to Allen, Rocha was the primary officer and witness and Martinez was the searching officer. Martinez apparently

completed the IOIL and included the false statement that Allen was wearing bulky clothes. The IOIL also falsely states that Allen was patted down and not strip searched. During the patdown, Martinez also falsely stated that she felt something. As is discussed above, Martinez clearly lacked a sufficient basis to strip search Allen. See §§ IV(B), V(B) supra. The negative search data shows Martinez conducted intrusive searches on 11.1% of African-American women, which is nearly four times her 2.8% rate for White women. The samples for both groups is approximately 100, so they are not too small of samples for comparison. There is adequate evidence to infer that Martinez stripped searched Allen, at least in part, because Allen is an African-American women.

As to Rocha, the evidence supports that Rocha was aware that Martinez's statement about feeling something was false. See § VI(I) supra. She also knew that the strip search clearly lacked an adequate basis. See id. The negative search data shows that, when Rocha is acting as a witness, African-American women are almost three times as likely to be searched as compared to White women (13.1% and 4.4%). The samples are of substantial size (60 and 113). It can be inferred that Rocha acted, at least in part, with a discriminatory intent both in selecting Allen for secondary and in witnessing her search without intervening to object to a strip search.

Additionally, it may also be considered that the search of Allen was conducted contemporaneously with the search of Price

in which Martinez and Rocha also acted discriminatorily.  <u>See</u>
§ VI(C)(2)(k)(ii) <u>infra</u>.

### ii. Price

As to Price, Rocha was the primary and searching officer
and Martinez was the witness.  Rocha apparently completed the
IOIL and included the false statements that Allen was wearing
loose fitting clothes, cried, and had kid<u>s</u>.  During the patdown,
Rocha also falsely stated that she felt something.  As is
discussed above, Rocha clearly lacked a sufficient basis to strip
search Allen.  <u>See</u> §§ IV(C), V(B) <u>supra</u>.  The negative search
data shows Rocha conducted intrusive searches on 13.0% of
African-American women, which is over twice her 5.7% rate for
White women.  The samples for both groups is substantial (92 and
70), so they are not too small of samples for comparison.  There
is adequate evidence to infer that Rocha selected Price for
secondary and stripped searched her, at least in part, because
Price is an African-American women.

As to Martinez, the evidence supports that Martinez was
aware that Rocha's statement about feeling something was false.
<u>See</u> § VI(I) <u>supra</u>.  Martinez also knew that the strip search
clearly lacked an adequate basis.  <u>See</u> <u>id.</u>  The negative search
data shows that, when Martinez is acting as a witness, African-
American women are 82% more likely to be searched as compared to
White women (16.8% and 9.3%).  The sample sizes are both over
100.  It can be inferred that Martinez acted, at least in part,
with a discriminatory intent when she witnessed Allen's search
without intervening to object to a strip search.

Additionally, it may also be considered that the search of Price was conducted contemporaneously with the search of Allen in which Rocha and Martinez also acted discriminatorily. See § VI(C)(2)(k)(i) supra.

**iii. Jones**

As to Jones, Diez was the searching officer and Banks was the witness. Unlike Allen and Price, the search explanation on the IOIL, which apparently was written by Diez, did not contain false information. See § III(D) supra. Also, in Jones's case, grounds for searching her were not clearly lacking. See §§ IV(E), V(B) supra. There is no additional evidence, when considered along with the statistical evidence,[46] that would be sufficient to infer a discriminatory intent on the part of Diez and Banks. Jones's Count I and Count II claims will be dismissed in their entirety.

**iv. Mendenhall**

As to Mendenhall, possible equal protection claims still remain pending as against Belcastro as the primary and searching officer and Zitowsky as the witness. Belcastro apparently completed the IOIL and included the false statement that there had been a canine alert. Both Belcastro and Zitowsky were aware that the necessary suspicion for a strip search was clearly lacking. See §§ IV(F), IV(I), V(B) supra. Belcastro was more than twice as likely to conduct intrusive searches of African-

[46]As to the statistical evidence regarding Banks acting as a witness, it is also noted that the sample sizes may be too small to draw a reasonable inference from the disparity that existed (3/28 and 1/49).

