In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-2234 & 02-2248

SHARON ANDERSON, et al.,

                                            *Plaintiffs-Appellees*,

v.

MARIO CORNEJO, et al.,

                                            *Defendants*.

Appeals of:

SERGEI HOTEKO, PATRICK NOONAN,
and ROBERT TROTTER

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 97 C 7556—William T. Hart, *Judge*.

ARGUED SEPTEMBER 9, 2003—DECIDED JANUARY 21, 2004

Before CUDAHY, EASTERBROOK, and RIPPLE, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Three of the defendants in this *Bivens* action have taken interlocutory appeals, contending that they are entitled to qualified immunity. The plaintiffs are 90 American citizens who were searched at O'Hare Airport between March 1996 and August 1999 when reentering this country after foreign travel. They

contend that Customs personnel chose them for non-routine searches (pat-downs, strip searches, x-ray inspections, or body-cavity searches) because of their race and sex (the plaintiffs are black women) rather than because of reasonable suspicion that they were violating the law. None of the searches detected any contraband in the plaintiffs' possession. What is more, plaintiffs contend, inspectors were more likely to act on suspicion with respect to black women than with respect to black men, white women, or any other combination of attributes. The selection practices at O'Hare between 1995 and 1999 (the period covered by the complaint) thus violate the equal protection component of the fifth amendment's due process clause, plaintiffs maintain. Appellants were managers and did not target any of the plaintiffs for search or perform any of those searches. Their argument starts from the rule that there is no vicarious liability in *Bivens* litigation, which means that they may be held liable only for their own conduct—and none of that conduct would have alerted a reasonable person to the risk of liability, appellants contend. If that is so, then they are entitled to immunity. See, e.g., *Saucier v. Katz*, 533 U.S. 194 (2001); *Anderson v. Creighton*, 483 U.S. 635 (1987). But the district court denied their motion for summary judgment, see 225 F. Supp. 2d 834 (N.D. Ill. 2002), leading to these appeals. See *Behrens v. Pelletier*, 516 U.S. 299 (1996).

Because the first issue when a defendant invokes immunity is whether the conduct alleged in the complaint violates the Constitution, see *Saucier*, 533 U.S. at 201, appellants also ask us to determine whether plaintiffs have a good claim against them. Plaintiffs see this as an opening, because *Saucier* did not reconcile its merits-first approach with the holding of *Johnson v. Jones*, 515 U.S. 304 (1995), that a court of appeals lacks jurisdiction to consider a challenge to the quality of the plaintiffs' proof. The district court must consider the merits first, but a court of

appeals must stick to immunity, the argument goes. Yet *Saucier* described an evaluation of the merits as part of the appellate task.

Resolution of this problem starts with separating factual and legal components of the claim for relief. "We didn't do it" may be a good defense, but it is unrelated to immunity (a doctrine designed to protect public officials from the effects of guessing wrong in a world of legal uncertainty) and thus, *Johnson* held, not a proper ground of interlocutory appeal. *Johnson* precludes the managerial defendants from denying that the line inspectors used race and sex as selection criteria. Plaintiffs believe that, if we must assume that racial discrimination occurred on defendants' watch, and they did nothing to stop it, there could be no point to the appeal. We should just let the case proceed to trial. Recognizing the force of *Johnson*, the managers concede (for purpose of the appeal only) that some line inspectors at O'Hare behaved unconstitutionally, and they further concede (again *arguendo*) that they did not lift a finger to rectify the problem. There remains a *bona fide* question about legal doctrine, and thus about immunity: would reasonable persons, knowing what the managers knew (or were bound to learn), have recognized that the Constitution required them to intervene? We may address that question without transgressing *Johnson*, and as in *Saucier* may give either of two answers: first, that taking all evidence in the light most favorable to the plaintiffs there was no requirement to act; or, second, that there is such a requirement but that a reasonable person would not have understood at the time that the law required this. Thus it is possible, consistent with *Johnson*, to cover the question whether the plaintiffs have a good legal theory as well as the immunity defense; but, as *Johnson* and *Saucier* hold, see 533 U.S. at 201, this must be done by taking the evidence and reasonable inferences in plaintiffs' favor. (Lest plaintiffs think that we have overlooked one of their

principal arguments, we add that the managers' *arguendo* concession that discrimination occurred does not waive any of the contentions they present on appeal; the concession is required not only by *Johnson* but also by the rule that a party opposing a motion for summary judgment receives the benefit of all reasonable inferences about disputed material issues of fact.)