American women as compared to White women (23.3% and 9.1%), though the sample sizes are somewhat small (30 and 55). While that may still be large enough for statistical significance, that cannot be determined without expert testimony. When Zitowsky witnessed a search, African-American women were close to three times as likely as White women to be strip searched (16.7% and 6.1%). The amount of disparity and sample sizes (48 and 49) are probably sufficient. Since Belcastro's search involved a false statement on the IOIL in addition to the lack of adequate suspicion for a strip search, a reasonable finder of fact could find that the statistical evidence viewed with the additional evidence is enough to find that Belcastro acted, at least in part, because Mendenhall is an African-American woman. As to Zitowsky, although she did not make the false statement, the statistical evidence is stronger. It is also a reasonable inference that Zitowsky acted, at least in part, because Mendenhall is an African-American woman.

### v. Milner

As to Milner, possible equal protection claims still remain pending as against Reyther as the primary and searching officer. Milner's IOIL, which apparently was completed by Reyther, does not state false reasons for her search, but does falsely state that she was patted down, but not strip searched. Adequate suspicion for a strip search was clearly lacking. See §§ IV(G), V(B) supra. The negative search data shows that Reyther was more than twice as likely to conduct an intrusive search of an African-American woman as compared to a White women

(7.1% and 3.3%).  However, the sample sizes are small enough
(2/28 and 2/61) that one less intrusive search of an African-
American woman or one more intrusive search of a White women
would substantially change the disparity.  The evidence before
the court is insufficient to draw an inference of discriminatory
intent.  Milner's Count I and Count II claims will be dismissed
in their entirety.

### VII.  CONCLUSION

For the foregoing reasons, defendants motion to strike
will be denied and their motion for summary judgment will be
granted in part and denied in part.  As to the Counts I, II, III,
V, and VI claims of the six Summary Judgment Plaintiffs, the
rulings are summarized as follows.  As to Count I and II, the
claims of Absolam, Jones, and Milner are dismissed in their
entirety.  Allen's and Price's Count I claims against Desmond and
Corona are dismissed, but remain pending as against Rocha and
Martinez.  Mendenhall's Count I claim is dismissed as against
Banks, but remains pending as against Belcastro and Zitowsky.
Allen's, Price's, and Mendenhall's Count II claims are dismissed
as to Noonan, but remain pending as against Hoteko.  As to Counts
III and VI, Absolam's and Jones's damages claims are dismissed in
their entirety.  As to Counts III and VI, Allen's, Price's,
Mendenhall's, and Milner's claims remain pending as to all
identified defendants except that all claims against a PAU
officer (Corona for Allen and Price, Hall for Milner) are

dismissed.[47]  As to the Count V claim of each Summary Judgment Plaintiff, all such claims remain pending except that Absolam's claim is dismissed in its entirety and Milner's claims is dismissed to the extent it is based on a patdown search but not to the extent it is based on a strip search.

A status hearing will be held on October 1, 2003 at 11:30 a.m. at which the parties shall report on the possibility of resolving remaining claims in light of today's ruling, with the possible assistance of the assigned magistrate judge.

IT IS THEREFORE ORDERED that defendants' motion to strike [380-1] is denied.  Defendants' motion for summary judgment [413-1] is granted in part and denied in part.  Plaintiff Michelle Absolam's Count I, II, III (damages), V, and VI (damages) claims are dismissed.  Plaintiff Adunni Allen's Count I claim against Desmond and Corona, Count II claim against Noonan, and Count III and VI claims against Corona are dismissed. Plaintiff Jacqueline Jones's Count I, II, III (damages), and VI (damages) claims are dismissed.  Plaintiff Yvette Price's Count I claim against Desmond and Corona, Count II claim against Noonan, and Count III and VI claims against Corona are dismissed. Plaintiff Ruby Mendenhall's Count I claim against Banks and Count II claim against Noonan are dismissed.  Plaintiff Katherine Milner's Count I and II claims, Count III and VI claims against

_____

[47]The damages claims aspects of Counts III and VI that were previously dismissed on qualified immunity grounds remain dismissed.

Hall, and Count V claim to the extent based on a patdown search
are dismissed.   Status hearing will be held on October 1, 2003 at
11:30 a.m.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED:   SEPTEMBER  4 , 2003