Application of this normal summary-judgment standard does not mean, however, that all evidence is equally helpful to the plaintiffs. Plaintiffs point to data collected by the General Accounting Office and described in its report *U.S. Customs Service: Better Targeting of Airline Passengers for Personal Searches Could Produce Better Results* (2000). They submit that these data show systematic constitutional violations by the Customs Service—the sort of violations that managers must know about and act to prevent. The district judge wrote that "Black women were . . . the racial/gender group of United States citizens most likely to be X-rayed (6.4%), a rate more than 8 times that of White women (0.73%) and almost 12 times that of White men (0.53%), as well as 39% higher than Black men (4.6%)." 225 F. Supp. 2d at 848. There were disparities by race, ethnicity, and sex in selection for other kinds of non-routine searches as well. Yet higher search rates for black women were not matched by better results (implying that they were not justified by reasonable suspicion in proportion to the rate of search): "Of those Black women that were strip searched, contraband was found on 27.6% of them, which is a higher positive rate than for White men (25.1%) and White women (19.5%), but a substantially lower positive rate than for Black men (61.6%), Hispanic men (58.8%), and Hispanic women (45.7%)." *Id.* at 848-49. The implication is that Customs inspectors searched black women with less by way of suspicion than they required before they would search Hispanics or black men (though black women seem to have been treated similarly to both white men and white women).

These and similar data from the GAO's report do not support any constitutional claim against the appellant managers, for at least four reasons. First, the report was not published until March 2000, while the last search contested in this litigation occurred in August 1999. (During May 1999 the Customs Service announced a review of its criteria for conducing non-routine inspections; plaintiffs do not contest the policy that was implemented as a result of this process.) Plaintiffs do not contend that the Customs Service had any equivalent compilations in its possession earlier, and there was accordingly no reason for the managers to know these statistics in time to have done plaintiffs any good. See 225 F. Supp. 2d at 860. The Constitution does not require prescience. Second, the GAO's data are national, aggregate information; it is not possible to use the published report to learn what happened at O'Hare. Third, the report's principal finding is that very few arriving passengers were subject to non-routine searches. Of approximately 140,000,000 passengers arriving at U.S. airports from abroad during 1997 and 1998, only 102,000 were subjected to any kind of personal search. *Better Targeting* at 9. Almost all black women, like almost all other passengers, were admitted without any search. The GAO did not discuss how the Customs Service selected the 102,000 from the 140 million; for all these data reveal, black women were *underselected* for search compared with other groups. The data to which the district court pointed—the 6.4%, 0.73%, and so on, are the *kinds* of searches experienced by the 102,000. *All* of those 102,000 experienced *some* non-routine search. That there were differences in precisely which kind of search was used for which members of the group does not help us with the principal issue in this case: were race and sex (as opposed to reasonable suspicion of wrongdoing) used to select, from among the 140 million, the 102,000 to be searched? The GAO's report sheds no light on that subject.

Fourth, these statistics show disparate impact, not disparate treatment, and the equal protection guarantee is concerned only with the latter. See *Washington v. Davis*, 426 U.S. 229 (1976). Differences in the sorts of search carried out could stem from differences in the arriving passengers' origins, itineraries, and other matters unrelated to race or sex. And even disparities that cannot be chalked up to random variance may have causes other than race, sex, or another proscribed ground of decision. That's the point of decisions such as *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), which held that a veterans'-preference program that bestowed 97% of its benefits on men could not be condemned as sex discrimination. Plaintiffs in *Feeney* had argued that because people intend the natural and probable consequences of their acts, to *know* that a program disfavors women is to *intend* to disfavor women. The Supreme Court disagreed; it held, instead, that "intent" (and thus disparate treatment) in constitutional law means doing something because of, rather than in spite of (or with indifference to), the prohibited characteristic. 442 U.S. at 279. Veterans'-preference programs are deferred compensation to veterans, compensation afforded in spite of its adverse effect on women, not because of that effect; hence these programs do not violate the Constitution, the Court held in *Feeney*. Similarly, the knowledge of prosecutors (and judges) that most defendants in crack-cocaine cases are black does not establish discrimination. To make out even a *prima facie* case of discrimination, the Court has held, a litigant must show that prosecutors are failing to bring charges against white crack peddlers similarly situated to the actual defendants. See *United States v. Bass*, 536 U.S. 862 (2002); *United States v. Armstrong*, 517 U.S. 456 (1996). Thus searches designed to catch smugglers comport with the Constitution even if they produce a disparate impact. See also *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir.

2001) (rejecting a claim that a statistical disparity in traffic stops is enough by itself to establish racial profiling).

Data from the GAO's report do not imply that Customs officials are searching black women (or any other group) but not similarly-situated passengers in other groups. The report's outcome-by-group tables—we gave one example above, concerning the success rate of strip searches—show that Customs officials search black women with (on average) the same degree of suspicion that leads them to search white women or white men. A 27.6% success rate for a particular kind of border search is not to be sneezed at. It may imply that the Customs officials are conducting too few searches, not too many. (The GAO recommended that the Customs Service increase the number of searches in high-success-rate categories.) Other searches, with far lower rates of success, have been held constitutional. See, e.g., *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (0.12% success rate); *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990) (1.6% success rate). If about 0.1% of black women returning from foreign travel are smuggling, and the agents select so carefully that 28% of those searched are caught with contraband, where's the beef? What this principally means is that many others who could have been searched (say, those with a 10% chance) are being admitted to the country without any extra attention. That the success rate for strip searches of black men is lower could mean that they were easier to catch. That is to say, perhaps there were inframarginal black men whose smuggling was more obvious and therefore was detected by pat-down searches. Then even if, at the margin, black men and women stopped for non-routine inspection were equally likely to be mules, the success rate for black women subjected to the more intrusive searches would be higher, without implying sex discrimination, because the higher-probability black men had already been

caught. The same analysis may apply to differences in success rate across racial and ethnic groups. Thus differences in success rate do not necessarily show even disparate impact. See Jeff Dominitz, *How Do the Laws of Probability Constrain Legislative and Judicial Efforts to Stop Racial Profiling?*, 5 Am. L. & Econ. Rev. 412 (2003).

Because the data in the GAO's report do not imply that any of the defendants engaged in (or had knowledge of) discrimination based on race or sex, we must analyze separately what each of the three appellants may have known or done. Robert Trotter is the first. Between June 1997 and February 1999, Trotter was the Assistant Commissioner of Field Operations. Based in Washington, D.C., Trotter reported directly to the Commissioner of Customs. The district court granted summary judgment in Trotter's favor except for claims raised by any plaintiff strip searched after July 21, 1998. On that date Trotter received an email message from Garrett Fee, his immediate subordinate (with responsibility for the Midwest, including O'Hare Airport), telling him that Senator Carol Mosley Braun had scheduled, and then cancelled, a meeting to discuss passenger-search practices at O'Hare. That email, which noted that 54 black women arriving from Jamaica had been searched during 1997, should have led Trotter to inquire whether searches had been based on race or sex, the district court thought. We need not decide whether this is a good constitutional theory, because plaintiffs' appellate brief abandons the suit against Trotter: "Only one plaintiff was strip searched after July 21, 1998 and plaintiffs have decided not to challenge the appeal from the denial of immunity for strip searches after July 21, 1998." Brief 1 n. 1. We read this as a promise to dismiss the complaint with respect to Trotter, and on that understanding we need not consider the substance of his arguments.

Sergei Hoteko, the second appellant, was Chief Inspector of Passenger Operations for the Port of Chicago between July 1995 and June 1999. On May 24, 1997, five passengers arriving from Jamaica (four of them black women) were found to be carrying concealed drugs on (or in) their persons. During the ensuing four months, black women arriving from Jamaica were subject to non-routine searches more frequently. Between January 1995 and May 14, 1997, about 9.5% of all strip searches at O'Hare were of black women; that figure rose to 16.2% between May 15 and September 15, 1997, and fell to 8.7% for September 16, 1997, through April 2000. The district court concluded that this four-month peak violated the Constitution and that a reasonable jury might think Hoteko responsible for it. 225 F. Supp. 2d at 851-52, 863. Hoteko held weekly meetings with O'Hare's customs inspectors and their supervisors. Plaintiffs surmise (and the district judge agreed) that the inspectors may have informed Hoteko at one of these meetings about the successful searches of passengers from Jamaica, and that Hoteko then may have urged them to conduct more. So far as we can see, there is no evidence to support either proposition.

Perhaps *Johnson v. Jones* precludes a close search of the record to find out just what Hoteko knew and what he told his subordinates to do. It does not, however, preclude a strictly legal ruling: That urging inspectors to conduct more of a kind of search that has been successful does not violate the Constitution. Plaintiffs do not contend that Hoteko told any inspector to single out black women. They contend, rather, that Hoteko and other persons at the meeting would have discussed multiple characteristics of the five persons caught smuggling on May 24, 1997: race; sex; age; occupation; origin of travel; length of stay; explanation for trip; number, timing, and destination of other international journeys; how and when the tickets were

purchased; and other details. Nothing in this episode suggests that anyone was selected because of race or sex, as opposed to reasonable suspicion that smuggling was ongoing. Plaintiffs have offered no statistical analysis of the data; for all we know (and for all Hoteko could have known), race and sex played no explanatory role. These attributes may have been correlated with others that are in turn linked to the probability of finding contraband. As we have pointed out, disparate impact does not imply disparate treatment, and plaintiffs have offered nothing to show that Hoteko knew about, or urged anyone to practice, disparate treatment. This evidence therefore would not allow a reasonable jury to conclude that Hoteko sponsored, encouraged, or failed to stop, disparate treatment of arriving passengers. Plaintiffs' contention that Hoteko attended other meetings at which the race and sex of persons searched was discussed adds nothing; *Bass*, *Armstrong*, and *Feeney* show that knowledge of disparate impact (if that can be imputed to Hoteko) is not knowledge of, let alone support for, disparate treatment.

Plaintiffs tell us that Hoteko "paid no attention to the efficacy of Customs searches" (Br. 14), which goes far to demonstrate that he cannot have engaged in disparate treatment of black women. According to plaintiffs, however, what this shows is that Hoteko "turned a blind eye" toward the problem and thus became liable. Opinions often say that averting one's eyes for fear of what one would see is a form of knowledge, e.g., *United States v. Ramsey*, 785 F.2d 184 (7th Cir. 1986), but lest this turn negligence into intent it is important to emphasize the "fear" part of the formula: The ostrich must know that there is danger, before an inference of intent may be drawn. See, e.g., *United States v. Giovannetti*, 919 F.2d 1223 (7th Cir. 1990). What plaintiffs allege, and what the district court found that the record could support, is that Hoteko was ignorant; but

there is no reason to think that he suspected that the inspectors were engaged in race or sex discrimination and then tried to shield himself from guilty knowledge. Without that level of suspicion, there can be no *deliberate* ignorance and no imputation of knowledge.

Hoteko supervised Patrick Noonan, the third appellant. Noonan, the Passenger Service Representative at O'Hare Airport, was in charge of the large staff of inspectors who dealt with arriving passengers. The district court concluded that Noonan could be culpable for failing to act on complaints from arriving passengers alleging that inspectors engaged in discrimination. See 225 F. Supp. 2d at 853-55, 862-63. About 3 million passengers arrive at O'Hare each year from foreign nations; of these, about 30,000 are selected for secondary screening, and a tenth of that number to personal searches. Between December 1996 and February 1999, when approximately 70,000 persons were referred to secondary screening, 12 filed written complaints asserting that an inspector had engaged in racial discrimination. Noonan's job includes responding to such complaints from passengers. As the judge saw things, the record would permit a jury to find that Noonan "repeatedly performed superficial and inadequate investigations." 225 F. Supp. 2d at 862. Most of these 12 complaints asserted that the inspectors had discriminated against black passengers, a charge that the district judge found unsupported by evidence (it was black women, not all blacks, who were searched disproportionately often). *Ibid.* Nonetheless, the judge held, "if Noonan had acted properly, the discriminatory conduct of specific Customs inspectors may have been curtailed and it is even possible that findings of discriminatory conduct would have sooner led to the implementation of institutional reforms." *Ibid.*

We may assume, as the district court concluded, that Noonan "repeatedly performed superficial and inadequate

investigations." Yet, as the district judge recognized, few of the 12 complaints alleged the combination of race and sex discrimination that concerns plaintiffs. This makes it impossible to task Noonan with deliberate indifference toward the complained-of discrimination. "Deliberate indifference" means subjective awareness. See *Farmer v. Brennan*, 511 U.S. 825 (1994). It is not enough, the Court held in *Farmer*, that the public official *ought* to have recognized the problem. Instead, "the official must both be aware of facts from which the inference could be drawn that [there is] a substantial risk of [a constitutional shortcoming], and he must also draw the inference." *Id.* at 837. The district court did not apply this standard to Noonan's conduct, and our independent review (applying *Saucier*'s merits-first approach) leads to the conclusion that the record does not demonstrate that, by failing to investigate a handful of complaints competently, Noonan displayed deliberate indifference to the sort of discrimination alleged here. This record evinces nothing more than negligence.

What we have said so far covers the district court's explanation for keeping Noonan and Hoteko in the case. Plaintiffs have all but abandoned the district judge's rulings concerning Hoteko, however. Instead of defending the ground on which they prevailed, plaintiffs offer a number of arguments that were presented to, and rejected by, the district court. They are entitled to do so; any argument presented to the district court may be urged in support of the judgment without need to take a cross-appeal. See *Massachusetts Mutual Insurance Co. v. Ludwig*, 426 U.S. 479 (1976). Plaintiffs contend, for example, that, as Noonan's supervisor, Hoteko is charged with the information that Noonan should have procured by better investigation. This is a request for vicarious liability, which is not allowed; at all events, our decision in Noonan's favor redounds to Hoteko's benefit as well. Plaintiffs assert that

Hoteko knew even apart from the events of May 24, 1997, that black women were being searched in disproportionate numbers; once again, however, knowledge of disparate impact is not knowledge of disparate treatment. According to plaintiffs, one line inspector had complained to Hoteko that others were discriminating. Hoteko referred this complaint to an internal investigator, who determined that it was unfounded. The district court sensibly concluded that the incident cannot be relied on to show that Hoteko knew about, or was culpable for, inspectors' discrimination. 225 F. Supp. 2d at 855-56. Likewise the district judge rejected plaintiffs' contention that Hoteko may be treated as a discriminator because he testified by deposition (allegedly incorrectly) that certain data were not compiled into tabular form until 1998, and that he therefore lacked access to them. *Id.* at 853. None of these circumstances, individually or collectively, justifies a departure from the norm that there is no vicarious liability in *Bivens* cases. There may well have been race or sex discrimination at O'Hare Airport, but the managerial defendants are not liable on account of discrimination practiced by the line inspectors.

The decision of the district court with respect to Hoteko and Noonan is reversed. The decision with respect to Trotter is vacated, and the matter is remanded so that the plaintiffs may dismiss their complaint with respect to him.

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—1-21-04